1　CHARLES L. HASTINGS　SBN 88599
2　NATALI A. RON　SBN 302927
　　PMB#270, 4719 Quail Lakes Drive, Suite G
3　Stockton, California 95207
　　Telephone: (209) 476-1010
4　Facsimile: (209) 952-7854
　　chastings@hastingslawoffice.com
5
6　Attorneys for Petitioning Creditors

7

8　　　　　　　**UNITED STATES BANKRUPTCY COURT**

9　　　　　　　**EASTERN DISTRICT OF CALIFORNIA**

10
　　In re:　　　　　　　　　　　　│　Case No.: 22-22056
11　　　　　　　　　　　　　　　　│　Chapter 7
　　DAVE R. MICHAL　　　　　　　│　DCN: DBL-2
12
13　　　　Involuntary Debtor.　　　│　EXHIBITS

14　　　　　　　　　　　　　　　　│　Date:　October 3, 2022
15　　　　　　　　　　　　　　　　│　Time:　9:00 a.m.
　　　　　　　　　　　　　　　　　│　The Honorable Fredrick E. Clement
16　　　　　　　　　　　　　　　　│　Courtroom 28, Department A

17

18

19　　　Exhibit 1　　Declaration of David R. Michal dated June 9, 2022

20　　　Exhibit 2　　Deed of Trust on Murchison Building

21　　　Exhibit 3　　Envelope

22　　　Exhibit 4　　Shasta County Superior Court Judgment

23

24

25

26

27

28

# EXHIBIT 1

Aaron W. Moore, State Bar No.: 248566
Collin M. Bogener, State Bar No.: 272560
Michael L. Ricks, Jr., State Bar No.: 314687
**MOORE & BOGENER, INC.**
1600 West Street
Redding, California 96001
(530) 605-0355 / 605-3693 (fax)

Attorney(s) for Defendant
DAVID R. MICHAL

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SHASTA

| | |
|---|---|
| **MARSHAL MELTON, WEST BAY PARTNERS, LLC, INVESTMENT PARTNERS FUND I, LLC, and INTEGRATED CONSULTING & MANAGEMENT, LLC,** | Case No.: 188809 |
| | **DECLARATION OF DAVID R. MICHAL** |
| **Plaintiffs,** | |
| vs. | |
| **BHB OF GEORGIA, LLC, ASSET MANAGEMENT PLUS, LLC, BULK HOME BUYERS, LLC, LEGACY PARTNERS 314, LLC, DRC PROPERTIES, LLC, and DAVID R. MICHAL,** | |
| **Defendants.** | |

     I, David R. Michal, a defendant and judgment debtor in the above-entitled action, make the following declaration of my own personal knowledge. If called upon, could and would competently testify to the matters herein:

     1.     By email(s) to Nicholas F. Scardigli, counsel for Assignees, at nscardigli@mayallaw.com on March 28, 2022, I produced all documents in my possession, custody, and/or control responsive to each request in Assignee's Requests for Production of Documents, Set One, a true and accurate copy of which is attached hereto as **Exhibit A**.

/ / /

1       2.     The following is a complete and exhaustive list of all real property, identified by

2  physical address, in which I have had any ownership and/or financial interest in the past five

3  years, including the nature of such ownership and/or financial interest(s):

4           a.     None.

5       3.     The following is a complete and exhaustive list of all real property, identified by

6  physical address, in which I currently have any ownership and/or financial interest, including the

7  nature of such ownership and/or financial interest(s):

8           a.     None.

9       4.     The following is a complete and exhaustive list of all corporations, limited

10  partnerships, limited liability company, and/or any other form of business entity, identified by

11  name and contact information, in which I have had any ownership and/or financial interest in the

12  past five years, including the nature of such ownership and/or financial interest(s):

13           a.     Reaven, Inc., a Nevada corporation; 311 West Third St., Carson City, NV

14                   89703

15       5.     The following is a complete and exhaustive list of all corporations, limited

16  partnerships, limited liability company, and/or any other form of business entity, identified by

17  name and contact information, in which I have had any ownership and/or financial interest in the

18  past five years, including the nature of such ownership and/or financial interest(s):

19           a.     Reaven, Inc., a Nevada corporation; 311 West Third St., Carson City, NV

20                   89703

21       6.     The following is a complete and exhaustive list of all bank accounts, identified by

22  banking institution and account number, in which I have had any ownership and/or financial

23  interest in the past five years, including the nature of such ownership and/or financial interest(s):

24           a.     Merchants Bank of Commerce, account number 1226517

25       7.     The following is a complete and exhaustive list of all bank accounts, identified by

26  banking institution and account number, in which I currently have any ownership and/or

27  financial interest, including the nature of such ownership and/or financial interest(s):

28           a.     Merchants Bank of Commerce, account number 1226517

8.     The following is a complete and exhaustive list of all investment accounts, identified by investment institution and account number, in which I have had any ownership and/or financial interest in the past five years, including the nature of such ownership and/or financial interest(s):

    a.     None.

9.     The following is a complete and exhaustive list of all investment accounts, identified by investment institution and account number, in which I currently have any ownership and/or financial interest, including the nature of such ownership and/or financial interest(s):

    a.     None.

10.     The following is a complete and exhaustive list of all sources of income, identified by payee's name and contact information, from which I have received any income within the past five years:

    a.     None.

11.     The following is a complete and exhaustive list of all my current sources of income, identified by payee's name and contact information:

    a.     None.

12.     The following is a complete and exhaustive list of all credit accounts, identified by the name and contact information of each creditor and account number, in relation to which I have had any interest and/or obligation in the past five years, including the nature of such interest(s) and/or obligation(s):

    a.     Capital One, account ending in 5302

    b.     Sierra Central Credit Union, account number 1911813

13.     The following is a complete and exhaustive list of all credit accounts, identified by the name and contact information of each creditor and account number, in relation to which I currently have any interest and/or obligation, including the nature of such interest(s) and/or obligation(s):

    a.     Capital One, account ending in 5302

Declaration of David R. Michal
Page 3 of 4

1             b.      Sierra Central Credit Union, account number 1911813

2       14.      The following is a complete and exhaustive list of all transfers of assets made by

3 me or on my behalf to any person or entity within the past five years, identified by date of

4 transfer and the name and contact information of transfer recipient:

5             a.      None.

6       15.      The following is a complete and exhaustive list of all transfers of assets made to

7 me or for my benefit from any person or entity within the past five years, identified by date of

8 transfer and the name and contact information of transferor:

9             a.      None.

10     I, David R. Michal, declare under penalty of perjury under the laws of the State of

11 California and the United States that the foregoing is true and correct and based on my personal

12 knowledge. Executed at Redding, California, on June 9th, 2022.

13

14

15                                              DAVID R. MICHAL

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of David R. Michal
Page 4 of 4

EXHIBIT 2

**BK: RB 6164**
**PG: 1879 - 1972**
RECORDED:

**08/22/2018**

**11:34:37 AM**

BY: STEPHANIE PEREZ

DEPUTY

**2018026724**

**NEW HANOVER COUNTY,**
**TAMMY THEUSCH BEASLEY**
**REGISTER OF DEEDS**

NC FEE $300.00

EXTX $0.00

ELECTRONICALLY RECORDED

## DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT, AND FIXTURE FILING

**MURCHISON GROUP, LLC,**
a North Carolina limited liability company
(Borrower)

to

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**
(Trustee)

in favor of

**KEYBANK NATIONAL ASSOCIATION,**
a national banking association
(Lender)

**Property Tax Parcel ID: R04720-007-001-000**

Dated: August 20, 2018
Location: 201 N. Front Street, Wilmington, North Carolina 28401

**PREPARED BY:**

KEYBANK NATIONAL ASSOCIATION
11501 Outlook, Suite 300
Overland Park, Kansas 66211
Attention: Mary Ann Gripka

**UPON RECORDATION RETURN TO:**

KEYBANK NATIONAL ASSOCIATION
11501 Outlook, Suite 300
Overland Park, Kansas 66211
Attention: Closing Department/Manager

Loan No.: 10190286

THIS INSTRUMENT COVERS GOODS THAT ARE OR ARE TO BECOME FIXTURES ON THE REAL PROPERTY DESCRIBED HEREIN. ACCORDINGLY, IN ADDITION TO ITS BEING FILED AS A DEED OF TRUST, IT SHOULD ALSO BE FILED AND INDEXED AS A FIXTURE FILING PURSUANT TO SECTION 9-502 AND RELATED PROVISIONS, OF THE NORTH CAROLINA UNIFORM COMMERCIAL CODE.

THIS INSTRUMENT IS TO BE FILED AND INDEXED IN THE REAL ESTATE RECORDS AND IS ALSO TO BE INDEXED IN THE INDEX OF FINANCING STATEMENTS UNDER THE NAMES OF BORROWER, AS "DEBTOR," AND LENDER, AS "SECURED PARTY."

64198337

Submitted electronically by "Moss Woods PLLC"
in compliance with North Carolina statutes governing recordable documents
and the terms of the submitter agreement with the New Hanover County Register of Deeds.

# TABLE OF CONTENTS

Page

ARTICLE I - DEFINITIONS; PRINCIPLES OF CONSTRUCTION .......................................... 1
    Section 1.1        Definitions .......................................................................... 1
    Section 1.2        Principles of Construction .................................................. 22

ARTICLE II – GRANTS OF SECURITY/CONDITIONS TO GRANT ....................................... 22
    Section 2.1        Property Mortgaged ........................................................... 22
    Section 2.2        Security Agreement ............................................................ 25
    Section 2.3        Fixture Filing .................................................................... 26
    Section 2.4        Common Law Pledge/Assignment ...................................... 26
    Section 2.5        Assignment of Rents .......................................................... 26

ARTICLE III – INTENTIONALLY OMITTED ....................................................................... 27

ARTICLE IV - REPRESENTATIONS AND WARRANTIES ....................................................... 27
    Section 4.1        Borrower Representations .................................................. 27
        4.1.1            Organization ...................................................................... 27
        4.1.2            Proceedings ........................................................................ 27
        4.1.3            Litigation ........................................................................... 27
        4.1.4            Title .................................................................................. 27
        4.1.5            Solvency ............................................................................ 27
        4.1.6            Full and Accurate Disclosure ............................................. 28
        4.1.7            No Plan Assets ................................................................... 28
        4.1.8            Compliance ........................................................................ 28
        4.1.9            Other Liabilities ................................................................ 28
        4.1.10          Condemnation .................................................................... 28
        4.1.11          Utilities and Public Access ................................................. 28
        4.1.12          Not a Foreign Person ......................................................... 29
        4.1.13          Separate Lots ..................................................................... 29
        4.1.14          Assessments ....................................................................... 29
        4.1.15          Enforceability .................................................................... 29
        4.1.16          Insurance ........................................................................... 29
        4.1.17          Use of Property .................................................................. 29
        4.1.18          Certificate of Occupancy; Licenses ................................... 29
        4.1.19          Flood Zone ......................................................................... 29
        4.1.20          Physical Condition ............................................................. 29
        4.1.21          Intentionally Omitted ......................................................... 30
        4.1.22          Leases ................................................................................ 30
        4.1.23          Filing and Recording Taxes ................................................ 30
        4.1.24          Special Purpose Entity/ Separateness/No Prohibited Entity/Ownership Structure . 30
        4.1.25          Management Agreement ...................................................... 31
        4.1.26          Illegal Activity ................................................................... 31
        4.1.27          No Change in Facts or Circumstances; Disclosure ............. 31
        4.1.28          Embargoed Person .............................................................. 31
        4.1.29          Principal Place of Business; State of Organization ............. 31
        4.1.30          Environmental Representations and Warranties ................. 31
        4.1.31          Federal Reserve Regulations ............................................. 32
        4.1.32          REA ................................................................................... 32
        4.1.33          Net Profits Agreement ........................................................ 32

64198337

i

Section 4.2          Survival of Representations ................................................................32
ARTICLE V - BORROWER COVENANTS ...............................................................32
Section 5.1          Affirmative Covenants .............................................................................33
5.1.1              Existence; Compliance with Legal Requirements ..................................33
5.1.2              Taxes and Other Charges ........................................................................33
5.1.3              Litigation ..................................................................................................33
5.1.4              Access to Property ...................................................................................33
5.1.5              Notice of Default .......................................................................................33
5.1.6              Perform Loan Documents ........................................................................33
5.1.7              Award and Insurance Benefits .................................................................34
5.1.8              Further Assurances .................................................................................34
5.1.9              Principal Place of Business, State of Organization ................................34
5.1.10             Financial Reporting ..................................................................................34
5.1.11             Business and Operations .........................................................................36
5.1.12             Title to the Property .................................................................................36
5.1.13             Estoppel Statement ..................................................................................36
5.1.14             Confirmation of Representations ..............................................................36
5.1.15             Environmental Covenants .......................................................................37
5.1.16             Leasing Matters .......................................................................................38
5.1.17             Alterations ................................................................................................39
5.1.18             Operation of Property ..............................................................................39
5.1.19             Embargoed Person ..................................................................................39
5.1.20             General Indemnification ..........................................................................39
5.1.21             Mortgage and/or Intangible Tax ..............................................................40
5.1.22             ERISA Indemnification .............................................................................40
5.1.23             Survival ....................................................................................................41
5.1.24             Duty to Defend .........................................................................................41
5.1.25             Clearing Account .....................................................................................41
5.1.26             Cash Management Account ......................................................................42
5.1.27             Net Profits Agreement .............................................................................44
Section 5.2          Negative Covenants .................................................................................44
5.2.1              Operation of Property ..............................................................................44
5.2.2              Liens .........................................................................................................45
5.2.3              Dissolution ...............................................................................................45
5.2.4              Zoning ......................................................................................................45
5.2.5              No Joint Assessment ...............................................................................45
5.2.6              ERISA .......................................................................................................45
5.2.7              Transfers ..................................................................................................46
5.2.8              Waste ........................................................................................................48
5.2.9              Material Agreements ................................................................................48

ARTICLE VI - INSURANCE; CASUALTY; CONDEMNATION ...................................48
Section 6.1          Insurance ..................................................................................................49
Section 6.2          Casualty ....................................................................................................51
Section 6.3          Condemnation ..........................................................................................52
Section 6.4          Restoration ...............................................................................................52

ARTICLE VII - RESERVE FUNDS ...........................................................................56
Section 7.1          Required Repairs and Required Repairs Fund .......................................56
Section 7.2          Tax and Insurance Escrow Fund .............................................................56
Section 7.3          Replacements and Replacement Reserve Fund .....................................57

ii

64198337

3

| 7.3.1 | Replacement Reserve Fund | 57 |
| 7.3.2 | Performance of Replacements | 57 |
| 7.3.3 | Failure to Make Replacements | 58 |
| Section 7.4 | Rollover Obligations and Monthly Rollover Reserve Fund | 58 |
| Section 7.5 | Disbursements from the Required Repairs Account, Replacement Reserve Account, Upfront Rollover Reserve Account, Monthly Rollover Reserve Account, and Pour Taproom Rollover Reserve Account | 58 |
| Section 7.6 | Reserve Funds, Generally | 59 |
| Section 7.7 | Intentionally Omitted | 60 |
| Section 7.8 | Pour Taproom Rollover Reserve Fund | 60 |
| Section 7.9 | Rollover Obligations and Upfront Rollover Reserve Fund | 60 |

**ARTICLE VIII - DEFAULTS** ........................................................................ 60

| Section 8.1 | Event of Default | 60 |
| Section 8.2 | Remedies | 62 |
| Section 8.3 | Other Rights | 64 |
| Section 8.4 | Rights Pertaining to Sales | 65 |
| Section 8.5 | Right to Sever Loan Documents | 66 |
| Section 8.6 | Remedies Cumulative; Waivers | 67 |

**ARTICLE IX - SPECIAL PROVISIONS** ......................................................... 67

| Section 9.1 | Securitization | 67 |
| 9.1.1 | Sale of Notes and Securitization | 67 |
| 9.1.2 | Securitization Costs | 68 |
| Section 9.2 | Right To Release Information | 68 |
| Section 9.3 | Exculpation | 68 |

**ARTICLE X - MISCELLANEOUS** ................................................................. 68

| Section 10.1 | Survival | 68 |
| Section 10.2 | Lender's Discretion | 69 |
| Section 10.3 | Governing Law | 69 |
| Section 10.4 | Modification, Waiver in Writing | 69 |
| Section 10.5 | Delay Not a Waiver | 69 |
| Section 10.6 | Notices | 70 |
| Section 10.7 | Trial by Jury | 70 |
| Section 10.8 | Severability | 70 |
| Section 10.9 | Preferences | 71 |
| Section 10.10 | Remedies of Borrower | 71 |
| Section 10.11 | Administration and Enforcement Expenses | 71 |
| Section 10.12 | Exhibits Incorporated | 72 |
| Section 10.13 | Offsets, Counterclaims and Defenses | 72 |
| Section 10.14 | No Joint Venture or Partnership; No Third Party Beneficiaries | 72 |
| Section 10.15 | Publicity | 72 |
| Section 10.16 | Waiver of Marshalling of Assets | 72 |
| Section 10.17 | Waiver of Counterclaim | 72 |
| Section 10.18 | Conflict; Construction of Documents; Reliance | 73 |
| Section 10.19 | Brokers and Financial Advisors | 73 |
| Section 10.20 | Prior Agreements | 73 |
| Section 10.21 | Liability | 73 |
| Section 10.22 | Certain Additional Rights of Lender (VCOC) | 74 |
| Section 10.23 | OFAC | 74 |
| Section 10.24 | Lender's Right to Subordinate | 74 |

64198337

iii

Section 10.25    Release ..................................................................... 74
Section 10.26    Duplicate Originals; Counterparts ............................... 75
Section 10.27    Matters Concerning Manager ...................................... 75
ARTICLE XI – DEED OF TRUST PROVISIONS ......................................... 75
Section 11.1    Concerning the Trustee ............................................... 75
Section 11.2    Trustee's Fees ............................................................ 75
Section 11.3    Certain Rights ............................................................ 75
Section 11.4    Retention of Money .................................................... 76
Section 11.5    Perfection of Appointment .......................................... 76
Section 11.6    Succession Instruments ............................................... 76
ARTICLE XII – LOCAL LAW PROVISIONS ............................................... 76
Section 12.1    Inconsistencies ........................................................... 76
Section 12.2    Fixture Filing ............................................................. 76
Section 12.3    Maturity Date ............................................................. 77
Section 12.4    Foreclosure ................................................................. 77
Section 12.5    Future Advances ......................................................... 77
Section 12.6    Attorney's Fees .......................................................... 77
Section 12.7    Trustee's Commission ................................................. 77

64198337

Filed 09/19/22          Case 22-22056                                    Doc 20

## EXHIBITS

Exhibit A   --   Legal Description

Exhibit B   --   Rent Roll

Exhibit C   --   Required Repairs - Deadlines for Completion

Exhibit D   --   Organizational Chart of Borrower

Exhibit E   --   Form of Disbursement Certification and Schedule

Filed 09/19/22                    Case 22-22056                                    Doc 20

# DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

THIS **DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING** (this "**Security Instrument**") is made as of this 20th day of August, 2018, by **MURCHISON GROUP, LLC**, a North Carolina limited liability company, having its principal place of business at 201 N. Front Street, Wilmington, North Carolina 28401, as Grantor ("**Borrower**") to **FIDELITY NATIONAL TITLE INSURANCE COMPANY**, a Delaware limited liability company, having an address at 421 Fayetteville Street, Suite 215, Raleigh, North Carolina 27601, as Trustee ("**Trustee**") for the benefit of **KEYBANK NATIONAL ASSOCIATION**, a national banking association, having an address at 11501 Outlook, Suite 300, Overland Park, Kansas 66211, as beneficiary (together with its successors and assigns, "**Lender**").

## RECITALS:

A.      Borrower desires to obtain the Loan (as hereinafter defined) from Lender.

B.      This Security Instrument is given to secure the Loan (as defined herein) in the principal sum of $4,150,000.00 made pursuant to and evidenced by the Note (as defined herein) made by Borrower in favor of Lender.

C.      As a condition for Lender making the Loan, Lender requires that Borrower execute and deliver this Security Instrument as security for Borrower's payment and performance of its obligations under the Loan Documents. Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of this Security Instrument and the other Loan Documents (as hereinafter defined).

**NOW THEREFORE**, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Security Instrument, the parties hereto agree as follows:

## ARTICLE I - DEFINITIONS; PRINCIPLES OF CONSTRUCTION.

**Section 1.1**      **Definitions**.  For all purposes of this Security Instrument, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"**Action**" has the meaning set forth in <u>Section 10.3</u> hereof.

"**Administration and Enforcement Expenses**" shall mean all fees and expenses incurred at any time or from time to time by Lender, including legal (whether for the purpose of advice, negotiation, documentation, defense, enforcement or otherwise), accounting, financial advisory, auditing, rating agency, appraisal, valuation, title or title insurance, engineering, environmental, collection agency, or other expert or consulting or similar services, in connection with:  (a) the negotiation and preparation of any amendments or modifications of the Loan or the Loan Documents, whether or not consummated; (b) the administration, servicing, or modification of the Loan Documents or any matter related to the Loan or the servicing thereof (which shall include the consideration of any requests for consents, waivers, modifications, approvals, or similar matters and any proposed transfer of the Property or any interest therein), (c) any litigation, contest, dispute, suit, arbitration, mediation, proceeding or action in any way relating to the Loan or the Loan Documents including in connection with any bankruptcy, reorganization, insolvency, or receivership proceeding; (d) any attempt to enforce any rights of Lender against Borrower or any other person that may be obligated to Lender by virtue of any Loan Document or otherwise, whether or not litigation is commenced in pursuance of such rights; (e) protection, enforcement against,

64198337

7

or liquidation of the Property or any other collateral for the Loan, including any attempt to inspect, verify, preserve, restore, collect, sell, liquidate or otherwise dispose of or realize upon the Loan, the Property or any other collateral for the Loan; (f) Borrower's ongoing performance of and compliance with Borrower's respective agreements and covenants contained in this Security Instrument and the other Loan Documents on its part to be performed or complied with after the Closing Date, including confirming compliance with environmental and insurance requirements; (g) all costs and expenses, liquidation fees, workout fees, special servicing fees, operating or trust advisor fees, or any other similar fees payable by Lender to Servicer which may be due and payable under any applicable servicing agreement (whether on a periodic or a continuing basis) as a result of an Event of Default or anticipated Event of Default under the Loan, the Loan becoming specially serviced, the commencement or continuance of any enforcement action of any kind with respect to the Loan or any of the Loan Documents, a refinancing or a restructuring of the credit arrangements provided under this Security Instrument in the nature of a "work-out" of the Loan Documents, or any Bankruptcy Action involving Borrower, Guarantor or any of their respective principals or Affiliates; and (h) Lender's ongoing performance and compliance with all agreements and conditions contained in this Security Instrument and the other Loan Documents on its part to be performed or complied with after the Closing Date.

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly, is in Control of, is Controlled by or is under common Control with such Person or is a director or officer of such Person or of an Affiliate of such Person.

"**Affiliated Manager**" means any Manager in which Borrower or Guarantor has, directly or indirectly, any legal, beneficial or economic interest.

"**Agent**" means KeyBank National Association, or any other Eligible Institution appointed by Lender as agent and acting as Agent under the Cash Management Agreement. Subject to the terms hereof, Lender shall have the sole and absolute right to appoint any Agent hereunder.

"**Annual Budget**" means an operating budget, including all planned Capital Expenditures, for the Property prepared by Borrower in accordance with Section 5.1.10(h) hereof for the applicable Fiscal Year or other period.

"**Approved Annual Budget**" has the meaning set forth in Section 5.1.10(h) hereof.

"**Assignment of Management Agreement**" means that certain Assignment of Management Agreement and Subordination of Management Fees, dated as of the date hereof, among Lender, Borrower and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Availability Threshold**" means the greater of $30,000.00 or 1% of the initial principal balance of the Loan.

"**Award**" means any compensation paid by any Governmental Authority in connection with a Condemnation.

"**Bankruptcy Action**" means with respect to any Person (a) such Person filing a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (b) the filing of an involuntary petition against such Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (c) such Person filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (d) such Person consenting

2

to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for such Person or any portion of the Property; (e) such Person making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due.

"**Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. §101, et seq., as the same may be amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights or any other Federal or state bankruptcy or insolvency law.

"**Borrower**" has the meaning set forth in the introductory paragraph hereto, together with its successors and permitted assigns.

"**Business Day**" means a day upon which commercial banks are not authorized or required by law to close in the city designated from time to time as the place for receipt of payments.

"**Capital Expenditures**" means, for any period, the amount expended for items capitalized under GAAP (including expenditures for building improvements or major repairs, leasing commissions and tenant improvements).

"**Cash Management Account**" has the meaning set forth in Section 5.1.26 hereof.

"**Cash Management Agreement**" means an original cash management agreement with respect to the Cash Management Account, between Borrower, Agent, and Lender, and entered into pursuant to the terms hereof (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time), and otherwise acceptable to Lender in its discretion.

"**Cash Sweep Event**" means the occurrence of the Pour Taproom Trigger Event.

"**Cash Sweep Event Cure**" means Borrower's completion of the applicable Pour Taproom Cure Event; provided, however, that, such Cash Sweep Event Cure set forth in this definition shall be subject to the following conditions, (i) no Event of Default shall have occurred and be continuing under this Security Instrument or any of the other Loan Documents, (ii) a Cash Sweep Event Cure may occur no more than a total of two (2) times in the aggregate during the term of the Loan, and (iii) Borrower shall have paid all of Lender's reasonable expenses incurred in connection with such Cash Sweep Event Cure including, reasonable attorney's fees and expenses.

"**Cash Sweep Period**" means each period commencing on the occurrence of a Cash Sweep Event and continuing until the earlier of (a) the Payment Date next occurring following the related Cash Sweep Event Cure, or (b) until payment in full of all principal and interest on the Loan and all other amounts payable under the Loan Documents or defeasance of the Loan in accordance with the terms and provisions of the Loan Documents.

"**Casualty**" has the meaning set forth in Section 6.2 hereof.

"**Casualty Consultant**" has the meaning set forth in Section 6.4(b)(iii) hereof.

"**Casualty Retainage**" has the meaning set forth in Section 6.4(b)(iv) hereof.

"**Clearing Account**" has the meaning set forth in Section 5.1.25 hereof.

Filed 09/19/22          Case 22-22056                                    Doc 20

"**Clearing Account Agreement**" means an original deposit account control agreement with respect to the Clearing Account, among Borrower, Lender and Clearing Bank, and entered into pursuant to the terms hereof (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time), and relating to funds deposited in the Clearing Account, and otherwise acceptable to Lender in its discretion.

"**Clearing Bank**" means the clearing bank which establishes, maintains and holds the Clearing Account, which shall be an Eligible Institution acceptable to Lender in its discretion.

"**Closing Date**" means the date of the funding of the Loan.

"**Code**" means the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Collateral**" has the meaning set forth in <u>Section 2.2</u> hereof.

"**Condemnation**" means a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto.

"**Condemnation Proceeds**" has the meaning set forth in <u>Section 6.4(b)</u> hereof.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise. "Controlled" and "Controlling" have correlative meanings.

"**Crowdfunding**" means, any offer or sale of equity or debt securities of Borrower or Guarantor or any Affiliate of any of them, involving or relating to direct or indirect interests, or any combination of direct or indirect interests, in any of the foregoing Persons, that is conducted or proposed to be conducted via the internet or through the use of other general solicitation or advertising of the investment opportunity to prospective investors by the issuer of such securities or an online or other funding portal in a transaction or series of transactions intended to be exempt from the registration requirements of the Securities Act of 1933, as amended, including but not limited to pursuant to the exemptions provided by Section 4(a)(6) thereof or Rule 506(c) promulgated thereunder, any other similar state securities law, or any similar transaction.

"**Debt**" means the outstanding principal amount of the Loan set forth in, and evidenced by, this Security Instrument and the Note together with all interest accrued and unpaid thereon and all other sums (including any Defeasance Payment Amount and any Yield Maintenance Premium) due to Lender in respect of the Loan under the Note, this Security Instrument or any other Loan Document.

"**Debt Service**" means, with respect to any particular period of time, the scheduled principal and interest payments due under this Security Instrument and the Note.

"**Debt Service Coverage Ratio**" means a ratio for the applicable period in which:

(a) the numerator is the Net Operating Income (excluding interest on credit accounts and using annualized operating expenses for any recurring expenses not paid monthly (e.g., Taxes and Insurance Premiums)) for such period as set forth in the statements required hereunder, without deduction for (i) actual management fees incurred in connection with the operation of the Property, or (ii) amounts

paid to the Reserve Funds, less (A) management fees equal to the greater of (1) assumed management fees of 9.3% of Gross Income from Operations and (2) the actual management fees incurred, and (B) annual Replacement Reserve Fund contributions equal to $0.25 per square foot of gross leasable area at the Property, and (C) annual Monthly Rollover Reserve Fund contributions equal to $1.44 per square foot of gross leasable area at the Property; and

     (b)     the denominator is the aggregate amount of Debt Service for such period.

"**Default**" means the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"**Default Rate**" has the meaning set forth in the Note.

"**Disbursement Certification and Schedule**" means a certificate in the form attached hereto as Exhibit E, delivered to Lender by Borrower which is signed by an authorized officer of Borrower or the general partner, managing member or sole member of Borrower, as applicable.

"**Disclosure Documents**" means, collectively and as applicable, any offering circular, prospectus, prospectus supplement, private placement memorandum or other offering document, in each case, in connection with a Securitization.

"**DSCR Trigger Event**" means, that as of the date of determination, the Debt Service Coverage Ratio based on the trailing three (3) month period immediately preceding the date of such determination is less than 1.20 to 1.00.

"**Eligible Account**" means a separate and identifiable account from all other funds held by the holding institution that is either (a) an account or accounts maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (b) a segregated trust account or accounts maintained with a federal or state chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a state chartered depository institution or trust company, is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000.00 and subject to supervision or examination by federal and state authority. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" means KeyBank or a depository institution or trust company insured by the Federal Deposit Insurance Corporation, the short term unsecured debt obligations or commercial paper of which are rated at least "A-1+" by S&P, "P-1" by Moody's and "F-1+" by Fitch in the case of accounts in which funds are held for thirty (30) days or less (or, in the case of accounts in which funds are held for more than thirty (30) days, the long-term unsecured debt obligations of which are rated at least "AA-" by Fitch and S&P and "Aa3" by Moody's).

"**Embargoed Person**" means any person, entity or government subject to trade restrictions under U.S. law, including The USA PATRIOT Act (including the anti terrorism provisions thereof), the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701, et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder including those related to Specially Designated Nationals and Specially Designated Global Terrorists, with the result that the investment in Borrower or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan made by the Lender is in violation of law.

64198337

"**Environmental Indemnity**" means that certain Environmental Indemnity Agreement, dated as of the date hereof, executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Environmental Law**" means any present and future federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law, relating to protection of human health or the environment, relating to Hazardous Substances, relating to liability for or costs of Remediation or prevention of Releases of Hazardous Substances or relating to liability for or costs of other actual or threatened danger to human health or the environment. Environmental Law also includes any present and future federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law: conditioning transfer of property upon a negative declaration or other approval of a governmental authority of the environmental condition of the Property; requiring notification or disclosure of Releases of Hazardous Substances or other environmental condition of the Property to any governmental authority or other Person, whether or not in connection with transfer of title to or interest in property; imposing conditions or requirements in connection with permits or other authorization for lawful activity; relating to nuisance, trespass or other causes of action related to the Property; or relating to wrongful death, personal injury, or property or other damage in connection with any physical condition or use of the Property.

"**Environmental Liens**" has the meaning set forth in <u>Section 5.1.15</u> hereof.

"**Environmental Report**" has the meaning set forth in <u>Section 4.1.30</u> hereof.

"**Equipment**" has the meaning set forth in <u>Section 2.1(e)</u> hereof.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and the rulings issued thereunder.

"**Event of Default**" has the meaning set forth in <u>Section 8.1(a)</u> hereof.

"**Excess Cash**" has the meaning set forth in Section <u>5.1.26</u> hereof.

"**Extraordinary Expense**" has the meaning set forth in <u>Section 5.1.10(h)</u> hereof.

"**Fiscal Year**" means each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the term of the Loan.

"**Fitch**" means Fitch, Inc.

"**Fixtures**" has the meaning set forth in <u>Section 2.1(f)</u> hereof.

"**GAAP**" means generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"**Governing State**" has the meaning set forth is <u>Section 10.3</u> hereof.

"**Governmental Authority**" means any court, board, agency, commission, office or other authority of any nature whatsoever for any governmental unit (foreign, federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

64198337

"**Gross Income from Operations**" means, during any period, all sustainable income as reported on the financial statements delivered by Borrower in accordance with this Security Instrument, computed in accordance with GAAP, derived from the ownership and operation of the Property from whatever source during such period, including (i) Rents from Tenants that are in occupancy, open for business and paying full contractual rent without right of offset or credit, (ii) utility charges, (iii) escalations, (iv) forfeited security deposits, (v) interest on credit accounts, (vi) service fees or charges, (vii) license fees, (viii) parking fees, (ix) rent concessions or credits, (x) income from vending machines, (xi) business interruption or other loss of income or rental insurance proceeds, and (xii) other required pass-throughs, but excluding (i) Rents from month-to-month Tenants, Rents from Tenants during a free-rent period or Rents from Tenants that are included in any Bankruptcy Action, (ii) sales, use and occupancy or other taxes on receipts required to be accounted for by Borrower to any Governmental Authority, (iii) refunds and uncollectible accounts, (iv) sales of furniture, fixtures and equipment, (v) Insurance Proceeds (other than business interruption or other loss of income or rental insurance), (vi) Awards, (vii) unforfeited security deposits, (viii) utility and other similar deposits and (ix) any disbursements to Borrower from the Reserve Funds, if any (provided, however, that Gross Income from Operations shall include any Reserve Funds disbursements that are intended to be in substitution of Rent that would be payable by any Tenant during any period where such Tenant does not have the obligation to pay Rent under its Lease). Gross income shall not be diminished as a result of this Security Instrument or the creation of any intervening estate or interest in the Property or any part thereof.

"**Guarantor**" means Christopher Michael Camann.

"**Guaranty**" means that certain Guaranty Agreement, dated as of the date hereof, executed and delivered by Guarantor in connection with the Loan to and for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Hazardous Substances**" means any and all substances (whether solid, liquid or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, or words of similar meaning or regulatory effect under any present or future Environmental Laws or that may have a negative impact on human health or the environment, including petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, radon, radioactive materials, flammables, explosives, mold, mycotoxins, microbial matter and airborne pathogens (naturally occurring or otherwise), but excluding substances of kinds and in amounts ordinarily and customarily used or stored in similar properties for the purpose of cleaning or other maintenance or operations and otherwise in compliance with all Environmental Laws.

"**Improvements**" has the meaning set forth in Section 2.1(c) hereof.

"**Indebtedness**" of a Person, at a particular date, means the sum (without duplication) at such date of (a) all indebtedness or liability of such Person (including amounts for borrowed money and indebtedness in the form of mezzanine debt or preferred equity); (b) obligations evidenced by bonds, debentures, notes, or other similar instruments; (c) obligations for the deferred purchase price of property or services (including trade obligations); (d) obligations under letters of credit; (e) obligations under acceptance facilities; (f) all guaranties, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds, to invest in any Person or entity, or otherwise to assure a creditor against loss; and (g) obligations secured by any Liens, whether or not the obligations have been assumed (other than the Permitted Encumbrances).

"**Indemnified Liabilities**" has the meaning set forth in Section 10.11(b) hereof.

64198337

"**Indemnified Parties**" means Lender and, its designee, (whether or not it is the Lender), any Affiliate of Lender that has filed any registration statement relating to the Securitization or has acted as the sponsor or depositor in connection with the Securitization, any Affiliate of Lender that acts as an underwriter, placement agent or initial purchaser of Securities issued in the Securitization, any other co-underwriters, co placement agents or co initial purchasers of Securities issued in the Securitization, and each Person or entity who Controls any such Person, any Person who is or will have been involved in the origination of the Loan, any Person who is or will have been involved in the servicing of the Loan secured hereby, any Person who may hold or acquire or will have held a full or partial interest in the Loan secured hereby (including investors or prospective investors in the Securities, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan secured hereby for the benefit of third parties) (including any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan, whether during the term of the Loan or as a part of or following a foreclosure of the Loan and including any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business).

"**Institutional Controls**" means any legal or physical restrictions or limitations on the use of, or access to, the Property to eliminate or minimize potential exposures to any Hazardous Substance, to prevent activities that could interfere with the effectiveness of any Remediation, or to ensure maintenance of a level of risk to human health or the environment, including physical modifications to the Property such as slurry walls, capping, hydraulic controls for ground water, or point of use water treatment, restrictive covenants, environmental protection easements, or property use limitations.

"**Insurance Premiums**" has the meaning set forth in <u>Section 6.1(b)</u> hereof.

"**Insurance Proceeds**" has the meaning set forth in <u>Section 6.4(b)</u> hereof.

"**Interest Rate**" has the meaning set forth in the Note.

"**KeyBank**" shall mean KeyBank National Association.

"**Labor and Material Costs**" has the meaning set forth in <u>Section 5.1.12</u> hereof.

"**Land**" has the meaning set forth in <u>Section 2.1(a)</u> hereof.

"**Lease**" has the meaning set forth in <u>Section 2.1(h)</u> hereof.

"**Legal Requirements**" means, all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting the Property or any part thereof, or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting Borrower, the Property or any part thereof.

"**Lender**" has the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

"**Lien**" means, any mortgage, deed of trust, deed to secure debt, indemnity deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, the Property, any portion thereof or any interest therein, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect

8

as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"**Liquid Assets**" means assets in the form of cash, cash equivalents, obligations of (or fully guaranteed as to principal and interest by) the United States or any agency or instrumentality thereof (provided the full faith and credit of the United States supports such obligation or guarantee), certificates of deposit issued by a commercial bank having net assets of not less than $500,000,000.00, securities listed and traded on a recognized stock exchange or traded over the counter and listed in the National Association of Securities Dealers Automatic Quotations, or liquid debt instruments that have a readily ascertainable value and are regularly traded in a recognized financial market.

"**Loan**" means the loan in the Original Principal Amount made by Lender to Borrower pursuant to the Note and this Security Instrument.

"**Loan Documents**" means, collectively, the Note, this Security Instrument, the Environmental Indemnity, the Assignment of Management Agreement, the Guaranty, any applicable Clearing Account Agreement, any applicable Cash Management Agreement and all other documents executed or delivered in connection with the Loan.

"**Loan to Value Ratio**" shall mean, as of the date of its calculation, the ratio of (i) the sum of the outstanding principal amount of the Loan as of the date of such calculation to (ii) the fair market value of the Property, as determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust.

"**Management Agreement**" means the management agreement entered into by and between Borrower and Manager, pursuant to which Manager is to provide management and other services with respect to the Property, or, if the context requires, a Qualified Manager who is managing the Property in accordance with the terms and provisions of this Security Instrument pursuant to a Replacement Management Agreement.

"**Manager**" means Lesha Williams, an individual, or, if the context requires, a Qualified Manager who is managing the Property in accordance with the terms and provisions of this Security Instrument pursuant to a Replacement Management Agreement.

"**Material Agreements**" shall mean, individually and collectively, (i) the REA, and (ii) each contract and agreement relating to the ownership, management, development, use, operation, leasing, maintenance, repair or improvement of the Property, other than the Management Agreement and the Leases, as to which either (i) there is an obligation of Borrower to pay more than $25,000.00 per annum; or (ii) the term thereof extends beyond one year (unless cancelable on thirty (30) days or less notice without requiring the payment of termination fees or payments of any kind).

"**Maturity Date**" means September 1, 2028, or such other date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Monthly Debt Service Payment Amount**" has the meaning set forth in the Note.

"**Monthly Rollover Reserve Account**" has the meaning set forth in Section 7.4 hereof.

"**Monthly Rollover Reserve Cap**" has the meaning set forth in Section 7.4 hereof.

9

"**Monthly Rollover Reserve Fund**" has the meaning set forth in <u>Section 7.4</u> hereof.

"**Moody's**" means Moody's Investors Service, Inc.

"**Net Cash Flow**" means, with respect to the Property for any period, the amount obtained by subtracting Operating Expenses and Capital Expenditures for such period from Gross Income from Operations for such period.

"**Net Operating Income**" means the amount obtained by subtracting Operating Expenses from Gross Income from Operations.

"**Net Proceeds**" has the meaning set forth in <u>Section 6.4(b)</u> hereof.

"**Net Proceeds Deficiency**" has the meaning set forth in <u>Section 6.4(b)(vi)</u> hereof.

"**Net Profits Agreement**" means that certain Net Profits Agreement dated September 10, 2013 by and between Murchison Building, LP, a South Carolina limited partnership d/b/a Murchison Building of North Carolina (Borrower's predecessor-in-interest) and SpectraSite Communications, LLC, a Delaware limited liability company (predecessor-in-interest to American Tower Corp.).

"**Net Worth**" shall mean, as of a given date, (a) the total assets of a Person as of such date less (b) such Person's total liabilities as of such date, determined in accordance with GAAP.

"**Note**" means that certain Promissory Note, dated the date hereof, in the principal amount of $4,150,000.00, made by Borrower in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Obligations**" shall mean, collectively, Borrower's obligations for the payment of the Debt and the performance of the Other Obligations.

"**OFAC**" has the meaning set forth in <u>Section 10.23</u> hereof.

"**Officer's Certificate**" means a certificate delivered to Lender by Borrower which is signed by an authorized officer of Borrower or the general partner, managing member or sole member of Borrower, as applicable.

"**Operating Expenses**" means the total of all expenditures, computed in accordance with GAAP, of whatever kind relating to the operation, maintenance and management of the Property that are incurred on a regular monthly or other periodic basis, but excluding depreciation, Debt Service, Capital Expenditures and contributions to the Reserve Funds.

"**Original Principal Amount**" has the meaning set forth in the Note.

"**Other Charges**" means all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Other Obligations**" shall mean, collectively, (a) the performance of all other obligations of Borrower contained herein; (b) the performance of each obligation of Borrower contained in any Loan Document; and (c) the performance of each obligation of Borrower contained in any renewal, extension,

64198337

amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of any Loan Document.

"**Outstanding Principal Balance**" or "**OPB**" means the portion of the Original Principal Amount that remains outstanding from time to time.

"**Payment Date**" has the meaning set forth in the Note.

"**Permitted Encumbrances**" means, with respect to the Property, collectively, (a) the Liens and security interests created by the Loan Documents, (b) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy, (c) Liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent, and (d) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's discretion.

"**Permitted Investments**" means any one or more of the following obligations or securities acquired at a purchase price of not greater than par, including those issued by Servicer, the trustee under any Securitization or any of their respective Affiliates, payable on demand or having a maturity date not later than the Business Day immediately prior to the first Payment Date following the date of acquiring such investment and meeting one of the appropriate standards set forth below:

       (i)      obligations of, or obligations fully guaranteed as to payment of principal and interest by, the United States or any agency or instrumentality thereof provided such obligations are backed by the full faith and credit of the United States of America including obligations of: the U.S. Treasury (all direct or fully guaranteed obligations), the Farmers Home Administration (certificates of beneficial ownership), the General Services Administration (participation certificates), the U.S. Maritime Administration (guaranteed Title XI financing), the Small Business Administration (guaranteed participation certificates and guaranteed pool certificates), the U.S. Department of Housing and Urban Development (local authority bonds) and the Washington Metropolitan Area Transit Authority (guaranteed transit bonds); provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

       (ii)     Federal Housing Administration debentures;

       (iii)    obligations of the following United States government sponsored agencies: Federal Home Loan Mortgage Corp. (debt obligations), the Farm Credit System (consolidated systemwide bonds and notes), the Federal Home Loan Banks (consolidated debt obligations), the Federal National Mortgage Association (debt obligations), the Financing Corp. (debt obligations), and the Resolution Funding Corp. (debt obligations); provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

       (iv)    federal funds, unsecured certificates of deposit, time deposits, bankers' acceptances and repurchase agreements with maturities of not more than 365 days of any bank,

64198337

the short term obligations of which at all times are rated in the highest short term rating category by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency in the highest short term rating category and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities); provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(v)      fully Federal Deposit Insurance Corporation-insured demand and time deposits in, or certificates of deposit of, or bankers' acceptances issued by, any bank or trust company, savings and loan association or savings bank, the short term obligations of which at all times are rated in the highest short term rating category by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency in the highest short term rating category and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities); provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(vi)      debt obligations with maturities of not more than 365 days and at all times rated by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities) in its highest long-term unsecured rating category; provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(vii)      commercial paper (including both non interest-bearing discount obligations and interest-bearing obligations payable on demand or on a specified date not more than one year after the date of issuance thereof) with maturities of not more than 365 days and that at all times is rated by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities) in its highest short-term unsecured debt rating; provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate

64198337

index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(viii) units of taxable money market funds, which funds are regulated investment companies, seek to maintain a constant net asset value per share and invest solely in obligations backed by the full faith and credit of the United States, which funds have the highest rating available from each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities) for money market funds; and

(ix) any other security, obligation or investment which has been approved as a Permitted Investment in writing by (a) Lender and (b) each Rating Agency, as evidenced by a written confirmation that the designation of such security, obligation or investment as a Permitted Investment will not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities by such Rating Agency;

provided, however, that no obligation or security shall be a Permitted Investment if (A) such obligation or security evidences a right to receive only interest payments or (B) the right to receive principal and interest payments on such obligation or security are derived from an underlying investment that provides a yield to maturity in excess of 120% of the yield to maturity at par of such underlying investment.

"**Permitted Transfer**" means any of the following:  (a) any transfer, directly as a result of the death of a natural person, of stock, membership interests, partnership interests or other ownership interests previously held by the decedent in question to the Person or Persons lawfully entitled thereto and (b) any transfer, directly as a result of the legal incapacity of a natural person, of stock, membership interests, partnership interests or other ownership interests previously held by such natural person to the Person or Persons lawfully entitled thereto.

"**Person**" means any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Personal Property**" has the meaning specified in Section 2.1(g) hereof.

"**Policies**" has the meaning specified in Section 6.1(b) hereof.

"**Policy**" has the meaning specified in Section 6.1(b) hereof.

"**Pour Taproom**" means Pour Taproom Wilmington, LLC, a North Carolina limited liability company, any successor or assign of Pour Taproom, or any subsequent Tenant under any replacement of the Pour Taproom Lease.

"**Pour Taproom Cure Event**" shall mean:

(i) if the Cash Sweep Period is caused by a Pour Taproom Trigger Event - Bankruptcy, no Default or Event of Default has occurred and no event that would trigger another Cash Sweep Period has occurred, the date, (a) which is thirty (30) days after the date that Pour Taproom has affirmed the Pour Taproom Lease, is no longer the subject of a bankruptcy or similar proceeding, is in occupancy and

13

paying full contractual unabated post-petition rent without right of offset or free rent credit, and has delivered to Lender a tenant estoppel acceptable to Lender, or (b) that Borrower has entered into one or more replacement Leases for the Pour Taproom Premises, in each case with a Tenant or Tenants acceptable to Lender in its discretion, and upon such terms and conditions (including, without limitation, rental rate and term) as are acceptable to Lender in its discretion, and (1) such replacement Tenant or Tenants are in occupancy of the entire net leasable area of the applicable portion of the Pour Taproom Premises, are obligated to pay full contractual rent without right of offset or free rent credit, and have made their first monthly rental payment, (2) all tenant improvements with respect to each such replacement Lease have been completed in accordance with the terms hereof, (3) all leasing commissions and any other tenant reimbursement obligations incurred by Borrower with respect to each such replacement Lease have been paid, and (4) such replacement Tenant or Tenants have delivered to Lender a tenant estoppel acceptable to Lender;

(ii)    if the Cash Sweep Event is caused by a Pour Taproom Trigger Event - Vacation, no Default or Event of Default has occurred and no event that would trigger another Cash Sweep Period has occurred, the date (a) which is thirty (30) days after the date that Pour Taproom has resumed operations at the Pour Taproom Premises, is in occupancy and open for business paying full contractual unabated rent without right of offset or free rent credit, has made its next due monthly rental payment, and has delivered to Lender a tenant estoppel acceptable to Lender, or (b) that Borrower has entered into one or more replacement Leases for the Pour Taproom Premises, in each case with a Tenant or Tenants acceptable to Lender in its discretion, and upon such terms and conditions (including, without limitation, rental rate and term) as are acceptable to Lender in its discretion, and (1) such replacement Tenant or Tenants are in occupancy of the entire net leasable area of the applicable portion of the Pour Taproom Premises, are obligated to pay full contractual rent without right of offset or free rent credit, and have made their first monthly rental payment, (2) all tenant improvements with respect to each such replacement Lease have been completed in accordance with the terms hereof, (3) all leasing commissions and any other tenant reimbursement obligations incurred by Borrower with respect to each such replacement Lease have been paid, and (4) such replacement Tenant or Tenants have delivered to Lender a tenant estoppel acceptable to Lender; or

(iii)    if the Cash Sweep Event is caused by a Pour Taproom Trigger Event – Lease Expiration, no Default or Event of Default has occurred and no event that would trigger another Cash Sweep Period has occurred, the date: (a) that Borrower has provided acceptable evidence to Lender that Pour Taproom has renewed the term of the Pour Taproom Lease pursuant to the terms set forth therein, or (b) that Borrower has entered into one or more replacement Leases for the Pour Taproom Premises, in each case with a Tenant or Tenants acceptable to Lender in its discretion, and upon such terms and conditions (including, without limitation, rental rate and term) as are acceptable to Lender in its discretion, and (1) such replacement Tenant or Tenants are in occupancy of the entire net leasable area of the applicable portion of the Pour Taproom Premises, are obligated to pay full contractual rent without right of offset or free rent credit, and have made their first monthly rental payment, (2) all tenant improvements with respect to each such replacement Lease have been completed in accordance with the terms hereof, (3) all leasing commissions and any other tenant reimbursement obligations incurred by Borrower with respect to each such replacement Lease have been paid, and (4) such replacement Tenant or Tenants have delivered to Lender a tenant estoppel acceptable to Lender (each of (a) and (b) being referred to herein as a "**Pour Taproom Lease Expiration Trigger Event Cure**").

"**Pour Taproom Lease**" means that certain Lease Agreement between Borrower, as landlord, and Pour Taproom, as tenant, dated September 1, 2016, as amended, modified, renewed and/or restated, or, if applicable, replaced in connection with any replacement of the Pour Taproom Lease.

64198337

"**Pour Taproom Premises**" means the portion of the Property demised to Pour Taproom pursuant to the Pour Taproom Lease.

"**Pour Taproom Rollover Obligations**" has the meaning set forth in <u>Section 7.8</u> hereof.

"**Pour Taproom Rollover Reserve Account**" has the meaning set forth in <u>Section 7.8</u> hereof.

"**Pour Taproom Rollover Reserve Fund**" has the meaning set forth in <u>Section 7.8</u> hereof.

"**Pour Taproom Trigger Event**" means the occurrence of a (a) Pour Taproom Trigger Event - Bankruptcy, (b) Pour Taproom Trigger Event - Vacation, or (c) Pour Taproom Trigger Event - Lease Expiration.

"**Pour Taproom Trigger Event - Bankruptcy**" means commencement of a Bankruptcy Action with respect to Pour Taproom or Pour Taproom provides notice to Borrower or Lender of its intent to file a Bankruptcy Action.

"**Pour Taproom Trigger Event - Lease Expiration**" means, unless, prior to such date Borrower has satisfied the requirements of a Pour Taproom Lease Expiration Trigger Event Cure with respect to the Pour Taproom Lease, the earlier to occur of (a) the date of any termination of the Pour Taproom Lease or (b) the earlier to occur of the date (x) that is twelve (12) months prior to the then applicable expiration date of the Pour Taproom Lease (or any renewal or replacement thereof) or (y) on which notice for extension is due under the Pour Taproom Lease.

"**Pour Taproom Trigger Event - Vacation**" means the earlier to occur of (a) the date that Pour Taproom ceases business operations at the Pour Taproom Premises, i.e. "goes dark", or vacates or abandons the Pour Taproom Premises (or gives notice of its intent to do same) or (b) the date that Pour Taproom (except for temporary closures for repairs, restoration, rehabilitation or customary force majeure events) vacates, abandons or surrenders any material portion of the Pour Taproom Premises or ceases to conduct normal business operations thereon (including without limitation, utilizing substantially less than all of the Pour Taproom Premises, personnel or equipment utilized as of the closing of the Loan), or otherwise "goes dark" at any material portion of the Pour Taproom Premises, all as determined by Lender in its discretion.

"**Prepayment Premium**" has the meaning set forth in the Note.

"**Prohibited Entity/Ownership Structure**" means any direct or indirect ownership of either the Property or Borrower by (a) a statutory trust organized under 12 *Del.C.* § 3801 *et seq.*, or any successor statute thereto, or under any similar other state of federal law, (b) any one or more Persons as tenants in common or any similar ownership structure, or (c) any one or more Persons as a result of any Crowdfunding.

"**Property**" has the meaning set forth in <u>Section 2.1</u> hereof.

"**Provided Information**" means any and all financial and other information provided at any time prepared by, or on behalf of, Borrower, Guarantor or Manager.

"**Qualified Manager**" means either (a) Manager; or (b) in the reasonable judgment of Lender, a reputable and experienced management organization (which may be an Affiliate of Borrower) possessing experience in managing properties similar in size, scope, use and value as the Property, <u>provided</u>, that, if required by Lender, Borrower shall have obtained prior written confirmation from the applicable Rating

Agencies that management of the Property by such entity will not cause a downgrade, withdrawal or qualification of the then current ratings of the Securities or any class thereof

"**Rating Agencies**" means each of S&P, Moody's, Fitch, and Morningstar Credit Ratings, LLC, or any other nationally recognized statistical rating agency which has been approved by Lender and designated by Lender to assign a rating to the Securities.

"**REA**" shall mean, individually or collectively (as the context requires), (a) each reciprocal easement or similar agreement (if any) affecting the Property or any part thereof as more particularly described in the Title Insurance Policy, and (b) any amendment, restatement, replacement or other modification thereof hereafter made, and any future reciprocal easement, or similar agreement affecting the Property or any part thereof and which is entered into in accordance with the applicable terms and conditions hereof and of any other applicable Loan Document.

"**Real Property**" has the meaning set forth in Section 2.1 hereof.

"**Release**" means any release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Substances.

"**Remediation**" includes any response, remedial, removal, or corrective action, any activity to cleanup, detoxify, decontaminate, contain or otherwise remediate any Hazardous Substance, any actions to prevent, cure or mitigate any Release of any Hazardous Substance, any action to comply with any Environmental Laws or with any permits issued pursuant thereto, any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or evaluation relating to any Hazardous Substances.

"**REMIC Requirements**" shall mean any applicable legal requirements relating to any REMIC Trust (including, without limitation, those relating to the continued treatment of the Loan (or the applicable portion thereof or interest therein) as a "qualified mortgage" held by such REMIC Trust, the continued qualification of such REMIC Trust as such under the Code, the non-imposition of any tax on such REMIC Trust under the Code (including, without limitation, taxes on "prohibited transactions and "contributions") and any other constraints, rules or other regulations or requirements relating to the servicing, modification or other similar matters with respect to the Loan (or any portion thereof or interest therein) that may now or hereafter exist under applicable legal requirements (including, without limitation under the Code)).

"**REMIC Trust**" means a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Note or a portion thereof.

"**Rents**" means, all rents (including percentage rents), rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, payments (including payments in connection with the exercise of any purchase option or termination rights), deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, all other amounts payable as rent under any Lease or other agreement relating to the Property, including charges for electricity, oil, gas, water, steam, heat, ventilation, air-conditioning and any other energy, telecommunication, telephone, utility or similar items or time use charges, HVAC equipment charges, sprinkler charges, escalation charges, license fees, maintenance fees, charges for Taxes, operating expenses or other reimbursables payable to Borrower (or to the Manager for the account of Borrower) under any Lease, and other

16

consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources arising from or attributable to the Property.

"**Replacement Management Agreement**" means, collectively, (a) either (i) a management agreement with a Qualified Manager substantially in the same form and substance as the Management Agreement, or (ii) a management agreement with a Qualified Manager, which management agreement shall be reasonably acceptable to Lender in form and substance, provided, however, with respect to either subclause (i) or (ii) above, that without Lender's prior consent, in its sole discretion, the management fee for such Qualified Manager shall not exceed the fee provided for in the Management Agreement in effect as of the closing of the Loan, and provided, further, with respect to subclause (ii) above, Lender, at its option, may require that Borrower shall have obtained prior written confirmation from the applicable Rating Agencies that such management agreement will not cause a downgrade, withdrawal or qualification of the then current rating of the Securities or any class thereof and (b) an assignment of management agreement and subordination of management fees substantially in the form then used by Lender (or of such other form and substance reasonably acceptable to Lender), executed and delivered to Lender by Borrower and such Qualified Manager at Borrower's expense.

"**Replacement Reserve Account**" has the meaning set forth in Section 7.3.1 hereof.

"**Replacement Reserve Fund**" has the meaning set forth in Section 7.3.1 hereof.

"**Replacement Reserve Monthly Deposit**" has the meaning set forth in Section 7.3.1 hereof.

"**Replacements**" has the meaning set forth in Section 7.3.1 hereof.

"**Required Repairs Account**" has the meaning set forth in Section 7.1 hereof.

"**Required Repairs Fund**" has the meaning set forth in Section 7.1 hereof.

"**Required Repairs**" has the meaning set forth in Section 7.1 hereof.

"**Reserve Funds**" means, collectively, the Tax and Insurance Escrow Fund, the Replacement Reserve Fund, the Required Repairs Fund, the Upfront Rollover Reserve Fund, the Monthly Rollover Reserve Fund, the Pour Taproom Rollover Reserve Fund, and any other escrow fund established by the Loan Documents.

"**Restoration**" means the repair and restoration of the Property after a Casualty or Condemnation as nearly as possible to the condition the Property was in immediately prior to such Casualty or Condemnation, with such alterations as may be reasonably approved by Lender.

"**Restricted Party**" means collectively, (a) Borrower, any Guarantor, and any Affiliated Manager and (b) any shareholder, partner, member, non-member manager, or any direct or indirect legal or beneficial owner of Borrower, any Guarantor, any Affiliated Manager or any non-member manager.

"**Rollover Obligations**" has the meaning set forth in Section 7.4 hereof.

"**Rollover Reserve Monthly Deposit**" has the meaning set forth in Section 7.4 hereof.

"**S&P**" means Standard & Poor's Ratings Group, a division of the McGraw-Hill Companies.

64198337

"**Sale or Pledge**" means a voluntary or involuntary sale, conveyance, assignment, transfer, encumbrance, pledge, grant of option or other transfer or disposal of a legal or beneficial interest, whether direct or indirect.

"**Satisfactory Replacement Guarantor**" shall mean a replacement guarantor that is acceptable to Lender, which determination shall be based upon, inter alia, (A) such replacement guarantor having (1) a direct or indirect ownership interest in Borrower, which is reasonably satisfactory to Lender, and (2) the ability to Control Borrower, (B) such replacement guarantor having a net worth and liquidity reasonably satisfactory to Lender, (C) Lender's receipt of searches (including credit, negative news, OFAC, litigation, judgment, lien and bankruptcy searches) reasonably required by Lender on such replacement guarantor, the results of which must be reasonably acceptable to Lender, (D) such replacement guarantor otherwise satisfying Lender's then current applicable underwriting criteria and requirements, and (E) such replacement guarantor being an experienced operator and/or owner of properties similar in location, size, class, use, operation and value as the Property, as evidenced by financial statements and other information reasonably requested by Lender or requested by the Rating Agencies.

"**Securities**" has the meaning set forth in <u>Section 9.1.1</u> hereof.

"**Securitization**" has the meaning set forth in <u>Section 9.1.1</u> hereof.

"**Security Instrument**" has the meaning set forth in the introductory paragraph hereto, and includes as this Security Instrument may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Servicer**" shall mean any servicer of the Loan, as appointed by Lender in its discretion, together with its agents, nominees or designees.

"**Severed Loan Documents**" has the meaning set forth in <u>Section 8.5</u> hereof.

"**Special Purpose Entity**" means a corporation, limited partnership or limited liability company that, since the date of its formation and at all times on and after the date thereof, has complied with and shall at all times comply with the following requirements:

(i) is and shall be organized solely for the purpose of acquiring, developing, owning, holding, selling, leasing, transferring, exchanging, managing and operating the Property, entering into and performing its obligations under the Loan Documents with Lender, refinancing the Property in connection with a permitted repayment of the Loan, and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing;

(ii) has not engaged and shall not engage in any business unrelated to the acquisition, development, ownership, management or operation of the Property;

(iii) has not owned and shall not own any real property other than the Property;

(iv) does not own, shall not own and at no time has owned any assets other than the Property and personal property necessary or incidental to its ownership and operation of the Property;

(v) has not engaged in, sought, consented to or permitted and shall not engage in, seek, consent to or permit (A) any dissolution, winding up, liquidation, consolidation or merger, or

(B) any sale or other transfer of all or substantially all of its assets or any sale of assets outside the ordinary course of its business, except as permitted by the Loan Documents;

(vi) shall not cause, consent to or permit any amendment of its limited partnership agreement, articles of incorporation, articles of organization, certificate of formation, operating agreement or other formation document or organizational document (as applicable) with respect to the matters set forth in this definition;

(vii) intentionally omitted;

(viii) has not and shall not (1) dissolve, merge, liquidate, consolidate; (2) sell all or substantially all of its assets; (3) amend its organizational documents with respect to the matters set forth in this definition without the consent of Lender; (4) file or consent to the filing of any bankruptcy, insolvency or reorganization case or proceeding, institute any proceedings under any applicable insolvency law or otherwise seek relief under any laws relating to the relief from debts or the protection of debtors generally, file a bankruptcy or insolvency petition or otherwise institute insolvency proceedings; (5) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for the entity or a substantial portion of its property; (6) make an assignment for the benefit of the creditors of the entity; or (7) take any action in furtherance of any of the foregoing;

(ix) has at all times been and shall at all times remain solvent and has paid and shall pay its debts and liabilities (including, a fairly-allocated portion of any personnel and overhead expenses that it shares with any Affiliate) from its own assets as the same shall become due, and has maintained and shall maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(x) has maintained and shall maintain its bank accounts, books of account, books and records, resolutions, and agreements separate from those of any other Person and, to the extent that it is required to file tax returns under applicable law, has filed and shall file its own tax returns, except to the extent that it is required by law to file consolidated tax returns and, if it is a corporation, has not filed and shall not file a consolidated federal income tax return with any other corporation, except to the extent that it is required by law to file consolidated tax returns;

(xi) has not commingled and shall not commingle its funds or assets with those of any other Person;

(xii) has held and shall hold its assets in its own name;

(xiii) (A) has maintained and shall maintain its financial statements, accounting records and other entity documents separate from those of any other Person; (B) has shown and shall show, in its financial statements, its asset and liabilities separate and apart from those of any other Person; and (C) has not permitted and shall not permit its assets to be listed as assets on the financial statement of any of its Affiliates except as required by GAAP; provided, however, that any such consolidated financial statement contains a note indicating that the Special Purpose Entity's separate assets and credit are not available to pay the debts of such Affiliate and that the Special Purpose Entity's liabilities do not constitute obligations of the consolidated entity;

(xiv) has maintained and shall maintain a sufficient number of employees in light of its contemplated business operations;

64198337

(xv) has observed and shall observe all partnership, corporate or limited liability company formalities, as applicable;

(xvi) has not incurred any Indebtedness other than (i) acquisition financing with respect to the Property; construction financing with respect to the Improvements and certain off-site improvements required by municipal and other authorities as conditions to the construction of the Improvements; and first mortgage financings secured by the Property; and Indebtedness pursuant to letters of credit, guaranties, interest rate protection agreements and other similar instruments executed and delivered in connection with such financings, (ii) unsecured trade payables and operational debt not evidenced by a note, and (iii) Indebtedness incurred in the financing of equipment and other personal property used on the Property;

(xvii) shall have no Indebtedness other than (i) the Loan, (ii) trade and operational liabilities incurred in the ordinary course of business relating to the ownership and operation of the Property and the routine administration of Borrower, in amounts not to exceed, in the aggregate, 2% of the amount of the Loan which liabilities are not more than sixty (60) days past the date incurred, are not evidenced by a note and are paid when due, and which amounts are normal and reasonable under the circumstances, and (iii) such other liabilities that are permitted pursuant to this Security Instrument;

(xviii) has not assumed, guaranteed or become obligated and shall not assume or guarantee or become obligated for the debts of any other Person, has not held out and shall not hold out its credit as being available to satisfy the obligations of any other Person or has not pledged and shall not pledge its assets for the benefit of any other Person, in each case except as permitted pursuant to this Security Instrument;

(xix) has not acquired and shall not acquire obligations or securities of its partners, members or shareholders or any other owner or Affiliate;

(xx) has maintained and used and shall maintain and use separate stationery, invoices and checks bearing its name and not bearing the name of any other entity unless such entity is clearly designated as being the Special Purpose Entity's agent;

(xxi) has not pledged and shall not pledge its assets to or for the benefit of any other Person other than with respect to loans secured by the Property and no such pledge remains outstanding except to Lender to secure the Loan;

(xxii) has held itself out and identified itself and shall hold itself out and identify itself as a separate and distinct entity under its own name or in a name franchised or licensed to it by an entity other than an Affiliate of Borrower and not as a division or part of any other Person (except for business conducted on behalf of itself by another Person under a business management services agreement that is on commercially-reasonable terms, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of Borrower), and has not failed and shall not fail to correct any known misunderstanding regarding the separate identity of such entity;

(xxiii) has maintained and shall maintain its assets in such a manner that it shall not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xxiv) has not made and shall not make loans to any Person and has not held and shall not hold evidence of indebtedness issued by any other Person or entity (other than cash and investment-grade securities issued by an entity that is not an Affiliate of or subject to common ownership with such entity);

(xxv) other than capital contributions and distributions permitted under the terms of its organizational documents, has not entered into or been a party to, and shall not enter into or be a party to, any transaction with any of its partners, members, shareholders or Affiliates except in the ordinary course of its business and on terms which are commercially reasonable terms comparable to those of an arm's-length transaction with an unrelated third party;

(xxvi) has not had and shall not have any obligation to, and has not indemnified and shall not indemnify its partners, officers, directors or members, as the case may be, in each case unless such an obligation or indemnification is fully subordinated to the Debt and shall not constitute a claim against it if its cash flow is insufficient to pay the Debt;

(xxvii) has considered and shall consider the interests of its creditors in connection with all actions;

(xxviii) has not had and shall not have any of its obligations guaranteed by any Affiliate except as provided by the Loan Documents;

(xxix) has not formed, acquired or held and shall not form, acquire or hold any subsidiary or make any investment in any Person;

(xxx) has complied and shall comply with all of the terms and provisions contained in its organizational documents;

(xxxi) has not permitted and shall not permit any Affiliate or constituent party independent access to its bank accounts.

"**State**" means, the State or Commonwealth in which the Land or any part thereof is located.

"**Substitution**" has the meaning set forth in Section 5.2.7(g) hereof.

"**Survey**" means a survey of the Property prepared by a surveyor and containing a certification of such surveyor satisfactory to Lender.

"**Tax and Insurance Escrow Fund**" has the meaning set forth in Section 7.2 hereof.

"**Taxes**" means all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against the Property or part thereof.

"**Tenant**" means the lessee of all or a portion of the Property under a Lease.

"**Title Insurance Policy**" means the mortgagee title insurance policy issued with respect to the Property and insuring the lien of this Security Instrument.

"**Transfer**" has the meaning set forth in Section 5.2.7(b) hereof.

"**Transferee**" has the meaning set forth in Section 5.2.7(e) hereof.

64198337

"**Transferee's Principals**" means collectively, (A) Transferee's managing members, general partners or principal shareholders and (B) such other members, partners or shareholders which directly or indirectly shall own a fifty-one percent (51%) or greater economic and voting interest in Transferee.

"**Trustee**" has the meaning set forth in the introductory paragraph hereto, together with its successors and permitted assigns.

"**UCC**" or "**Uniform Commercial Code**" has the meaning set forth in Section 2.1(g) hereof.

"**Upfront Rollover Reserve Account**" has the meaning set forth in Section 7.9 hereof.

"**Upfront Rollover Reserve Fund**" has the meaning set forth in Section 7.9 hereof.

"**U.S. Obligations**" means non redeemable, non prepayable, non callable securities evidencing an obligation to timely pay principal and/or interest in a full and timely manner that constitute "government securities" within the meaning of Section 2(a)(16) of the Investment Company Act of 1940, as amended, and are (a) direct obligations of the United States of America for the payment of which its full faith and credit is pledged, or (b) to the extent acceptable to the Rating Agencies, other "government securities" within the meaning of Section 2(a)(16) of the Investment Company Act of 1940, as amended.

"**Yield Maintenance Premium**" has the meaning set forth in the Note.

**Section 1.2**     **Principles of Construction**.   The following rules of construction shall be applicable for all purposes of this Security Instrument and all documents or instruments supplemental hereto, unless the context otherwise clearly requires: (a) any pronoun used herein shall be deemed to cover all genders, and words importing the singular number shall mean and include the plural number, and vice versa; (b) the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or"; (c) an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by Lender or cured (as determined by Lender in its discretion); (d) no inference in favor of or against any party shall be drawn from the fact that such party has drafted any portion hereof or any other Loan Document; (e) the cover page (if any) of, all recitals set forth in, and all Exhibits to, this Security Instrument are hereby incorporated herein; (f) all references to sections and exhibits are to sections and exhibits in or to this Security Instrument unless otherwise specified; (g) all uses of the words "include," "including" and similar terms shall be construed as if followed by the phrase "without being limited to" unless the context shall indicate otherwise; (h) unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import used in this Security Instrument shall refer to this Security Instrument as a whole and not to any particular provision of this Security Instrument; and (i) unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

## ARTICLE II – GRANTS OF SECURITY/CONDITIONS TO GRANT

**Section 2.1**     **Property Mortgaged**.   Borrower does hereby irrevocably grant, bargain, sell, pledge, assign, warrant, transfer and convey to Trustee for the benefit of Lender and its successors and assigns the following property, rights, interests and estates now owned, or hereafter acquired by Borrower (collectively, the "**Property**"):

(a)     The real property described in Exhibit A attached hereto and made a part hereof (the "**Land**"):

64198337

(b)     All additional lands. estates and development rights hereafter acquired by Borrower for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time. by supplemental deed of trust or otherwise be expressly made subject to the lien of this Security Instrument;

(c)     The buildings, structures, fixtures. additions, enlargements, extensions. modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (collectively, the "**Improvements**");

(d)     All easements, rights-of-way or use, rights, strips and gores of land, streets, ways. alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties. servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements and the reversion and reversions and remainders. and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Land and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(e)     All "goods" and "equipment," as such terms are defined in Article 9 of the Uniform Commercial Code, now owned or hereafter acquired by Borrower, which is used at or in connection with the Improvements or the Land or is located thereon or therein (including all machinery. equipment, furnishings, and electronic data-processing and other office equipment now owned or hereafter acquired by Borrower and any and all additions, substitutions and replacements of any of the foregoing), together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto (collectively, the "**Equipment**"). Notwithstanding the foregoing, Equipment shall not include any property belonging to tenants under leases except to the extent that Borrower shall have any right or interest therein;

(f)     All Equipment now owned, or the ownership of which is hereafter acquired, by Borrower which is so related to the Land and Improvements forming part of the Property that it is deemed fixtures or real property under the law of the particular state in which the Equipment is located, including all building or construction materials intended for construction, reconstruction, alteration or repair of or installation on the Property, construction equipment, appliances, machinery, plant equipment, fittings, apparatuses, fixtures and other items now or hereafter attached to, installed in or used in connection with (temporarily or permanently) any of the Improvements or the Land, including engines, devices for the operation of pumps, pipes, plumbing, cleaning. call and sprinkler systems, fire extinguishing apparatuses and equipment, heating, ventilating, laundry, incinerating, electrical, air conditioning and air cooling equipment and systems, gas and electric machinery, appurtenances and equipment. pollution control equipment, security systems, disposals, dishwashers, refrigerators and ranges, recreational equipment and facilities of all kinds, and water, gas, electrical. storm and sanitary sewer facilities, utility lines and equipment (whether owned individually or jointly with others, and, if owned jointly, to the extent of Borrower's interest therein) and all other utilities whether or not situated in easements, all water tanks. water supply, water power sites, fuel stations. fuel tanks, fuel supply, and all other structures, together with all accessions, appurtenances, additions, replacements, betterments and substitutions for any of the foregoing and the proceeds thereof (collectively, the "**Fixtures**").   Notwithstanding the foregoing. "Fixtures" shall not include any property which tenants are entitled to remove pursuant to leases except to the extent that Borrower shall have any right or interest therein;

(g)     All furniture, furnishings, objects of art, machinery, goods, tools, supplies, appliances, general intangibles, contract rights, accounts, accounts receivable, franchises, licenses,

23

certificates and permits, and all other personal property of any kind or character whatsoever as defined in and subject to the provisions of the Uniform Commercial Code, other than Fixtures, which are now or hereafter owned by Borrower and which are located within or about the Land and the Improvements, together with all accessories, replacements and substitutions thereto or therefor and the proceeds thereof (collectively, the "**Personal Property**"), and the right, title and interest of Borrower in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code in effect in the State in which the Property is located (the "**Uniform Commercial Code**" or the "**UCC**"), superior in lien to the lien of this Security Instrument and all proceeds and products of the above. Notwithstanding the foregoing, "Personal Property" shall not include any property which tenants are entitled to remove pursuant to their leases except to the extent that Borrower shall have any right or interest therein;

(h)  All leases, subleases or subsubleases, lettings, licenses, concessions or other agreements (whether written or oral) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of the Land and the Improvements, and every modification, amendment or other agreement relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, heretofore or hereafter entered into (collectively, the "**Leases**"), whether before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all Rents from the Land and the Improvements whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

(i)  All awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Property, from the exercise of the right of eminent domain (including any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

(j)  All proceeds in respect of the Property under any insurance policies covering the Property, including the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;

(k)  All refunds, rebates or credits in connection with reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari or any applications or proceedings for reduction;

(l)  All proceeds of the conversion, voluntary or involuntary, of any of the foregoing including proceeds of insurance and condemnation awards, into cash or liquidation claims;

(m)  The right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property;

(n)  All agreements (including without limitation, the Net Profits Agreement), contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any

24

Improvements or respecting or pertaining to any business or activity conducted on the Land and any part thereof and all right, title and interest of Borrower therein and thereunder, including the right, upon the occurrence and during the continuance of an Event of Default, to receive and collect any sums payable to Borrower thereunder;

(o)     All tradenames, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property;

(p)     All reserves, escrows and deposit accounts (including any lockbox, collection, clearing or cash management accounts) maintained by Borrower with respect to the Property, together with all deposits or wire transfers made to such accounts, all cash, checks, drafts, certificates, securities, investment property, financial assets, instruments and other property held therein from time to time and all proceeds, products, distributions or dividends or substitutions thereon and thereof;

(q)     All letter-of-credit rights (whether or not the letter of credit is evidenced by a writing) Borrower now has or hereafter acquires relating to the properties, rights, titles and interests referred to in this Section 2.1;

(r)     All commercial tort claims Borrower now has or hereafter acquires relating to the properties, rights, titles and interests referred to in this Section 2.1; and

(s)     Other Rights.  Any and all other rights of Borrower in and to the items set forth in Subsections (a) through (r) above.

AND without limiting any of the other provisions of this Security Instrument, to the extent permitted by applicable law, Borrower expressly grants to Lender as secured party, a security interest in the portion of the Property which is or may be subject to the provisions of the Uniform Commercial Code which are applicable to secured transactions; it being understood and agreed that the Improvements and Fixtures are part and parcel of the Land (the Land, the Improvements and the Fixtures collectively referred to as the "**Real Property**") appropriated to the use thereof and, whether affixed or annexed to the Real Property or not, shall for the purposes of this Security Instrument be deemed conclusively to be real estate and subject to this Security Instrument.

This Security Instrument and the grants, assignments and transfers made in this Article II are given for the purpose of securing the Obligations (including, but not limited to, all Debt).

Section 2.2     **Security Agreement**.  This Security Instrument is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code.  The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Property.  By executing and delivering this Security Instrument, Borrower hereby grants to Lender, as security for the Obligations, a security interest in the Fixtures, the Equipment and the Personal Property and other property constituting the Property, whether now owned or hereafter acquired, to the full extent that the Fixtures, the Equipment and the Personal Property and such other property may be subject to the Uniform Commercial Code (said portion of the Property so subject to the Uniform Commercial Code being called the "**Collateral**").  If an Event of Default shall occur and be continuing, Lender, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including the right to take possession of the Collateral or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Collateral.  Upon request or demand of Lender after the occurrence and during the

25

64198337

31

continuance of an Event of Default, Borrower shall, at its expense, assemble the Collateral and make it available to Lender at a convenient place (at the Land if tangible property) reasonably acceptable to Lender. Any notice of sale, disposition or other intended action by Lender with respect to the Collateral sent to Borrower in accordance with the provisions hereof at least five (5) Business Days prior to such action, shall, except as otherwise provided by applicable law, constitute reasonable notice to Borrower. Borrower's (debtor's) principal place of business is as set forth on page one hereof and the address of Lender (secured party) is as set forth on page one hereof.

Borrower shall promptly notify Lender of the existence of any commercial tort claim now or hereafter existing for the benefit of Borrower or the Property, and shall execute, acknowledge and deliver a security agreement or other documentation as Lender shall from time to time require to acquire and perfect a valid and binding security interest in such commercial tort claim.

**Section 2.3     Fixture Filing**.  Certain of the Property is or will become "fixtures" (as that term is defined in the Uniform Commercial Code) on the Land, and this Security Instrument, upon being filed for record in the real estate records of the city or county wherein such fixtures are situated, shall operate also as a financing statement filed as a fixture filing in accordance with the applicable provisions of said Uniform Commercial Code upon such of the Property that is or may become fixtures. Borrower hereby authorizes Lender to file, at any time, any financing statement (and any continuation statements and amendments thereto) deemed necessary by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein (including the filing of a financing statement with a generic description such as "all assets").

**Section 2.4     Common Law Pledge/Assignment**.     To the extent that the Uniform Commercial Code does not apply to any item of the Personal Property, it is the intention of this Security Instrument that Lender have a common law pledge and/or collateral assignment of such item of Personal Property.

**Section 2.5     Assignment of Rents**.  Borrower does hereby absolutely and unconditionally assign to Lender, as a present assignment, and not as additional security, all of Borrower's right, title and interest in all current and future Leases and Rents, it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only.  Such assignment shall not be construed to bind Lender to the performance of any of the covenants or provisions contained in any Lease or otherwise impose any obligation upon Lender.  Nevertheless, subject to the terms of this paragraph, Lender grants to Borrower a revocable license to operate and manage the Property and to collect the Rents subject to the requirements of this Security Instrument.  Upon an Event of Default, without the need for notice or demand, the license granted to Borrower herein shall automatically be revoked, and Lender shall immediately be entitled to possession of all Rents, whether or not Lender enters upon or takes control of the Property.  Borrower hereby grants and assigns to Lender the right, at Lender's option, upon revocation of the license granted herein, to enter upon the Property in person, by agent or by court appointed receiver to collect the Rents.  Any Rents collected after the revocation of such license may be applied toward payment of the Debt in such priority and proportions as Lender in its sole discretion shall deem proper.

## CONDITIONS TO GRANT

TO HAVE AND TO HOLD the above granted and described Property unto Trustee for the use and benefit of Lender, and its successors and assigns, forever;

26

64198337

32

IN TRUST, WITH POWER OF SALE, to secure payment to Lender of the Note, the Debt, and the Other Obligations, at the time and in the manner provided for its payment in the Note and in this Security Instrument.

PROVIDED, HOWEVER, these presents are upon the express condition that, if Borrower shall pay to Lender the Debt at the time and in the manner provided in the Loan Documents, shall perform the Other Obligations as set forth in this Security Instrument and shall abide by and comply with each and every covenant and condition set forth in any Loan Document, or upon the full defeasance of the Loan in accordance with the Note, these presents and the estate hereby granted shall cease, terminate and be void; provided, however, that Borrower's obligation to indemnify and hold harmless Lender pursuant to the provisions hereof shall survive any such payment or release.

## ARTICLE III – INTENTIONALLY OMITTED

## ARTICLE IV - REPRESENTATIONS AND WARRANTIES

**Section 4.1**    **Borrower Representations**. Borrower represents and warrants as of the date hereof that:

**4.1.1**   **Organization**. Borrower has been duly organized and is validly existing and in good standing with requisite power and authority to own the Property and to transact the businesses in which it is now engaged. Borrower is duly qualified to do business and is in good standing in the jurisdiction in which the Property is located and each other jurisdiction where it is required to be so qualified in connection with its businesses and operations. The direct and indirect ownership interests in Borrower are as set forth on the organizational chart attached hereto as Exhibit D, and the direct and indirect ownership interests in Borrower or the Property do not include any Prohibited Entity/Ownership Structure.

**4.1.2**   **Proceedings**. Borrower has taken all necessary action to authorize the execution, delivery and performance of this Security Instrument and the other Loan Documents.

**4.1.3**   **Litigation**. There are no actions, suits or proceedings at law or in equity, arbitrations, or governmental investigations by or before any Governmental Authority or other agency now pending, filed, or, to Borrower's knowledge, threatened against or affecting Borrower, Guarantor or the Property, which actions, suits or proceedings, or governmental investigations, if determined against Borrower, Guarantor or the Property, might materially adversely affect (a) title to the Property; (b) the validity or enforceability of this Security Instrument; (c) Borrower's ability to perform under the Loan; (d) Guarantor's ability to perform under the Guaranty; (e) the use, operation or value of the Property; (f) the principal benefit of the security intended to be provided by the Loan Documents; or (g) the current principal use of the Property.

**4.1.4**   **Title**. Borrower has good, marketable and insurable fee simple title to the real property comprising part of the Property and good title to the balance of the Property, free and clear of all Liens whatsoever except the Permitted Encumbrances, such other Liens as may be expressly permitted pursuant to the Loan Documents and the Liens created by the Loan Documents. There are no claims for payment for work, labor or materials affecting the Property which are or may become a Lien prior to, or of equal priority with, the Liens created by the Loan Documents.

**4.1.5**   **Solvency**. Borrower has (a) not entered into this transaction or executed the Note, this Security Instrument or any other Loan Documents with the actual intent to hinder, delay or defraud any creditor and (b) received reasonably equivalent value in exchange for its obligations under such Loan

27

Documents. Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including subordinated, unliquidated, disputed and contingent liabilities. Borrower's assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Neither Borrower nor any of its constituent Persons are contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of Borrower's assets or property, and Borrower has no knowledge of any Person contemplating the filing of any such petition against it or such constituent Persons.

**4.1.6   Full and Accurate Disclosure**.  No statement of fact made by Borrower in this Security Instrument or in any of the other Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading. There is no material fact presently known to Borrower which has not been disclosed to Lender which adversely affects, nor as far as Borrower can foresee, might adversely affect, the Property or the business, operations or condition of Borrower.

**4.1.7   No Plan Assets**.  Borrower does not sponsor, is not obligated to contribute to, and is not itself an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA or Section 4975 of the Code, and none of the assets of Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101.  In addition, (a) Borrower is not a "governmental plan" within the meaning of Section 3(32) of ERISA and (b) transactions by or with Borrower are not subject to any state or other statute , regulation or other restriction regulating investments of, or fiduciary obligations with respect to, governmental plans within the meaning of Section 3(32) of ERISA which is similar to the provisions of Section 406 of ERISA or Section 4975 of the Code and which prohibit or otherwise restrict the transactions contemplated by this Security Instrument, including the exercise by Lender of any of its rights under the Loan Documents.

**4.1.8   Compliance**.  Borrower and the Property and the use thereof comply in all material respects with all applicable Legal Requirements, including building and zoning ordinances and codes. Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority.  There has not been committed by Borrower or any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any other Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.  On the Closing Date, the Improvements at the Property were in material compliance with applicable law.

**4.1.9   Other Liabilities**.  Except for Permitted Encumbrances, Borrower does not have any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a material adverse effect on the Property or the current operation thereof, except as referred to or reflected in said financial statements.

**4.1.10   Condemnation**.  No Condemnation or other similar proceeding has been commenced or, to Borrower's best knowledge, is threatened or contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

**4.1.11   Utilities and Public Access**.  The Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its

64198337

intended uses. All roads necessary for the use of the Property for its current purposes have been completed and dedicated to public use and accepted by all Governmental Authorities.

**4.1.12 Not a Foreign Person.** Borrower is not a "foreign person" within the meaning of §1445(f)(3) of the Code.

**4.1.13 Separate Lots.** The Property is comprised of one (1) or more parcels which constitute a separate tax lot or lots and does not constitute a portion of any other tax lot not a part of the Property.

**4.1.14 Assessments.** There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

**4.1.15 Enforceability.** This Security Instrument and such other Loan Documents have been duly executed and delivered by or on behalf of Borrower. The Loan Documents are enforceable by Lender (or any subsequent holder thereof) in accordance with their respective terms. The Loan Documents are not subject to any right of rescission, set off, counterclaim or defense by Borrower or Guarantor, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable, and neither Borrower nor Guarantor has asserted any right of rescission, set off, counterclaim or defense with respect thereto.

**4.1.16 Insurance.** No claims have been made or are currently pending, outstanding or otherwise remain unsatisfied under any such Policy, and neither Borrower nor any other Person, has done, by act or omission, anything which would impair the coverage of any such Policy.

**4.1.17 Use of Property.** The Property is used exclusively for office, restaurant and bar purposes and other appurtenant and related uses.

**4.1.18 Certificate of Occupancy; Licenses.** All certifications, permits, franchises, licenses, consents, authorizations, and approvals, including, certificates of completion and occupancy permits, required for the legal use, occupancy and operation of the Property have been obtained and are in full force and effect. The use being made of the Property is in conformity with the certificate of occupancy issued for the Property.

**4.1.19 Flood Zone.** None of the Improvements on the Property are located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards, or, if so located, the flood insurance required pursuant to Section 6.1(a) is in full force and effect with respect to the Property.

**4.1.20 Physical Condition.** Except as otherwise disclosed in that certain Property Condition Assessment dated July 13, 2018, prepared by UES Consulting Services, Inc., delivered to Lender by Borrower in connection with the origination of the Loan, the Property, including all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are in good condition, order and repair in all material respects; there exists no structural or other material defects or damages in the Property, whether latent or otherwise, and Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

64198337

**4.1.21  Intentionally Omitted**.

**4.1.22  Leases**. The Property is not subject to any leases other than the Leases described in the rent roll attached hereto as <u>Exhibit B</u> and made a part hereof, which rent roll is true, complete and accurate in all respects as of the Closing Date. Borrower is the owner and lessor of landlord's interest in the Leases. No Person has any possessory interest in the Property or right to occupy the same except under and pursuant to the provisions of the Leases. The current Leases are in full force and effect and there are no defaults thereunder by either party and there are no conditions that, with the passage of time or the giving of notice, or both, would constitute defaults thereunder. No Rent has been paid more than one (1) month in advance of its due date. All security deposits are held by Borrower in accordance with applicable law. All work to be performed by Borrower under each Lease has been performed as required and has been accepted by the applicable Tenant, and any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by Borrower to any Tenant has already been received by such Tenant. There has been no prior sale, transfer or assignment, hypothecation or pledge of any Lease or of the Rents received therein which is outstanding. No Tenant listed on <u>Exhibit B</u> has assigned its Lease or sublet all or any portion of the premises demised thereby, no such Tenant holds its leased premises under assignment or sublease, nor does anyone except such Tenant and its employees occupy such leased premises. No Tenant under any Lease has a right or option pursuant to such Lease or otherwise to purchase all or any part of the leased premises or the building of which the leased premises are a part. No Tenant under any Lease has any right or option for additional space in the Improvements.

**4.1.23  Filing and Recording Taxes**. All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements have been paid. All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including this Security Instrument, have been paid.

**4.1.24  Special Purpose Entity/Separateness/No Prohibited Entity/Ownership Structure**. (a) Until the Debt has been paid in full, Borrower hereby represents, warrants and covenants that (i) Borrower is, shall be and shall continue to be a Special Purpose Entity, and (ii) no direct or indirect ownership interests in Borrower or the Property shall include any Prohibited Entity/Ownership Structure.

(b)  The representations, warranties and covenants set forth in <u>Section 4.1.24(a)</u> and <u>Section 4.1.24(c)</u> shall survive for so long as any amount remains payable to Lender under this Security Instrument or any other Loan Document.

(c)  Borrower hereby represents and warrants to Lender that: (i) Borrower is and always has been duly formed and validly existing in the state in which it was formed and in any other jurisdictions where it is qualified to do business; (ii) Borrower has no judgments or liens of any nature against it except for tax liens, liens created by any of the Loan Documents and liens encumbering the Property that will be satisfied with the proceeds of the Loan; (iii) Borrower is, to the best of its knowledge, in compliance with all laws, regulations and orders applicable to Borrower and has received all permits necessary for Borrower to operate and for which a failure to possess would materially and adversely affect the condition, financial or otherwise, of Borrower; (iv) Borrower is not aware of any pending or threatened litigation involving Borrower that, if adversely determined, might materially adversely affect the condition (financial or otherwise) of Borrower, or the condition or ownership of the property owned by Borrower; (v) Borrower is not involved in any dispute with any taxing authority; (vi) Borrower has paid or has caused to be paid all real estate taxes that are due and payable with respect to the Property; (vii) Borrower has never owned any property other than the Property and has never engaged in any business

64198337

except the ownership and operation of the Property; (viii) Borrower is not now, nor has ever been party to any lawsuit, arbitration, summons or legal proceeding that, if adversely determined, might materially adversely affect the condition (financial or otherwise) of Borrower or the condition or ownership of the property owned by Borrower; (ix) Borrower has provided Lender with complete financial statements that reflect a fair and accurate view of Borrower's financial condition; (x) At all times since its formation, Borrower has complied with the separateness covenants of a Special Purpose Entity; and (xi) Borrower has no contingent or actual obligations not related to the Property.

**4.1.25  Management Agreement.**  The Management Agreement is in full force and effect and there is no default thereunder by any party thereto and no event has occurred that, with the passage of time or the giving of notice would constitute a default thereunder.  The Management Agreement was entered into on commercially reasonable terms.

**4.1.26  Illegal Activity.**  No portion of the Property has been or will be purchased with proceeds of any illegal activity.

**4.1.27  No Change in Facts or Circumstances; Disclosure.**  All information submitted by and on behalf of Borrower to Lender and in all financial statements, rent rolls (including the rent roll attached hereto as Exhibit B), reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower in this Security Instrument or in any other Loan Document, are true, complete and correct in all material respects.  There has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects or might materially and adversely affect the use, operation or value of the Property or the business operations or the financial condition of Borrower.  Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any Provided Information or representation or warranty made herein to be materially misleading.

**4.1.28  Embargoed Person.**  As of the date hereof and at all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower and Guarantor constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person; (b) no Embargoed Person has any interest of any nature whatsoever in Borrower or Guarantor, as applicable, with the result that the investment in Borrower or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law; and (c) none of the funds of Borrower or Guarantor, as applicable, have been derived from any unlawful activity with the result that the investment in Borrower or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law.

**4.1.29  Principal Place of Business; State of Organization.**  Borrower's principal place of business as of the date hereof is the address set forth in the introductory paragraph of this Security Instrument.  Borrower's state of organization is as set forth in the introductory paragraph of this Security Instrument.

**4.1.30  Environmental Representations and Warranties.**  Except as otherwise disclosed by that certain Phase I environmental report (or Phase II environmental report, if required) delivered to Lender by Borrower in connection with the origination of the Loan (such report is referred to below as the "**Environmental Report**"), (a) there are no Hazardous Substances or underground storage tanks in, on, or under the Property and no Hazardous Substances have been handled, manufactured, generated, stored, processed, or disposed of on or released or discharged from the Property, except those that are (i) in compliance with Environmental Laws and with permits issued pursuant thereto (to the extent such permits are required under Environmental Law), (ii) de-minimis amounts necessary to operate the Property for the

64198337

purposes set forth in this Security Instrument which will not result in an environmental condition in, on or under the Property and which are otherwise permitted under and used in compliance with Environmental Law and (iii) fully disclosed to Lender in writing pursuant the Environmental Report; (b) there are no past, present or threatened Releases of Hazardous Substances in, on, under or from the Property which has not been fully remediated in accordance with Environmental Law; (c) there is no threat of any Release of Hazardous Substances migrating to the Property; (d) there is no past or present non-compliance with Environmental Laws, or with permits issued pursuant thereto, in connection with the Property which has not been fully remediated in accordance with Environmental Law; (e) Borrower does not know of, and has not received, any written or oral notice or other communication from any Person (including a Governmental Authority) relating to Hazardous Substances or Remediation thereof, of possible liability of any Person pursuant to any Environmental Law, other environmental conditions in connection with the Property, or any actual or potential administrative or judicial proceedings in connection with any of the foregoing; (f) Borrower has truthfully and fully disclosed to Lender, in writing, any and all information relating to environmental conditions in, on, under or from the Property that is known to Borrower and has provided to Lender all information that is contained in Borrower's files and records, including any reports relating to Hazardous Substances in, on, under or from the Property or to the environmental condition of the Property; and (g) there are no Institutional Controls on or affecting the Property.

    **4.1.31  Federal Reserve Regulations**.  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by any Legal Requirements or by the terms and conditions of this Security Instrument or the other Loan Documents.

    **4.1.32  REA**.  The REA (if any) is in full force and effect and neither Borrower nor, to the best of Borrower's knowledge, any other party to the REA (if any), is in default thereunder, and to the best of Borrower's knowledge after due inquiry, there are no conditions which, with the passage of time or the giving of notice, or both, would constitute a default thereunder.  Except as set forth in the Title Insurance Policy, the REA (if any) has not been modified, amended or supplemented.

    **4.1.33  Net Profits Agreement**.  Borrower is the current Grantor and Site Owner (each as defined in the Net Profits Agreement) under the Net Profits Agreement.  The Net Profits Agreement is in full force and effect and unmodified and all Excess Revenue (as defined in the Net Profits Agreement) payable thereunder has been paid to the extent such Excess Revenue was due and payable prior to the date hereof. No event has occurred which, with the passage of time, the giving of notice, or both, would result in a default or an event of default under the provisions of the Net Profits Agreement or in the performance of any of the terms, covenants, conditions or warranties thereof on the part of the grantor or grantee to be observed and performed.

    **Section 4.2  Survival of Representations**.  Borrower agrees that all of the representations and warranties of Borrower set forth in Section 4.1 hereof and elsewhere in this Security Instrument and in the other Loan Documents shall survive for so long as any amount remains owing to Lender under this Security Instrument or any of the other Loan Documents by Borrower.  All representations, warranties, covenants and agreements made in this Security Instrument or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

## ARTICLE V - BORROWER COVENANTS

64198337

**Section 5.1**     **Affirmative Covenants**.    From the date hereof and until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Lien of this Security Instrument encumbering the Property (and all related obligations) in accordance with the terms of this Security Instrument and the other Loan Documents, Borrower hereby covenants and agrees with Lender that:

**5.1.1    Existence; Compliance with Legal Requirements**.    Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits, authorizations, and franchises and comply with all Legal Requirements applicable to it and the Property, including all regulations, building and zoning codes and certificates of occupancy.    Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture.    Borrower shall at all times maintain, preserve and protect all franchises and trade names and preserve all the remainder of its property used or useful in the conduct of its business and shall keep the Property in good working order and repair, and from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto, all as more fully provided in the Loan Documents.    Borrower shall from time to time, upon Lender's reasonable request, provide Lender with evidence reasonably satisfactory to Lender that the Property complies with all Legal Requirements or is exempt from compliance with Legal Requirements.    Borrower shall give prompt notice to Lender of the receipt by Borrower of any notice related to a violation of any Legal Requirements and of the commencement of any proceedings or investigations which relate to compliance with Legal Requirements.

**5.1.2    Taxes and Other Charges**.    Borrower shall pay all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable; provided, however, Borrower's obligation to directly pay Taxes shall be suspended for so long as Borrower complies with the terms and provisions of <u>Section 7.2</u> hereof.    Borrower shall deliver to Lender receipts for payment or other evidence satisfactory to Lender that the Taxes and Other Charges have been so paid or are not then delinquent no later than ten (10) days prior to the date on which the Taxes or Other Charges would otherwise be delinquent if not paid.    Borrower shall furnish to Lender receipts for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent (provided, however, Borrower is not required to furnish such receipts for payment of Taxes if such Taxes have been paid by Lender pursuant to <u>Section 7.2</u> hereof and Lender has received receipts from the relevant taxing authority).    Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien or charge whatsoever which may be or become a Lien or charge against the Property, and shall promptly pay for all utility services provided to the Property.

**5.1.3    Litigation**.    Borrower shall give prompt written notice to Lender of any litigation or governmental proceedings pending or threatened against Borrower or Guarantor which might materially adversely affect Borrower's or Guarantor's condition (financial or otherwise) or business or the Property.

**5.1.4    Access to Property**.    Borrower shall permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice.

**5.1.5    Notice of Default**.    Borrower shall promptly advise Lender of any material adverse change in Borrower's or Guarantor's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower has knowledge.

**5.1.6    Perform Loan Documents**.    Borrower shall observe, perform and satisfy all the terms, provisions, covenants and conditions of, and shall pay when due all costs, fees and expenses to the extent required under the Loan Documents executed and delivered by, or applicable to, Borrower, and shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other

64198337

modification of any Loan Document executed and delivered by, or applicable to, Borrower without the prior written consent of Lender.

   **5.1.7**   **Award and Insurance Benefits**.  Borrower shall cooperate with Lender in obtaining for Lender the benefits of any Awards or Insurance Proceeds lawfully or equitably payable in connection with the Property, and Lender shall be reimbursed for any expenses incurred in connection therewith (including attorneys' fees and disbursements, and the payment by Borrower of the expense of an appraisal on behalf of Lender in case of Casualty or Condemnation affecting the Property or any part thereof) out of such Insurance Proceeds.

   **5.1.8**   **Further Assurances**.  Borrower shall, at Borrower's sole cost and expense: (a) furnish to Lender all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, and each and every other document, certificate, agreement and instrument required to be furnished by Borrower pursuant to the terms of the Loan Documents or which are reasonably requested by Lender in connection therewith; (b) execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve or protect the collateral at any time securing or intended to secure the obligations of Borrower under the Loan Documents, as Lender may reasonably require; and (c) do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Security Instrument and the other Loan Documents, as Lender shall reasonably require from time to time.

   **5.1.9**   **Principal Place of Business, State of Organization**.  Borrower shall not cause or permit any change to be made in its name, identity (including its trade name or names), place of organization or formation (as set forth in Section 4.1.29 hereof) or Borrower's corporate or partnership or other structure unless Borrower shall have first notified Lender in writing of such change at least thirty (30) days prior to the effective date of such change, and shall have first taken all action required by Lender for the purpose of perfecting or protecting the lien and security interests of Lender pursuant to this Security Instrument, and the other Loan Documents and, in the case of a change in Borrower's structure, without first obtaining the prior written consent of Lender, which consent may be given or denied in Lender's discretion.  Upon Lender's request, Borrower shall, at Borrower's sole cost and expense, execute and deliver additional security agreements and other instruments which may be necessary to effectively evidence or perfect Lender's security interest in the Property as a result of such change of principal place of business or place of organization.

   **5.1.10**   **Financial Reporting**.  (a) Borrower shall keep and maintain or shall cause to be kept and maintained on a Fiscal Year basis, in accordance with the requirements for a Special Purpose Entity set forth herein and GAAP (or such other accounting basis acceptable to Lender), proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense in connection with the operation of the Property.  Lender shall have the right from time to time at all times during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Borrower or any other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Lender shall desire.  During the continuance of an Event of Default, Borrower shall pay any costs and expenses incurred by Lender to examine Borrower's accounting records with respect to the Property, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

   (b)      Borrower shall furnish to Lender annually, within ninety (90) days following the end of each Fiscal Year of Borrower, a complete copy of Borrower's annual financial statements prepared in accordance with GAAP (or such other accounting basis acceptable to Lender) covering the Property for such Fiscal Year and containing statements of profit and loss for Borrower and the Property, an annual

34

64198337

rent roll and a balance sheet for Borrower (provided that if Borrower consists of more than one entity, said balance sheet shall be an annual combined balance sheet of the Borrower entities (and no other entities) including a combined statement of members' capital). Such statements shall set forth the financial condition and the results of operations for the Property for such Fiscal Year, and shall include amounts representing annual net operating income, Net Cash Flow, gross income, and operating expenses. Any such records, books, or statements delivered pursuant to this Section 5.1.10(b) shall be accompanied by an Officer's Certificate stating that such items are true and correct as of the date of such certificate.

(c)     Borrower shall furnish, or cause to be furnished, to Lender on or before forty-five (45) days after the end of each calendar quarter the following items, accompanied by an Officer's Certificate stating that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower and the Property (subject to normal year-end adjustments) as applicable: (i) a rent roll for the subject quarter; and (ii) quarterly and year-to-date operating statements (including Capital Expenditures) prepared for each calendar quarter, noting net operating income, gross income, and operating expenses (not including any contributions to the Replacement Reserve Fund and the Required Repairs Fund). In addition, such certificate shall also be accompanied by an Officer's Certificate stating that the representations and warranties of Borrower set forth in Section 4.1.24 are true and correct as of the date of such certificate.

(d)     Until the earlier of Securitization or nine (9) months after the date of this Security Instrument, Borrower shall furnish, or cause to be furnished, to Lender on or before twenty (20) days after the end of each calendar month, all of the following items with respect to the previous calendar month, accompanied by an Officer's Certificate stating that such items are true and correct as of the date of such certificate (subject to normal year-end adjustments) as applicable: (A) a rent roll for the subject month; (B) monthly operating statement(s) of the Property; and (C) year-to-date operating statement(s) of the Property.

(e)     Borrower shall cause Guarantor to furnish to Lender annually, within ninety (90) days following the end of each Fiscal Year of Guarantor: (i) if such Guarantor is an entity, financial statements, which shall include an annual balance sheet and profit and loss statement of Guarantor, in the form reasonably required by Lender, accompanied by a certificate of such Guarantor stating that such items are true and correct as of the date of such certificate or (ii) if such Guarantor is an individual, a signed personal financial statement in a form satisfactory to Lender.

(f)     Borrower shall furnish to Lender, within ten (10) Business Days after request (or as soon thereafter as may be reasonably possible), such further detailed information with respect to the operation of the Property and the financial affairs of Borrower as may be reasonably requested by Lender in its discretion.

(g)     Borrower agrees that Lender may disclose information that is provided to Lender pursuant to this Section 5.1.10 in connection with the Securitization to such parties requesting such information in connection with such Securitization.

(h)     For the partial year period commencing on the occurrence of a Cash Sweep Event, and for each Fiscal Year thereafter during any Cash Sweep Period, Borrower shall submit to Lender an Annual Budget (i) promptly after the occurrence of a Cash Sweep Period and (ii) not later than forty-five (45) days prior to the commencement of Borrower's Fiscal Year, each in form reasonably satisfactory to Lender. The Annual Budget shall be subject to Lender's written approval (each such Annual Budget, an "**Approved Annual Budget**"). If Lender objects to a proposed Annual Budget submitted by Borrower, Lender shall advise Borrower of such objections within fifteen (15) days after receipt thereof (and deliver

35

to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise such Annual Budget and resubmit the same to Lender. Lender shall advise Borrower of any objections to such revised Annual Budget within ten (10) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise the same in accordance with the process described in this subsection until Lender approves the Annual Budget. Until such time that Lender approves a proposed Annual Budget, the most recently Approved Annual Budget shall apply; provided that, such Approved Annual Budget shall be adjusted to reflect actual increases in Taxes, Insurance Premiums and Other Charges. If during a Cash Sweep Period Borrower must incur an extraordinary operating expense or capital expense not set forth in the Approved Annual Budget (each an "**Extraordinary Expense**"), then Borrower shall promptly deliver to Lender a reasonably detailed explanation of such proposed Extraordinary Expense for Lender's approval, which may be given or denied in Lender's discretion.

    **5.1.11**   **Business and Operations**. Borrower shall continue to engage in the businesses presently conducted by it as and to the extent the same are necessary for the ownership, maintenance, management and operation of the Property. Borrower shall qualify to do business and shall remain in good standing in the jurisdiction in which the Property is located and the jurisdiction of its formation. Borrower shall at all times during the term of the Loan, continue to own all of Equipment, Fixtures and Personal Property which are necessary to operate the Property in the manner required hereunder and in the manner in which it is currently operated.

    **5.1.12**   **Title to the Property**. Borrower shall warrant and defend (a) the title to the Property and every part thereof, subject only to Liens permitted hereunder (including Permitted Encumbrances) and (b) the validity and priority of the Lien of this Security Instrument on the Property, subject only to Liens permitted hereunder (including Permitted Encumbrances), in each case against the claims of all Persons whomsoever. Borrower shall reimburse Lender for any losses, costs, damages or expenses (including reasonable attorneys' fees and expenses) incurred by Lender if an interest in the Property, other than as permitted hereunder, is claimed by another Person. Borrower shall promptly pay when due all bills and costs for labor and materials ("**Labor and Material Costs**") incurred in connection with the Property. Borrower shall never permit to be created or exist in respect of the Property or any part thereof any lien or security interest other than the liens or security interests created pursuant to the Loan Documents and except for the Permitted Encumbrances.

    **5.1.13**   **Estoppel Statement**. (a) After request by Lender, Borrower shall use its best efforts to, within ten (10) days of such request, furnish Lender or any proposed assignee of the Loan with a statement, duly acknowledged and certified, setting forth matters reasonably requested by Lender and reasonably related to the Leases, the obligations secured hereby, the Property or this Security Instrument.

    (b)     Borrower shall deliver to Lender upon request, tenant estoppel certificates from each commercial Tenant leasing space at the Property in form and substance reasonably satisfactory to Lender provided that Borrower shall not be required to deliver such certificates more frequently than two (2) times in any calendar year.

    (c)     Borrower shall use its best efforts to deliver to Lender, within ten (10) days of Lender's request, estoppel certificates from each party under the REA (if any); provided that such certificates may be in the form required under such REA.

    **5.1.14**   **Confirmation of Representations**. Borrower shall deliver, in connection with any Securitization, (a) one (1) or more Officer's Certificates certifying as to the accuracy of all representations made by Borrower in the Loan Documents as of the date of the closing of such Securitization in all relevant jurisdictions, and (b) certificates of the relevant Governmental Authorities in all relevant

64198337

jurisdictions indicating the good standing and qualification of Borrower and Guarantor as of the date of the Securitization.

> **5.1.15  Environmental Covenants.** (a) Borrower covenants and agrees that: (i) all uses and operations on or of the Property, whether by Borrower or any other Person, shall be in compliance with all Environmental Laws and permits issued pursuant thereto; (ii) there shall be no Releases of Hazardous Substances in, on, under or from the Property; (iii) there shall be no Hazardous Substances in, on, or under the Property, except those that are (A) in compliance with all Environmental Laws and with permits issued pursuant thereto (to the extent such permits are required by Environmental Law), (B) de-minimis amounts necessary to operate the Property for the purposes set forth in this Security Instrument which will not result in an environmental condition in, on or under the Property and which are otherwise permitted under and used in compliance with Environmental Law and (C) fully disclosed to Lender in writing; (iv) Borrower shall keep the Property free and clear of all liens and other encumbrances imposed pursuant to any Environmental Law, whether due to any act or omission of Borrower or any other Person (the "**Environmental Liens**"); (v) Borrower shall, at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to <u>subsection (b)</u> below, including providing all relevant information and making knowledgeable persons available for interviews; (vi) intentionally omitted; (vii) Borrower shall, at its sole cost and expense, comply with all reasonable written requests of Lender made if Lender has reason to believe that an environmental hazard exists on the Property in order to: (A) reasonably effectuate Remediation of any condition (including a Release of a Hazardous Substance) in, on, under or from the Property; (B) comply with any Environmental Law; (C) comply with any directive from any Governmental Authority; and (D) take any other reasonable action necessary or appropriate for protection of human health or the environment; (viii) Borrower shall not do or allow any Tenant or other user of the Property to do any act that materially increases the dangers to human health or the environment, poses an unreasonable risk of harm to any Person (whether on or off the Property), impairs or may impair the value of the Property, is contrary to any requirement of any insurer, constitutes a public or private nuisance, constitutes waste, or violates any covenant, condition, agreement or easement applicable to the Property; (ix) Borrower shall immediately notify Lender in writing of (A) any presence or Releases or threatened Releases of Hazardous Substances in, on, under, from or migrating towards the Property; (B) any non-compliance with any Environmental Laws related in any way to the Property; (C) any actual or potential Environmental Lien; (D) any required or proposed Remediation of environmental conditions relating to the Property; and (E) any written or oral notice or other communication of which Borrower becomes aware from any source whatsoever (including a governmental entity) relating in any way to the release or potential release of Hazardous Substances or Remediation thereof, likely to result in liability of any Person pursuant to any Environmental Law, other environmental conditions in connection with the Property, or any actual or potential administrative or judicial proceedings in connection with anything referred to in this Section; (x) Borrower shall not install, use, generate, manufacture, store, treat, release or dispose of, nor permit the installation, use, generation, storage, treatment, release or disposal of, any Hazardous Substances (except de-minimis amounts necessary to operate the Property for the purposes set forth in this Security Instrument which will not result in an environmental condition in, on or under the Property and which are otherwise permitted under and used in compliance with Environmental Law) on, under or about the Property, and all uses and operations on or of the Property, whether by Borrower or any other person or entity, shall be in compliance with all Environmental Laws and permits issued pursuant thereto; (xi) Borrower shall not make any change in the use or condition of the Property which (A) might lead to the presence on, under or about the Property of any Hazardous Substances which is not in accordance with any applicable Environmental Law, or (B) would require, under any applicable Environmental Law, notice to be given to or approval be obtained from any governmental agency in the event of a transfer of ownership or control of the Property, in each case without the prior written consent of Lender; (xii) Borrower shall not allow any Institutional Control on or to affect the Property; and (xiii) Borrower shall take all acts necessary to preserve its status, if applicable, as an "innocent landowner," "contiguous property owner," or "prospective purchaser" as to the Property and as those terms are defined

37

in CERCLA; provided, however, that this covenant does not limit or modify any of Borrower's other duties or obligations under this Security Instrument.

(b)     If Lender has reason to believe that an environmental hazard exists on the Property, upon reasonable notice from Lender, Borrower shall, at Borrower's expense, promptly cause an engineer or consultant satisfactory to Lender to conduct an environmental assessment or audit (the scope of which shall be determined in Lender's discretion) and take any samples of soil, groundwater or other water, air, or building materials or any other invasive testing requested by Lender and promptly deliver the results of any such assessment, audit, sampling or other testing; provided, however, if such results are not delivered to Lender within a reasonable period or if Lender has reason to believe that an environmental hazard exists on the Property that, in Lender's sole judgment, endangers any Tenant or other occupant of the Property or their guests or the general public or may materially and adversely affect the value of the Property, upon reasonable notice to Borrower, Lender and any other Person designated by Lender, including any receiver, any representative of a governmental entity, and any environmental consultant, shall have the right, but not the obligation, to enter upon the Property at all reasonable times to assess any and all aspects of the environmental condition of the Property and its use, including conducting any environmental assessment or audit (the scope of which shall be determined in Lender's discretion) and taking samples of soil, groundwater or other water, air, or building materials, and reasonably conducting other invasive testing. Borrower shall cooperate with and provide Lender and any such Person designated by Lender with access to the Property.

(c)     Borrower shall promptly perform all necessary remedial work in response to the presence of any Hazardous Substances on the Property, any violation of any Environmental Laws, or any claims or requirements made by any governmental agency or authority. All such work shall be conducted by licensed and reputable contractors pursuant to written plans approved by the agency or authority in question (if applicable), under proper permits and licenses (if applicable) with such insurance coverage as is customarily maintained by prudent property owners in similar situations. If the cost of the work exceeds $100,000.00, then Lender shall have the right of prior approval over the environmental contractor and plans, which shall not be unreasonably withheld or delayed. All costs and expenses of the remedial work shall be promptly paid by Borrower. In the event Borrower fails to undertake the remedial work, or fails to complete the same within a reasonable time period after the same is undertaken, and if Lender is of the good faith opinion that Lender's security in the Property is jeopardized thereby, then Lender shall have the right to undertake or complete the remedial work itself. In such event all costs of Lender in doing so, including all fees and expenses of environmental consultants, engineers, attorneys, accountants and other professional advisors, shall become a part of the Loan and shall be due and payable from Borrower upon demand. Such amount shall be secured by the Loan Documents, and failure to pay the same shall be an Event of Default under the Loan Documents. In the event any Hazardous Substances are removed from the Property, either by Borrower or Lender, the number assigned by the United States Environmental Protection Agency to such Hazardous Substances shall be solely in the name of Borrower, and Borrower shall have any and all liability for such removed Hazardous Substances.

**5.1.16  Leasing Matters.**  Any Leases with respect to the Property written after the date hereof, for more than 6,000 square feet shall be subject to the prior written approval of Lender, which approval shall not be unreasonably withheld, conditioned or delayed. Upon request, Borrower shall furnish Lender with executed copies of all Leases. All renewals of Leases and all proposed Leases shall provide for rental rates comparable to existing local market rates. All proposed Leases shall be on commercially reasonable terms and shall not contain any terms which would materially affect Lender's rights under the Loan Documents. All Leases executed after the date hereof shall provide that they are subordinate to this Security Instrument and that the lessee agrees to attorn to Lender or any purchaser at a sale by foreclosure or power of sale. Borrower (i) shall observe and perform the obligations imposed upon the lessor under the Leases in a commercially reasonable manner; (ii) shall enforce and may amend or terminate the terms,

64198337

covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed in a commercially reasonable manner and in a manner not to impair the value of the Property involved except that no termination by Borrower or acceptance of surrender by a Tenant of any Leases shall be permitted unless by reason of a tenant default and then only in a commercially reasonable manner to preserve and protect the Property; provided, however, that no such termination or surrender of any Lease covering more than 6,000 square feet will be permitted without the prior written consent of Lender; (iii) shall not collect any of the rents more than one (1) month in advance (other than security deposits); (iv) shall not execute any other assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents); (v) shall not alter, modify or change the terms of the Leases in a manner inconsistent with the provisions of the Loan Documents; and (vi) shall execute and deliver at the request of Lender all such further assurances, confirmations and assignments in connection with the Leases as Lender shall from time to time reasonably require. Notwithstanding anything to the contrary contained herein, all new Leases and all amendments, modifications, extensions, and renewals of existing Leases with Tenants that are Affiliates of Borrower shall be subject to the prior written consent of Lender.

**5.1.17  Alterations.**  Borrower shall obtain Lender's prior written consent to any alterations to any Improvements for which the total projected cost exceeds $100,000.00, which consent shall not be unreasonably withheld, conditioned or delayed except with respect to alterations that may have a material adverse effect on Borrower's financial condition, the value of the Property or the Property's Net Operating Income.

**5.1.18  Operation of Property.**  Borrower shall cause the Property to be operated, in all material respects, in accordance with the Management Agreement (or Replacement Management Agreement) as applicable.  If the Management Agreement expires or is terminated (without limiting any obligation of Borrower to obtain Lender's consent to any termination or modification of the Management Agreement in accordance with the terms and provisions of this Security Instrument), Borrower shall promptly enter into a Replacement Management Agreement with Manager or another Qualified Manager, as applicable. Borrower shall:  (a) promptly perform or observe, in all material respects, all of the covenants and agreements required to be performed and observed by it under the Management Agreement and do all things necessary to preserve and to keep unimpaired its material rights thereunder; (b) promptly notify Lender of any material default under the Management Agreement  of which it is aware; (c) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, notice, report and estimate received by it under the Management Agreement; and (d) enforce the performance and observance of all of the covenants and agreements required to be performed or observed by Manager under the Management Agreement, in a commercially reasonable manner.

**5.1.19  Embargoed Person.**  Borrower has performed and shall perform reasonable due diligence to insure that at all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower and Guarantor constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person; (b) no Embargoed Person has any interest of any nature whatsoever in Borrower or Guarantor, as applicable, with the result that the investment in Borrower or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law; and (c) none of the funds of Borrower or Guarantor, as applicable, have been derived from, or are the proceeds of, any unlawful activity, including money laundering, terrorism or terrorism activities, with the result that the investment in Borrower or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law, or may cause the Property to be subject to forfeiture or seizure.

**5.1.20  General Indemnification.**  Borrower shall, at its sole cost and expense, protect (with legal counsel reasonably acceptable to Lender), defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all claims, suits, liabilities (including strict liabilities but

64198337

excluding consequential or remote and speculative damages), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement, punitive damages, of whatever kind or nature (including reasonable attorneys' fees and other costs of defense) (collectively, the "Losses") imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) ownership of this Security Instrument, the Property or any interest therein or receipt of any Rents; (b) any amendment to, or restructuring of, the Debt or any Loan Document; (c) any and all lawful action that may be taken by Lender in connection with the enforcement of the provisions of any Loan Document, whether or not suit is filed in connection with same, or in connection with Borrower, any guarantor or any indemnitor Person and/or any partner, joint venturer or shareholder thereof becoming a party to a voluntary or involuntary federal or state bankruptcy, insolvency or similar proceeding; (d) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (e) any use, nonuse or condition in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (f) any failure on the part of Borrower to perform or be in compliance with any of the terms of any Loan Document; (g) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (h) the failure of any person to file timely with the Internal Revenue Service an accurate Form 1099-B, Statement for Recipients of Proceeds from Real Estate, Broker and Barter Exchange Transactions, which may be required in connection with this Security Instrument, or to supply a copy thereof in a timely fashion to the recipient of the proceeds of the transaction in connection with which this Security Instrument is made; (i) any failure of the Property to be in compliance with any Legal Requirements; (j) the enforcement by any Indemnified Party of the provisions of this Security Instrument; (k) any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any Lease; (l) any and all claims (including lender liability claims) or demands by Borrower or any third parties, including any guarantor or indemnitor; (m) the payment of any commission, charge or brokerage fee to anyone claiming through Borrower which may be payable in connection with the funding of the Loan; or (n) any misrepresentation made by Borrower in this Security Instrument or any other Loan Document. Any amounts payable to an Indemnified Party by reason of the application of this Section 5.1.20 shall become due and payable fifteen (15) days after written demand by such Indemnified Party and shall bear interest at the Default Rate from the date such amounts became due and payable by such Indemnified Party until paid. Notwithstanding anything contained herein to the contrary, Borrower shall not be liable for, and Borrower's obligations under this Section 5.1.20 shall not apply to, any Losses to an Indemnified Party arising solely from the gross negligence or willful misconduct of such Indemnified Party as determined by a final non-appealable judgment of a court of competent jurisdiction.

    **5.1.21  Mortgage and/or Intangible Tax**.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all (a) Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of any Loan Document (excluding any income, franchise or other similar taxes), and (b) any documentary stamp taxes or intangible personal property taxes determined to be due in connection with any Loan Document, including all penalties and interest assessed or charged in connection therewith.

    **5.1.22  ERISA Indemnification**.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's

64198337

discretion) that Lender may incur, directly or indirectly, as a result of a breach of any of the representations made under Section 4.1.7 of this Security Instrument or a breach of any negative covenants contained in Section 5.2.6 of this Security Instrument.

**5.1.23  Survival**. The indemnifications made pursuant to Sections 5.1.20, 5.1.21, and 5.1.22 herein shall continue indefinitely in full force and effect and shall survive and shall in no way be impaired by any of the following: any satisfaction or other termination of this Security Instrument, any assignment or other transfer of all or any portion of this Security Instrument or Lender's interest in the Property (but, in such case, shall benefit both Indemnified Parties and any assignee or transferee), any exercise of Lender's rights and remedies pursuant hereto including foreclosure or acceptance of a deed in lieu of foreclosure, any exercise of any rights and remedies pursuant to any Loan Document, any transfer of all or any portion of the Property (whether by Borrower or by Lender following foreclosure or acceptance of a deed in lieu of foreclosure or at any other time), any amendment to any Loan Document, and any act or omission that might otherwise be construed as a release or discharge of Borrower from the obligations pursuant hereto.

**5.1.24  Duty to Defend**. Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties. Notwithstanding the foregoing, if the defendants in any such claim or proceeding include both Borrower and any Indemnified Party and Borrower and such Indemnified Party shall have reasonably concluded that there are any legal defenses available to it and/or other Indemnified Parties that are different from or additional to those available to Borrower, such Indemnified Party shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such Indemnified Party, provided that no compromise or settlement shall be entered without Borrower's consent, which consent shall not be unreasonably withheld, conditioned or delayed. If any Indemnified Parties are entitled to separately defend any indemnified matter as provided above, upon demand, Borrower shall pay or, in the sole and absolute discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

**5.1.25  Clearing Account**.

(a)      Within ten (10) Business Days following the occurrence of the first Cash Sweep Event, Borrower shall (i) deliver to Lender an original Clearing Account Agreement and (ii) establish an Eligible Account (the "**Clearing Account**") with Clearing Bank for the benefit of Lender, which Clearing Account shall be under the sole dominion and control of Lender. The Clearing Account shall be entitled in the name of Borrower for the benefit of Lender. Borrower hereby grants to Lender a first-priority security interest in the Clearing Account and all deposits at any time contained therein and the proceeds thereof and shall take all actions necessary to maintain in favor of Lender a perfected first priority security interest in the Clearing Account, including filing UCC-1 Financing Statements and continuations thereof. The Clearing Account shall constitute a "deposit account" or "securities account" within the meaning of the Uniform Commercial Code. Lender and Servicer shall have the sole right to make withdrawals from the Clearing Account. All costs and expenses for establishing and maintaining the Clearing Account shall be paid by Borrower. All monies now or hereafter deposited into the Clearing Account shall be deemed additional security for the Debt. Once established, the Clearing Account Agreement and Clearing Account shall remain in effect until the Loan has been repaid or defeased in full.

(b)      Upon the institution of the Clearing Account pursuant to subsection (a) above, Borrower shall, and shall cause Manager to, deposit all amounts received by Borrower or Manager constituting Rents into the Clearing Account within one (1) Business Day after receipt thereof. Until so deposited, all

41

Rents received by Borrower or Manager shall be held in trust for the benefit of Lender and shall not be commingled with any other funds or property of Borrower or Manager.

(c)     Upon the institution of the Clearing Account pursuant to <u>subsection (a)</u> above, Borrower shall obtain from Clearing Bank its agreement to transfer on each Business Day, or other period determined by Borrower, all amounts on deposit in the Clearing Account at the direction of Borrower unless a Cash Sweep Period is in effect, in which case such funds shall be transferred on each Business Day to the Cash Management Account.

(d)     Upon the occurrence of an Event of Default, Lender may, in addition to any and all other rights and remedies available to Lender, apply any sums then present in the Clearing Account to the payment of the Debt in any order in its discretion.

(e)     The Clearing Account shall not be commingled with other monies held by Borrower, Manager or Clearing Bank.

(f)     Borrower shall not further pledge, assign or grant any security interest in the Clearing Account or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.

(g)     Borrower shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and reasonable attorneys' fees and expenses) arising from or in any way connected with the Clearing Account or the Clearing Account Agreement (unless arising from the gross negligence or willful misconduct of Lender) or the performance of the obligations for which the Clearing Account was established.

(h)     Upon (i) Clearing Bank ceasing to be an Eligible Institution, (ii) the Clearing Account ceasing to be an Eligible Account, (iii) any resignation by Clearing Bank or termination of the Clearing Account Agreement by Clearing Bank or Lender or (iv) the occurrence and continuance of an Event of Default, Borrower shall, within fifteen (15) days of Lender's written request, (A) terminate the existing Clearing Account Agreement, (B) appoint a new Clearing Bank (which such Clearing Bank shall (I) be an Eligible Institution, (II) other than during the continuance of an Event of Default, be selected by Borrower and approved by Lender and (III) during the continuance of an Event of Default, be selected by Lender), (C) cause such Clearing Bank to open a new Clearing Account (which such account shall be an Eligible Account) and enter into a new Clearing Account Agreement with Lender on substantially the same terms and conditions as the previous Clearing Account Agreement and (D) send any notices required pursuant to the terms hereof relating to such new Clearing Account Agreement and Clearing Account. Upon the institution of the Clearing Account pursuant to <u>subsection (a)</u> above, Borrower constitutes and appoints Lender its true and lawful attorney-in-fact with full power of substitution to complete or undertake any action required of Borrower under this <u>Section 5.1.25</u> in the name of Borrower in the event Borrower fails to do the same. Such power of attorney shall be deemed to be a power coupled with an interest and cannot be revoked.

**5.1.26    <u>Cash Management Account</u>.**

(a)  Within ten (10) Business Days following the occurrence of a Cash Sweep Event, Borrower shall (i) deliver to Lender an original Cash Management Agreement and (ii) during any Cash Sweep Period, establish and maintain an Eligible Account (the "**Cash Management Account**") with Agent in Borrower's name for the benefit of Lender, which Cash Management Account shall be under the sole

64198337

dominion and control of Lender. Borrower hereby grants to Lender a first priority security interest in the Cash Management Account and all deposits at any time contained therein and the proceeds thereof and shall take all actions necessary to maintain in favor of Lender a perfected first priority security interest in the Cash Management Account, including filing UCC-1 Financing Statements and continuations thereof. The Cash Management Account shall constitute a "deposit account" or "securities account" within the meaning of the Uniform Commercial Code. Upon the institution of the Cash Management Account pursuant to subsection (a) above, Lender and Servicer shall have the sole right to make withdrawals from the Cash Management Account and all costs and expenses for establishing and maintaining the Cash Management Account shall be paid by Borrower.

(b)        Provided no Event of Default shall have occurred and be continuing, on each Payment Date (or, if such Payment Date is not a Business Day, on the immediately succeeding Business Day) all funds on deposit in the Cash Management Account shall be applied by Lender (or by Agent at Lender's direction) to the payment of the following items in the order indicated:

(i)        First, payment to Lender (for deposit in the Tax and Insurance Escrow Account) in respect of the Tax and Insurance Escrow Funds in accordance with the terms and conditions of Section 7.2 hereof, to be disbursed as set forth in this Security Instrument;

(ii)        Second, payment to Agent of the fees and expenses of Agent then due and payable pursuant to the Cash Management Agreement;

(iii)        Third, payment to Lender of the Monthly Debt Service Payment Amount due on such Payment Date;

(iv)        Fourth, payment to Lender (for deposit in the Replacement Reserve Account) in respect of the Replacement Reserve Monthly Deposit in accordance with the terms and conditions of Section 7.3.1 hereof;

(v)        Fifth, payment to Lender (for deposit in the Monthly Rollover Reserve Account) in respect of the Rollover Reserve Monthly Deposit in accordance with the terms and conditions of Section 7.4 hereof;

(vi)        Sixth, payment to Lender of any other amounts then due and payable under the Loan Documents (other than the Outstanding Principal Balance);

(vii)        Seventh, if a Cash Sweep Period is then continuing, payment to Borrower in an amount equal to the aggregate of (A) Operating Expenses due and payable by Borrower during the succeeding month as set forth in the Approved Annual Budget, and (B) Extraordinary Expenses, if any, approved by Lender;

(viii)        Eighth, if a Cash Sweep Period is then continuing, payment of all amounts then remaining after payment of items (i) through (vii) (all amounts then remaining after payment of items (i) through (vii) being hereinafter referred to as "**Excess Cash**") to the Pour Taproom Rollover Reserve Fund in accordance with the terms and conditions of Sections 7.8 hereof; and

(ix)        Lastly, if no Cash Sweep Period is then continuing, all Excess Cash to Borrower.

64198337

(c)     The insufficiency of funds on deposit in the Cash Management Account shall not relieve Borrower from the obligation to make any payments, as and when due pursuant to this Security Instrument and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever.

(d)     All funds on deposit in the Cash Management Account following the occurrence of an Event of Default may be applied by Lender in such order and priority as Lender shall determine.

(e)     Borrower hereby agrees that Lender may modify the Cash Management Agreement for the purpose of establishing additional sub-accounts in connection with any payments otherwise required under this Security Instrument and the other Loan Documents and Lender shall provide notice thereof to Borrower.

(f)     Notwithstanding anything to the contrary contained in this Security Instrument or the other Loan Documents, and provided no Event of Default has occurred and is continuing, Borrower's obligations with respect to the payment of the Monthly Debt Service Payment Amount and amounts required to be deposited into the Reserve Funds, if any, shall be deemed satisfied to the extent sufficient amounts are deposited in the Cash Management Account to satisfy such obligations pursuant to this Security Instrument on the dates each such payment is required, regardless of whether any of such amounts are so applied by Lender.

**5.1.27  Net Profits Agreement.**  (a) With respect to the Net Profits Agreement, Borrower covenants and agrees as follows: (i) to promptly and faithfully observe, perform and comply with all the terms, covenants and provisions thereof on its part to be observed, performed and complied with, at the times set forth therein, and to do all things necessary to preserve unimpaired its rights thereunder; (ii) not to do, permit, suffer or refrain from doing anything, as a result of which there could be a default under or breach of any of the terms thereof; (iii) not to terminate (pursuant to the terms thereof or otherwise), cancel, surrender, modify, amend or in any way alter or permit the alteration of any of the terms thereof and not to release the grantee under the Net Profits Agreement from any obligations imposed upon it thereby; (iv) not to assign the Net Profits Agreement in whole or in part; (v) to give Lender prompt written notice of any default by Borrower or the grantee under the Net Profits Agreement and to promptly deliver to Lender copies of each notice of default and all other material notices, communications, plans, specifications and other similar instruments received or delivered by Borrower in connection therewith; and (vi) to furnish to Lender such information and evidence as Lender may reasonably require concerning Borrower's due observance, performance and compliance with the terms, covenants and provisions thereof.

**Section 5.2     Negative Covenants.**  From the date hereof until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Lien of this Security Instrument and any other collateral in accordance with the terms of this Security Instrument and the other Loan Documents, Borrower covenants and agrees with Lender that it shall not do, directly or indirectly, any of the following:

**5.2.1     Operation of Property.**  (a) Borrower shall not, without Lender's prior written consent (which consent shall not be unreasonably withheld): (i) surrender, terminate, cancel, amend or modify the Management Agreement; provided, that Borrower may, without Lender's consent, replace the Manager so long as the replacement manager is a Qualified Manager pursuant to a Replacement Management Agreement; (ii) reduce or consent to the reduction of the term of the Management Agreement; (iii) increase or consent to the increase of the amount of any charges under the Management Agreement, or (iv) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Management Agreement in any material respect.

44

64198337

(b)      Following the occurrence and during the continuance of an Event of Default, Borrower shall not exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Management Agreement without the prior written consent of Lender, which consent may be granted, conditioned or withheld in Lender's discretion.

(c)      If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Borrower shall not cause or permit the nonconforming use or Improvement to be discontinued or abandoned without the express written consent of Lender.

(d)      No portion of the Property has been or will be purchased, improved, equipped or furnished with proceeds of any illegal activity and to the best of Borrower's knowledge, there are no illegal activities or activities relating to controlled substances (which shall include, without limitation, the growing, distributing and/or selling or dispensing of marijuana, whether for medical use or otherwise). Borrower has not, will not, and will not permit the operation or use of the Property in any manner that would afford any Governmental Authority a right of forfeiture against the Property or any part thereof and, irrespective of the legality of such activity, no portion of the Property shall be operated or used for growing, distributing, selling and/or dispensing of marijuana, whether for medical use or otherwise.

**5.2.2   Liens.** Borrower shall not create, incur, assume or suffer to exist any Lien on any portion of the Property or permit any such action to be taken, except for Permitted Encumbrances.

**5.2.3   Dissolution.**   Borrower shall not (a) engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, (b) engage in any business activity not related to the ownership and operation of the Property, (c) transfer, lease or sell, in one transaction or any combination of transactions, the assets or all or substantially all of the properties or assets of Borrower except to the extent permitted by the Loan Documents, or (d) modify, amend, waive or terminate its organizational documents or its qualification and good standing in any jurisdiction, in each case, without obtaining the prior written consent of Lender or Lender's designee.

**5.2.4   Zoning.**   Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior written consent of Lender.

**5.2.5   No Joint Assessment.**   Borrower shall not suffer, permit or initiate the joint assessment of the Property (a) with any other real property constituting a tax lot separate from the Property, and (b) which constitutes real property with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to such real property portion of the Property.

**5.2.6   ERISA.**   (a) Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Security Instrument or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

(b)      Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender in its discretion, that (A) Borrower is not and does not maintain an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title 1 of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (B) Borrower is not subject to any state statute regulating investment of, or

fiduciary obligations with respect to governmental plans and (C) one or more of the following circumstances is true:

(i)     Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. §2510.3-101(b)(2);

(ii)     Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R. §2510.3-101(f)(2); or

(iii)     Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. §2510.3-101(c) or (e).

**5.2.7**    **Transfers.** (a) Borrower acknowledges that Lender has examined and relied on the experience of Borrower and its stockholders, general partners, members, principals and (if Borrower is a trust) beneficial owners in owning and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for repayment of the Debt and the performance of the Other Obligations. Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Debt or the performance of the Other Obligations, Lender can recover the Debt by a sale of the Property.

(b)     Without the prior written consent of Lender, and except to the extent otherwise set forth in this Section 5.2.7, Borrower shall not, and shall not permit any Restricted Party to do any of the following (collectively, a "**Transfer**"): (i) sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) the Property or any part thereof or any legal or beneficial interest therein or any interest of Borrower in the Loan or (ii) permit a Sale or Pledge of an interest in any Restricted Party, other than (A) pursuant to Leases of space in the Improvements to Tenants in accordance with the provisions of Section 5.1.16 and (B) Permitted Transfers.

(c)     A Transfer shall include (i) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space Tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general partner or any profits or proceeds relating to such partnership interest, or the Sale or Pledge of limited partnership interests or any profits or proceeds relating to such limited partnership interest or the creation or issuance of new limited partnership interests; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non managing member (or if no managing member, any member) or the Sale or Pledge of the membership interest of a managing member (or if no managing member, any member) or any profits or proceeds relating to such membership interest, or the Sale or Pledge of non managing membership interests or the creation or issuance of new non managing membership interests; (vi) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of

46

64198337

new legal or beneficial interests; or (vii) the removal or the resignation of the managing agent (including an Affiliated Manager) other than in accordance with Section 5.1.18 hereof.

(d)     Notwithstanding the provisions of this Section 5.2.7, Lender's consent shall not be required in connection with one or a series of Transfers, of not more than forty-nine percent (49%) of the stock, the limited partnership interests or non-managing membership interests (as the case may be) in a Restricted Party; provided, however, no such Transfer shall result in the change of Control in a Restricted Party, and as a condition to each such Transfer, Lender shall receive not less than thirty (30) days prior written notice of such proposed Transfer. Borrower shall pay any and all reasonable out-of-pocket costs and expenses incurred in connection with such Transfers (including Lender's counsel fees and disbursements and any fees and expenses of the Rating Agencies).

(e)     No Transfer of the Property and assumption of the Loan shall occur during the period that is sixty (60) days prior to and sixty (60) days after a Securitization. Notwithstanding anything to the contrary contained herein, so long as no Default or Event of Default is ongoing, Borrower shall have the right to convey the entire Property to a new borrower and have such new borrower assume all of Borrower's obligations under the Loan Documents, and have replacement guarantors and indemnitors replace the Guarantors and Indemnitors with respect to all of the obligations of the Guarantors and Indemnitors under the Loan Documents from and after the date of such Transfer, subject to the following terms and conditions: (i) Borrower shall pay Lender a transfer fee equal to one percent (1%) of the outstanding principal balance of the Loan at the time of such transfer; (ii) Borrower shall pay Lender a processing fee in the amount of $15,000.00; (iii) Borrower shall pay any and all reasonable out-of-pocket costs incurred in connection with such Transfer (including Lender's counsel fees and disbursements and all recording fees, and mortgage and intangible taxes); (iv) the proposed transferee (the "**Transferee**") and Transferee's Principals have reasonable experience in owning, operating or managing commercial real estate; (v) Lender's receipt of, with respect to Transferee and Transferee's Principals, satisfactory search results (which may include, but not be limited to, search results related to public records, background, UCC filings, ongoing litigation, credit, bankruptcy and OFAC); (vi) the proposed new guarantor shall, as of the date of such Transfer, have (A) a Net Worth of not less than $2,500,000.00 (excluding from such calculation the value of such proposed guarantor's direct or indirect interest in the Borrower) and Liquid Assets having a market value of not less than $300,000.00; (vii) Transferee shall assume all of the obligations of Borrower under the Loan Documents by entering into an assumption agreement in form and substance satisfactory to Lender; and (viii) prior to any release of Guarantor, (A) the proposed guarantor shall have assumed all of the liabilities and obligations of Guarantor under the Guaranty and Environmental Indemnity executed by Guarantor or (B) shall have executed a replacement guaranty and environmental indemnity in substantially the same form as the Guaranty and Environmental Indemnity; *provided, however,* that any such release of Borrower or Guarantor pursuant to this Section 5.2.7(e) shall not apply to any acts, events or omissions which occurred prior to the effective date of such Transfer, whether or not the effects of or damages from such acts, events or omissions are apparent or ascertainable as of such effective date (i.e, existing environmental claims).

(f)     Without Lender's prior written consent thereto, in its sole discretion, any Transfer or Permitted Transfer resulting in any direct or indirect ownership interests in Borrower or the Property being held in any Prohibited Entity/Ownership Structure is prohibited, even if the same would be otherwise allowed pursuant to this Section 5.2.7, the definition of a Permitted Transfer or any other provision of any Loan Document.

(g)     To the extent that any Guarantor is a natural person, the death or incapacity of such Guarantor shall be an Event of Default hereunder unless such Guarantor is replaced in accordance with this Section 5.2.7(g).     Borrower shall be permitted to substitute a replacement guarantor (a "**Substitution**") and no Event of Default shall be deemed to have occurred hereunder, provided that each

47

of the following terms and conditions are satisfied: (i) no Event of Default shall have occurred and be continuing or would occur as a result of such Substitution; (ii) within thirty (30) days after the occurrence of such death or incapacity, Borrower delivers to Lender notice of its intent to substitute such Guarantor and, concurrently therewith, gives Lender all such information concerning the proposed substitute guarantor as Lender may reasonably require, including, without limitation, certified financial statements detailing assets and liabilities; (iii) the replacement guarantor is a Satisfactory Replacement Guarantor; (iv) within fifteen (15) days after delivery of the written notice described in the preceding clause (ii), such Satisfactory Replacement Guarantor (A) assumes the obligations of Guarantor under the Guaranty and the Environmental Indemnity for events or conditions occurring prior to, as of and after the Substitution or (B) executes and delivers to Lender a replacement guaranty and a replacement environmental indemnity in each case in form and substance the same as the Guaranty and the Environmental Indemnity, respectively, and otherwise reasonably acceptable to Lender, for events or conditions occurring prior to, as of and after the Substitution; (v) concurrently with such assumption or execution and delivery (A) such Satisfactory Replacement Guarantor delivers to Lender a spousal consent in form and substance acceptable to Lender, as and to the extent applicable, and (B) each of Borrower, the remaining Guarantors and/or such Satisfactory Replacement Guarantor, as applicable, affirms each of their respective obligations under the Loan Documents; (vi) Borrower shall have obtained prior written confirmation from the applicable Rating Agencies that such Substitution will not cause a downgrade, withdrawal or qualification of the then current rating of the Securities or any class thereof; (vii) if required by Lender or the Rating Agencies, Borrower delivers to Lender an opinion from counsel, and in form and substance, in each case reasonably acceptable to Lender and acceptable to Lender stating, among other things, (A) that the Guaranty and the Environmental Indemnity (or the replacement guaranty and environmental indemnity, as the case may be) are enforceable against such Satisfactory Replacement Guarantor in accordance with their terms and (B) that any REMIC Trust formed pursuant to a Securitization will not fail to maintain its status as a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code or be subject to tax as a result of such Substitution. No such death or replacement of a Guarantor shall hinder, impair, limit, terminate or effectuate a novation of the obligations or liabilities of any other Guarantor under any of the Loan Documents.

Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon Borrower's Transfer without Lender's consent. This provision shall apply to every Transfer regardless of whether voluntary or not, or whether or not Lender has consented to any previous Transfer.

**5.2.8    Waste.**  Borrower shall not commit or suffer any waste of the Property ("waste" meaning the diminution in the Property's value resulting from Borrower's negligent or willful failure to manage, maintain, repair and otherwise operate the Property in a commercially reasonable manner) or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or allow the cancellation of any Policy, or do or permit to be done thereon anything that may in any way materially impair the value of the Property or the security of this Security Instrument. Borrower shall not, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Land, regardless of the depth thereof or the method of mining or extraction thereof.

**5.2.9    Material Agreements.**  Borrower shall not (a) be in default under any Material Agreements beyond the expiration of applicable notice and grace periods, if any, thereunder, or (iii) terminate, amend, supplement, replace, restate or otherwise modify any Material Agreement without Lender's prior written consent.

### ARTICLE VI - INSURANCE; CASUALTY; CONDEMNATION

64198337

**Section 6.1      Insurance.**  (a) Borrower shall obtain and maintain, or cause to be maintained, insurance for Borrower and the Property providing at least the following coverages:

(i)        comprehensive all risk "special form" insurance including loss caused by any type of windstorm, windstorm related perils, "named storms," or hail on the Improvements and the Personal Property, including contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements, (A) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," which for purposes of this Security Instrument means actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation; (B) containing an agreed amount endorsement with respect to the Improvements and Personal Property waiving all co-insurance provisions or to be written on a no co-insurance form; (C) providing for no deductible in excess of 5% of Net Cash Flow of the Property for all such insurance coverage; provided however with respect to windstorm and earthquake coverage, providing for a deductible satisfactory to Lender in its discretion; and (D) if any of the Improvements or the use of the Property shall at any time constitute legal non-conforming structures or uses, coverage for loss due to operation of law in an amount equal to the full Replacement Cost, coverage for demolition costs and coverage for increased costs of construction.  In addition, Borrower shall obtain: (y) if any material portion of the Improvements is currently or at any time in the future located in a federally designated "special flood hazard area," flood hazard insurance in an amount equal to the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended, plus excess flood coverage in an amount equal to the "probable maximum loss" for the Improvements, as determined by an engineer satisfactory to Lender, or such greater amount as Lender shall require, and (z) earthquake insurance in amounts and in form and substance satisfactory to Lender (but in any event, in an amount not less than 150% of the "probable maximum loss") in the event the Property is located in an area with a high degree of seismic activity and the "probable maximum loss" for the Improvements, as determined by an engineer satisfactory to Lender, is 20% or greater (based on a 475-year return period, an exposure period of 50 years and a 10% probability of exceedance), provided that the insurance pursuant to clauses (y) and (z) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under this subsection (i);

(ii)       business income or rental loss insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in subsection (i) above; and (C) in an amount equal to one hundred percent (100%) of the projected gross revenues from the operation of the Property (as reduced to reflect expenses not incurred during a period of Restoration) for a period of not less than twelve (12) months from the date of casualty or loss. The amount of such business income or rental loss insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the gross revenues from the Property for the succeeding twelve (12) month period.  All proceeds payable to Lender pursuant to this subsection shall be held by Lender and shall be applied to the obligations secured by the Loan Documents from time to time due and payable hereunder and under the Note; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the obligations secured by the Loan Documents on the respective dates of payment provided for in this Security Instrument and the other Loan Documents except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(iii)      at all times during which structural construction, repairs or alterations are being made with respect to the Improvements, and only if the Property coverage form does not otherwise apply, (A) owner's contingent or protective liability insurance, otherwise known as

49

Owner Contractor's Protective Liability, covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy and (B) the insurance provided for in <u>subsection (i)</u> above written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to <u>subsection (i)</u> above, (3) including permission to occupy the Property and (4) with an agreed amount endorsement waiving co-insurance provisions;

     (iv)    comprehensive boiler and machinery insurance, if steam boilers, other pressure-fixed vessels, large air conditioning systems, elevators or other large machinery are in operation, in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance policy required under <u>subsection (i)</u> above;

     (v)    commercial general liability insurance against claims for personal injury, bodily injury, death, contractual damage or property damage occurring upon, in or about the Property, such insurance (A) to be on the so-called "occurrence" form with a combined limit of not less than $2,000,000.00 in the aggregate and $1,000,000.00 per occurrence; (B) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) blanket contractual liability for all written contracts; and (5) contractual liability covering the indemnities contained in Article 5 of this Security Instrument to the extent the same is available;

     (vi)    automobile liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence of $1,000,000.00;

     (vii)    worker's compensation and employee's liability subject to the worker's compensation laws of the applicable state;

     (viii)    umbrella and excess liability insurance in an amount not less than $5,000,000.00 per occurrence, on terms consistent with the commercial general liability insurance policy required under <u>subsection (v)</u> above, including supplemental coverage for employer liability and automobile liability, which umbrella liability coverage shall apply in excess of the automobile liability coverage in clause (vi) above;

     (ix)    the insurance required under this <u>Section 6.1(a)</u> above shall cover perils of terrorism and acts of terrorism and Borrower shall maintain insurance for loss resulting from perils and acts of terrorism on terms (including amounts) consistent with those required under <u>Section 6.1(a)</u> above at all times during the term of the Loan; and

     (x)    upon sixty (60) days written notice, such other reasonable insurance, including sinkhole or land subsidence insurance, and in such reasonable amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is located.

     (b)    All insurance provided for in <u>Section 6.1(a)</u> hereof, shall be obtained under valid and enforceable policies (collectively, the "**Policies**" or in the singular, the "**Policy**"), and shall be subject to the approval of Lender as to insurance companies, amounts, deductibles, loss payees and insureds. The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the State and having a rating of "A-:VIII" or better in the current Best's Insurance Reports and

64198337

a claims paying ability rating of "A-" or better by S&P, and "A3" or better by Moody's. Notwithstanding the foregoing, the rating of the insurance company issuing the Policy for any required earthquake insurance must have a rating of "A:VIII" or better in the current Best's Insurance Reports and a claims paying ability rating of "A-" or better by S&P, and "A3" or better by Moody's. The Policies described in Section 6.1 hereof (other than those strictly limited to liability protection) shall designate Lender as loss payee. Not less than ten (10) days prior to the expiration dates of the Policies theretofore furnished to Lender, certificates of insurance evidencing the Policies accompanied by evidence satisfactory to Lender of payment of the premiums due thereunder (the "**Insurance Premiums**"), shall be delivered by Borrower to Lender.

(c)     Any blanket insurance Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 6.1(a) hereof.

(d)     All Policies provided for or contemplated by Section 6.1(a) hereof, except for the Policy referenced in Section 6.1(a)(vii) of this Security Instrument, shall name Borrower as the insured and Lender as the additional insured, as its interests may appear, and in the case of property damage, boiler and machinery, flood and earthquake insurance, shall contain a so-called New York standard non-contributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender.

(e)     All Policies shall contain clauses or endorsements to the effect that:

(i)     no act or negligence of Borrower, or anyone acting for Borrower, or of any Tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned;

(ii)     the Policy shall not be canceled (A) for nonpayment of a premium without at least ten (10) days written notice to Lender and any other party named therein as an additional insured, and (B) for any reason other than non-payment of a premium without at least thirty (30) days written notice to Lender and any other party named therein as an additional insured;

(iii)     the issuers thereof shall give written notice to Lender if the Policy has not been renewed thirty (30) days prior to its expiration; and

(iv)     Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

(f)     If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property, including the obtaining of such insurance coverage as Lender in its discretion deems appropriate after three (3) Business Days' notice to Borrower if prior to the date upon which any such coverage will lapse or at any time Lender deems necessary (regardless of prior notice to Borrower) to avoid the lapse of any such coverage. All premiums incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and, until paid, shall be secured by this Security Instrument and shall bear interest at the Default Rate.

**Section 6.2     Casualty**. If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "**Casualty**"), Borrower shall give prompt written notice of such damage to

64198337

Lender and shall promptly commence and diligently prosecute the completion of the Restoration of the Property pursuant to <u>Section 6.4</u> hereof as nearly as possible to the condition the Property was in immediately prior to such Casualty, with such alterations as may be reasonably approved by Lender and otherwise in accordance with <u>Section 6.4</u> hereof. Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance. Lender may, but shall not be obligated to make proof of loss if not made promptly by Borrower. In addition, Lender may participate in any settlement discussions with any insurance companies (and shall approve the final settlement, which approval shall not be unreasonably withheld or delayed) with respect to any Casualty in which the Net Proceeds or the costs of completing the Restoration are equal to or greater than the Availability Threshold and Borrower shall deliver to Lender all instruments required by Lender to permit such participation.

**Section 6.3     Condemnation.** Borrower shall promptly give Lender notice of the actual or threatened commencement of any proceeding for the Condemnation of the Property and shall deliver to Lender copies of any and all papers served in connection with such proceedings. Lender may participate in any such proceedings, and Borrower shall from time to time deliver to Lender all instruments requested by it to permit such participation. Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Security Instrument and the Debt shall not be reduced until any Award shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note. If any portion of the Property is taken by a condemning authority, Borrower shall promptly commence and diligently prosecute the Restoration of the Property pursuant to <u>Section 6.4</u> hereof and otherwise comply with the provisions of <u>Section 6.4</u> hereof. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt. Notwithstanding the foregoing provisions of this <u>Section 6.3</u>, and <u>Section 6.4</u> hereof, if the Loan or any portion thereof is included in a REMIC Trust and, immediately following a release of any portion of the Lien of this Security Instrument in connection with a Condemnation (but taking into account any proposed Restoration on the remaining portion of the Property), the Loan to Value Ratio is greater than 125% (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust), the principal balance of the Loan must be paid down in an amount sufficient to satisfy the REMIC Requirements, unless the Lender receives an opinion of counsel that if such amount is not paid, the Securitization will not fail to maintain its status as a REMIC Trust and that the REMIC Trust will not be subject to tax as a result of the related release of such portion of the Lien of this Security Instrument. In connection with the foregoing, the Net Proceeds shall not be available for Restoration and shall be used to pay down the principal balance of the Loan to the extent set forth above.

**Section 6.4     Restoration.** The following provisions shall apply in connection with the Restoration of the Property:

(a)     If the Net Proceeds shall be less than the Availability Threshold and the costs of completing the Restoration shall be less than the Availability Threshold (and provided that such Restoration is permitted under applicable Legal Requirements even though the Property is nonconforming or legally nonconforming), the Net Proceeds shall be disbursed by Lender to Borrower upon receipt, provided that all of the conditions set forth in <u>Section 6.4(b)(i)</u> hereof are met and Borrower delivers to

Lender a written undertaking to expeditiously commence and to satisfactorily complete with due diligence the Restoration in accordance with the terms of this Security Instrument.

(b)　　If the Net Proceeds are equal to or greater than the Availability Threshold or the costs of completing the Restoration are equal to or greater than the Availability Threshold, Lender shall make the Net Proceeds available for the Restoration in accordance with the provisions of this Section 6.4. The term "**Net Proceeds**" for purposes of this Section 6.4 means: (i) the net amount of all insurance proceeds received by Lender pursuant to Section 6.1(a)(i), (iv), (ix) and (x) as a result of such damage or destruction, after deduction of its reasonable costs and expenses (including reasonable counsel fees), if any, in collecting same ("**Insurance Proceeds**"), or (ii) the net amount of the Award, after deduction of its reasonable costs and expenses (including reasonable counsel fees), if any, in collecting same ("**Condemnation Proceeds**"), whichever the case may be.

(i)　　The Net Proceeds shall be made available to Borrower for Restoration provided that each of the following conditions are met:

(A)　　no Default or Event of Default shall have occurred and be continuing;

(B)　　(1) in the event the Net Proceeds are Insurance Proceeds, less than twenty-five percent (25%) of the total floor area of the Improvements on the Property has been damaged, destroyed or rendered unusable as a result of such Casualty or (2) in the event the Net Proceeds are Condemnation Proceeds, less than ten percent (10%) of the land constituting the Property is taken, and such land is located along the perimeter or periphery of the Property, and no portion of the Improvements is located on such land;

(C)　　Leases demising in the aggregate a percentage amount equal to or greater than the Rentable Space Percentage of the total rentable space in the Property which has been demised under executed and delivered Leases in effect as of the date of the occurrence of such Casualty or Condemnation, whichever the case may be, shall remain in full force and effect during and after the completion of the Restoration, notwithstanding the occurrence of any such Casualty or Condemnation, whichever the case may be, and Borrower and/or Tenant, as applicable under the respective Lease, shall make all necessary repairs and restorations thereto at their sole cost and expense. The term "**Rentable Space Percentage**" means (1) in the event the Net Proceeds are Insurance Proceeds, a percentage amount equal to ninety percent (90%) and (2) in the event the Net Proceeds are Condemnation Proceeds, a percentage amount equal to ninety percent (90%);

(D)　　Borrower shall commence the Restoration as soon as reasonably practicable (but in no event later than sixty (60) days after such Casualty or Condemnation, whichever the case may be, occurs) and shall diligently pursue the same to satisfactory completion;

(E)　　Lender shall be satisfied that any operating deficits, including all scheduled payments of principal and interest under the Note, which will be incurred with respect to the Property as a result of the occurrence of any such Casualty or Condemnation, whichever the case may be, will be covered out of (1) the Net Proceeds, (2) the insurance coverage referred to in Section 6.1(a)(ii) hereof, if applicable, or (3) by other funds of Borrower;

64198337

(F)    Lender shall be satisfied that the Restoration will be completed on or before the earliest to occur of (1) six (6) months prior to the Maturity Date, (2) the earliest date required for such completion under the terms of any Leases, (3) such time as may be required under all applicable Legal Requirements in order to repair and restore the Property to the condition it was in immediately prior to such Casualty or to as nearly as possible the condition it was in immediately prior to such Condemnation, as applicable, or (4) the expiration of the insurance coverage referred to in Section 6.1(a)(ii) hereof;

(G)    the Restoration is permitted under applicable Legal Requirements even though the Property is nonconforming or legally nonconforming and the Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable Legal Requirements;

(H)    the Restoration shall be done and completed by Borrower in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements;

(I)    such Casualty or Condemnation, as applicable, does not result in the loss of access to the Property or the Improvements;

(J)    Borrower shall deliver, or cause to be delivered, to Lender a signed detailed budget approved in writing by Borrower's architect or engineer stating the entire cost of completing the Restoration, which budget shall be subject to Lender's approval; and

(K)    the Net Proceeds together with any cash or cash equivalent deposited by Borrower with Lender are sufficient in Lender's discretion to cover the cost of the Restoration.

(ii)    The Net Proceeds shall be held by Lender in an Eligible Account and, until disbursed in accordance with the provisions of this Section 6.4(b), shall constitute additional security for the Debt and Other Obligations under the Loan Documents. The Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Property which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the title company issuing the Title Insurance Policy.

(iii)    All plans and specifications required in connection with the Restoration shall be subject to prior review and acceptance in all respects by Lender and by an independent consulting engineer selected by Lender (the "**Casualty Consultant**"). Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration. The identity of the contractors, subcontractors and materialmen engaged in the Restoration, as well as the contracts under which they have been engaged, shall be subject to prior review and approval by Lender and the Casualty Consultant. All costs and expenses incurred by Lender in connection with making the Net Proceeds available for the Restoration including

54

reasonable counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower.

(iv)    In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, minus the Casualty Retainage. The term "**Casualty Retainage**" means an amount equal to ten percent (10%) of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until the Restoration has been completed. The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this <u>Section 6.4(b)</u>, be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration. The Casualty Retainage shall not be released until the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this <u>Section 6.4(b)</u> and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate governmental and quasi-governmental authorities, and Lender receives evidence satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage; provided, however, that Lender shall release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the title company issuing the Title Insurance Policy, and Lender receives an endorsement to the Title Insurance Policy insuring the continued priority of the lien of this Security Instrument and evidence of payment of any premium payable for such endorsement. If required by Lender, the release of any such portion of the Casualty Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(v)    Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(vi)    If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the opinion of Lender in consultation with the Casualty Consultant, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "**Net Proceeds Deficiency**") with Lender before any further disbursement of the Net Proceeds shall be made. The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this <u>Section 6.4(b)</u> shall constitute additional security for the Debt and Other Obligations under the Loan Documents.

(vii)    Provided no continuing Event of Default shall then exist, after the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this <u>Section 6.4(b)</u>, and the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full, the excess, if any, of the Net Proceeds (and the remaining balance, if any, of the Net Proceeds Deficiency) deposited

64198337

with Lender shall be (1) if a Cash Sweep Period then exists, deposited into the Cash Management Account, and (2) if no Cash Sweep Period then exists, disbursed to Borrower.

(c)    All Net Proceeds not required (i) to be made available for the Restoration or (ii) to be returned to Borrower as excess Net Proceeds pursuant to Section 6.4(b)(vii) hereof may be retained and applied by Lender toward the payment of the Debt in accordance with Section 8(b) of the Note, whether or not then due and payable in such order, priority and proportions as Lender in its discretion shall deem proper, or, at the discretion of Lender, the same may be paid, either in whole or in part, to Borrower for such purposes as Lender shall approve, in its discretion.

(d)    In the event of foreclosure of this Security Instrument, or other transfer of title to the Property in extinguishment in whole or in part of the Debt all right, title and interest of Borrower in and to the Policies that are not blanket Policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

(e)    Notwithstanding anything to the contrary set forth herein, if the applicable Legal Requirements do not permit the Restoration of the Property, all Net Proceeds shall be retained and applied by Lender toward the payment of the Debt in accordance with the terms hereof.

## ARTICLE VII - RESERVE FUNDS

**Section 7.1    Required Repairs and Required Repairs Fund**.  Borrower shall perform the repairs at the Property, as more particularly set forth on Exhibit C hereto (such repairs hereinafter referred to as "**Required Repairs**").  Borrower shall complete the Required Repairs on or before the required deadline for each repair as set forth on Exhibit C.  It shall be an Event of Default under this Security Instrument if Borrower does not complete the Required Repairs at the Property by the required deadline for each repair as set forth on Exhibit C.  On the Closing Date, Borrower shall deposit with Lender the amount for the Property set forth on such Exhibit C hereto to perform the Required Repairs for the Property.  Amounts so deposited shall hereinafter be referred to as Borrower's "**Required Repairs Fund**" and the account in which such amounts are held shall hereinafter be referred to as Borrower's "**Required Repairs Account**."  Disbursements to the Borrower of funds held in the Required Repairs Fund will be made according to the terms of Section 7.5 below.

**Section 7.2    Tax and Insurance Escrow Fund**.  Borrower shall pay to Lender (a) on the Closing Date an initial deposit and (b) on each Payment Date thereafter (i) one-twelfth (1/12) of the Taxes and Other Charges that Lender estimates will be payable during the next ensuing twelve (12) months in order to accumulate with Lender sufficient funds to pay all such Taxes and Other Charges at least thirty (30) days prior to their respective due dates, and (ii) one-twelfth (1/12) of the Insurance Premiums that Lender estimates will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies (said amounts in (a) and (b) above hereinafter called the "**Tax and Insurance Escrow Fund**").  Provided, however, so long as Borrower maintains blanket policies of insurance in accordance with Section 6.1 hereof, the provisions of this Section with regard to Insurance Premiums shall not be applicable, until and unless Lender elects to apply such provisions following (i) the issuance by any insurer or its agent of any notice of cancellation, termination, or lapse of any insurance coverage required under Section 6.1 hereof, (ii) any cancellation, termination, or lapse of any insurance coverage required under Section 6.1 hereof whether or not any notice is issued, (iii) Lender having not received from Borrower evidence of insurance coverages as required by and in accordance with the terms of Section 6.1 hereof, or (iv) the occurrence of any Event of Default or the occurrence of any event which with the giving of notice, the passage of time or both would

64198337

result in an Event of Default. Lender shall apply the Tax and Insurance Escrow Fund to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to <u>Section 5.1.2</u> hereof. In making any payment relating to the Tax and Insurance Escrow Fund, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof. If the amount of the Tax and Insurance Escrow Fund shall exceed the amounts due for Taxes, Other Charges and Insurance Premiums pursuant to <u>Section 5.1.2</u> hereof, Lender shall, in its discretion, return any excess to Borrower or credit such excess against future payments to be made to the Tax and Insurance Escrow Fund. If at any time Lender reasonably determines that the Tax and Insurance Escrow Fund is not or will not be sufficient to pay Taxes, Other Charges and Insurance Premiums by the dates set forth in (a) and (b) above, Lender shall notify Borrower of such determination and Borrower shall increase its monthly payments to Lender by the amount that Lender estimates is sufficient to make up the deficiency at least thirty (30) days prior to the due date of the Taxes and Other Charges or thirty (30) days prior to expiration of the Policies, as the case may be.

**Section 7.3          <u>Replacements and Replacement Reserve Fund</u>.**

**7.3.1          <u>Replacement Reserve Fund</u>.** Borrower shall pay to Lender (a) on the Closing Date an initial deposit of $122,500.00 and (b) on each Payment Date thereafter $1,066.00 (the "**Replacement Reserve Monthly Deposit**") which amounts are reasonably estimated by Lender in its discretion to be due for replacements and repairs required to be made to the Property during the calendar year (collectively, the "**Replacements**"). Amounts so deposited shall hereinafter be referred to as Borrower's "**Replacement Reserve Fund**" and the account in which such amounts are held shall hereinafter be referred to as Borrower's "**Replacement Reserve Account**." Lender may reassess its estimate of the amount necessary for the Replacement Reserve Fund from time to time, and may increase the monthly amounts required to be deposited into the Replacement Reserve Fund upon thirty (30) days' notice to Borrower if Lender determines in its discretion that an increase is necessary to maintain the proper maintenance and operation of the Property. Disbursements to the Borrower of funds held in the Replacement Reserve Fund will be made according to the terms of <u>Section 7.5</u> below.

**7.3.2          <u>Performance of Replacements</u>.** (a) Borrower shall make Replacements when required in order to keep the Property in condition and repair consistent with other comparable properties in the same market segment in the metropolitan area in which the Property is located, and to keep the Property or any portion thereof from deteriorating. Borrower shall complete all Replacements as soon as practicable following the commencement of making each such Replacement. In the event Lender determines in its discretion that any Replacement is not being performed in a workmanlike or timely manner or that any Replacement has not been completed in a workmanlike or timely manner, Lender shall have the option to withhold disbursement for such unsatisfactory Replacement and to proceed under existing contracts or to contract with third parties to complete such Replacement and to apply the Replacement Reserve Fund toward the labor and materials necessary to complete such Replacement, without providing any prior notice to Borrower and to exercise any and all other remedies available to Lender during the continuance of an Event of Default hereunder. The Replacements and all materials, equipment, fixtures, or any other item comprising a part of any Replacement shall be constructed, installed or completed, as applicable, free and clear of all mechanic's, materialmen's or other liens (except for those Liens existing on the date of this Security Instrument which have been approved in writing by Lender). All Replacements shall comply with all applicable Legal Requirements of all Governmental Authorities having jurisdiction over the Property and applicable insurance requirements including applicable building codes, special use permits, environmental regulations, and requirements of insurance underwriters.

64198337

(b)    In order to facilitate Lender's completion or making of such Replacements pursuant to Section 7.3.2(a) above, Borrower grants Lender the right to enter onto the Property and perform any and all work and labor necessary to complete or make such Replacements and/or employ watchmen to protect the Property from damage. All sums so expended by Lender, to the extent not from the Replacement Reserve Fund, shall be deemed to have been advanced under the Loan to Borrower and secured by this Security Instrument. For this purpose Borrower constitutes and appoints Lender its true and lawful attorney in fact with full power of substitution to complete or undertake such Replacements in the name of Borrower. Such power of attorney shall be deemed to be a power coupled with an interest and cannot be revoked.

(c)    Nothing in this Section 7.3.2 shall:  (i) make Lender responsible for making or completing any Replacements; (ii) require Lender to expend funds in addition to the Replacement Reserve Fund to make or complete any Replacement; (iii) obligate Lender to proceed with any Replacements; or (iv) obligate Lender to demand from Borrower additional sums to make or complete any Replacement.

**7.3.3    Failure to Make Replacements**. During the continuance of an Event of Default, Lender may use the Replacement Reserve Fund (or any portion thereof) for any purpose, including completion of the Replacements as provided in Section 7.3.2, or for any other repair or replacement to the Property or toward payment of the Debt in such order, proportion and priority as Lender may determine in its discretion. Nothing in this Security Instrument shall obligate Lender to apply all or any portion of the Replacement Reserve Fund on account of an Event of Default to payment of the Debt or in any specific order or priority.

**Section 7.4    Rollover Obligations and Monthly Rollover Reserve Fund**. Borrower shall pay to Lender $5,545.00 on each Payment Date (the "**Rollover Reserve Monthly Deposit**"), which amounts shall be deposited with and held by Lender for tenant improvement and leasing commission obligations incurred following the date hereof in connection with Leases entered into in accordance with the terms hereof (the "**Rollover Obligations**"). Amounts so deposited shall hereinafter be referred to as the "**Monthly Rollover Reserve Fund**" and the account to which such amounts are held shall hereinafter be referred to as the "**Monthly Rollover Reserve Account**." Borrower shall also pay to Lender, for deposit into the Monthly Rollover Reserve Account, all fees and other payments made to Borrower in connection with or relating to the rejection, buy-out, termination, surrender or cancellation of any Lease. Notwithstanding the aforementioned, the aggregate amount of the Monthly Rollover Reserve Fund shall not exceed $200,000.00 in the aggregate (the "**Monthly Rollover Reserve Cap**"), on any Payment Date (after giving effect to the payment of the Rollover Reserve Monthly Deposit) and accordingly, to the extent a Rollover Reserve Monthly Deposit would result in the aggregate amount of Monthly Rollover Reserve Funds in the Monthly Rollover Reserve Account to exceed the Monthly Rollover Reserve Cap, such Rollover Reserve Monthly Deposit shall be decreased by an amount equal to such excess. Notwithstanding the foregoing, all amounts held in the Upfront Rollover Reserve Account must be disbursed before any disbursements are made from the Monthly Rollover Reserve Account. Disbursements to the Borrower of funds held in the Monthly Rollover Reserve Fund will be made according to the terms of Section 7.5 below.

**Section 7.5    Disbursements from the Required Repairs Account, Replacement Reserve Account, Upfront Rollover Reserve Account, Monthly Rollover Reserve Account, and Pour Taproom Rollover Reserve Account**. Lender shall make disbursements from the (a) Upfront Rollover Reserve Account or the Monthly Rollover Reserve Account, as applicable, to pay Borrower only for the costs of Rollover Obligations, (b) Replacement Reserve Account to pay Borrower only for the costs of the Replacements, and (c) Pour Taproom Rollover Reserve Account to pay Borrower only for the costs of Pour Taproom Rollover Obligations, and (d) Required Repairs Account to pay Borrower only for the

64198337

costs of the Required Repairs. Lender shall disburse funds from each of the Reserve Accounts referenced in this Section 7.5, as applicable, from time to time upon satisfaction by Borrower of each of the following conditions: (i) Borrower shall submit a written request for payment to Lender at least thirty (30) days prior to the date on which Borrower requests such payment be made, (ii) on the date such request is received by Lender and on the date such payment is to be made, no Default or Event of Default shall exist and remain uncured, (iii) Lender shall have received a Disbursement Certification and Schedule for the requested disbursement; and (iv) with respect to any requested disbursement in excess of $50,000.00, Lender shall have received: (w) copies of appropriate lien waivers, conditional lien waivers or other evidence of payment reasonably satisfactory to Lender with respect to any contractor, subcontractor and/or materialman whose proposed payment (or Borrower reimbursement, if applicable) is in excess of $100,000.00, (x) if required by Lender, a title search for the applicable Property indicating that such Property is free from all Liens, claims and other encumbrances not previously approved by Lender (other than Permitted Encumbrances), and (y) such other evidence with respect to completion and payment as Lender shall reasonably request. With respect to any disbursement in excess of $100,000.00, Lender may require an inspection of the Property, at Borrower's expense, by an appropriate independent qualified professional selected by Lender prior to making such disbursement in order to verify completion of the Required Repairs, Pour Taproom Rollover Obligations, Replacements or Rollover Obligations, as applicable, for which reimbursement is sought. Lender shall not be required to make disbursements from any of the Required Repairs Account, the Pour Taproom Rollover Reserve Account, Replacement Reserve Account, Upfront Rollover Reserve Account, or the Monthly Rollover Reserve Account (1) more than once a month and (2) unless such requested disbursement is in an amount greater than $25,000.00 (or a lesser amount if the total amount in the applicable Reserve Account is less than $25,000.00), in which case only one disbursement of the amount remaining in the account shall be made) and such disbursement shall be made only upon satisfaction of each condition contained in this Section 7.5. Notwithstanding the foregoing, all amounts held in the Upfront Rollover Reserve Account must be disbursed before any disbursements are made from the Monthly Rollover Reserve Account.

**Section 7.6    Reserve Funds, Generally**. Borrower grants to Lender a first-priority perfected security interest in each of the Reserve Funds and any and all monies now or hereafter deposited in each Reserve Fund as additional security for payment of the Debt. Until expended or applied in accordance herewith, the Reserve Funds shall constitute additional security for the Debt. During the continuance of an Event of Default, Lender may, in addition to any and all other rights and remedies available to Lender, apply any sums then present in any or all of the Reserve Funds to the payment of the Debt in any order in its discretion. The Reserve Funds shall not constitute trust funds and may be commingled with other monies held by Lender. The Reserve Funds shall be held in an Eligible Account in Permitted Investments as directed by Lender or Lender's Servicer. Unless expressly provided for in this Article VII, all interest on a Reserve Fund shall not be added to or become a part thereof and shall be the sole property of and shall be paid to Lender. Borrower shall be responsible for payment of any federal, state or local income or other tax applicable to the interest earned on the Reserve Funds credited or paid to Borrower. Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any Reserve Fund or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto. Lender and Servicer shall not be liable for any loss sustained on the investment of any funds constituting the Reserve Funds. Borrower shall indemnify Lender and Servicer and hold Lender and Servicer harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and reasonable attorneys' fees and expenses) arising from or in any way connected with the Reserve Funds or the performance of the obligations for which the Reserve Funds were established. Borrower shall assign to Lender all rights and claims Borrower may have against all persons or entities supplying labor, materials or other services which are to be paid from or secured by the Reserve Funds; provided, however, that Lender may not pursue any such right or claim unless an Event of

59

Default has occurred and remains uncured. The required monthly deposits into the Reserve Funds and the Monthly Debt Service Payment Amount, shall be added together and shall be paid as an aggregate sum by Borrower to Lender. Any amount remaining in the Reserve Funds after the Debt has been paid (or defeased) in full shall be returned to Borrower.

**Section 7.7**     **Intentionally Omitted**.

**Section 7.8**     **Pour Taproom Rollover Reserve**.  (a) During a Cash Sweep Period, Borrower shall deposit with Lender all Excess Cash, which amounts shall be held by Lender for tenant improvement and leasing commission obligations incurred in connection with the leasing of any or all of the Pour Taproom Premises (the "**Pour Taproom Rollover Obligations**"). Amounts so deposited shall hereinafter be referred to as the "**Pour Taproom Rollover Reserve Fund**" and the account to which such amounts are held shall hereinafter be referred to as the "**Pour Taproom Rollover Reserve Account**". Borrower shall also pay to Lender, for deposit into the Pour Taproom Rollover Reserve Account, all fees and other payments made to Borrower in connection with or relating to the rejection, buy-out, termination, surrender or cancellation of the Pour Taproom Lease. Disbursements to the Borrower of funds held in the Pour Taproom Rollover Reserve Fund will be made according to the terms of Section 7.5 above.

(b)     Notwithstanding the foregoing, if no Default or Event of Default is then ongoing and no Cash Sweep Period is then in effect, then upon the date that (i) Borrower has entered into one or more replacement Leases, in each case with a Tenant or Tenants acceptable to Lender in its discretion, demising the entire Pour Taproom Premises on terms and conditions acceptable to Lender in its discretion (including, without limitation, rental rate and term), (ii) Pour Taproom or such replacement Tenant is in occupancy of the Pour Taproom Premises, open for business, and obligated to pay full contractual rent without right of offset or additional free rent credit, has made its first three (3) monthly rental payments and has delivered to Lender a tenant estoppel acceptable to Lender, and (iii) Borrower has delivered to Lender written evidence, acceptable to Lender in its discretion that Borrower has paid in full all applicable tenant improvement and leasing commission expenses payable by Borrower in connection with the renewal or re-tenanting of the Pour Taproom Premises, Lender shall disburse any remaining deposits in the Pour Taproom Rollover Reserve Fund to Borrower.

**Section 7.9**     **Rollover Obligations and Upfront Rollover Reserve Fund**.  On the Closing Date, Borrower shall pay to Lender a deposit of $150,000.00, which amount shall be held by Lender for the Rollover Obligations. Amounts so deposited shall hereinafter be referred to as the "**Upfront Rollover Reserve Fund**" and the account to which such amounts are held shall hereinafter be referred to as the "**Upfront Rollover Reserve Account**." Disbursements to the Borrower of funds held in the Upfront Rollover Reserve Fund will be made according to the terms of Section 7.5 above.

## ARTICLE VIII - DEFAULTS

**Section 8.1**     **Event of Default**.  (a) Each of the following events shall constitute an event of default hereunder (an "**Event of Default**"):

(i)     if: (A) Borrower fails to make full and punctual payment of any Monthly Debt Service Payment Amount or any other amount payable on a monthly basis under the Note (including any required monthly payments into any Reserve Funds), this Security Instrument or any other Loan Document within three (3) days of the date on which such payment is due; or (B) any portion of the Debt (other than any portion of the Debt described in subclause (A) in this Section 8.1(a)(i)) is not paid when due;

64198337

(ii)     if any of the Taxes or Other Charges are not paid when the same are due and payable;

(iii)     if the Policies are not kept in full force and effect, or if certified copies of the Policies are not delivered to Lender upon request;

(iv)     if a Transfer occurs in violation of the provisions of this Security Instrument;

(v)     if any representation or warranty made by Borrower herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect as of the date the representation or warranty was made;

(vi)     if Borrower shall make an assignment for the benefit of creditors;

(vii)     if (A) Borrower, Guarantor or any other guarantor or indemnitor under any guarantee issued in connection with the Loan shall commence any case, proceeding or other action (I) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (II) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or the Borrower, Guarantor or any other guarantor or indemnitor shall make a general assignment for the benefit of its creditors; or (B) there shall be commenced against Borrower, Guarantor or any other guarantor or indemnitor any case, proceeding or other action of a nature referred to in clause (A) above that is not dismissed within thirty (30) days of filing; or (C) there shall be commenced against the Borrower, Guarantor or any other guarantor or indemnitor any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets; or (D) the Borrower, Guarantor or any other guarantor or indemnitor shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (A), (B), or (C) above; or (E) the Borrower, Guarantor or any other guarantor or indemnitor shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due;

(viii)     if Borrower assigns its rights under this Security Instrument or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(ix)     if Borrower breaches any covenant contained in <u>Section 4.1.24</u> hereof or any negative covenant contained in <u>Section 5.2</u> hereof;

(x)     with respect to any term, covenant or provision set forth herein which specifically contains a notice requirement or grace period, if Borrower shall be in default under such term, covenant or condition after the giving of such notice or the expiration of such grace period;

(xi)     if a material default has occurred and continues beyond any applicable cure period under the Management Agreement (or any Replacement Management Agreement) and if such default permits the Manager thereunder to terminate or cancel the Management Agreement (or any Replacement Management Agreement);

64198337

(xii)    if Borrower shall continue to be in Default under any of the terms, covenants or conditions of <u>Section 9.1</u> hereof, or fails to cooperate with Lender in connection with a Securitization pursuant to the provisions of <u>Section 9.1</u> hereof, for three (3) days after notice to Borrower from Lender;

(xiii)    if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Security Instrument not specified in <u>subsections (i)</u> to <u>(xii)</u> above, for ten (10) days after notice to Borrower from Lender, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other Default; provided, however, that if Lender determines that such non monetary Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period and provided further that Borrower shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed sixty (60) days;

(xiv)    if there shall be default under any of the other Loan Documents beyond any applicable cure periods contained in such documents, whether as to Borrower or the Property, or if any other such event shall occur or condition shall exist, if the effect of such default, event or condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt;

(xv)    Borrower shall be in default under any other deed of trust, mortgage or security agreement covering any part of the Property whether it be superior or junior in priority to this Security Instrument (it not being implied by this clause that any such encumbrance will be permitted); or

(xvi)    Borrower fails to comply with the terms of <u>Section 5.1.25</u> or <u>5.1.26</u> hereof.

(b)    During the continuance of an Event of Default (other than an Event of Default described in clauses (vi), (vii) or (viii) above) and at any time thereafter, in addition to any other rights or remedies available to it pursuant to this Security Instrument and the other Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and the Property, including declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and any or all of the Property, including all rights or remedies available at law or in equity; and upon any Event of Default described in clauses (vi), (vii) or (viii) above, the Debt and Other Obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

**Section 8.2    <u>Remedies</u>.**  During the continuance of any Event of Default, Borrower agrees that Lender may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower and in and to the Property, including the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its discretion, without impairing or otherwise affecting the other rights and remedies of Lender: (a) declare the entire unpaid Debt to be immediately due and payable; (b) institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any applicable provision of law, in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in

62

64198337

68

several interests or portions and in any order or manner (as used in this Article VIII. a "foreclosure" shall include, without limitation, any sale by power of sale); (c) with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Debt then due and payable, subject to the continuing lien and security interest of this Security Instrument for the balance of the Debt not then due, unimpaired and without loss of priority; (d) sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law; (e) institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained in any Loan Document; (f) recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument or the other Loan Documents; (g)apply for and obtain the appointment, on an *ex parte* basis (any required notice of such appointment or any proceeding to appoint the same being hereby expressly waived) and without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, any guarantor, indemnitor or of any Person liable for the payment of the Debt, of a receiver, trustee, liquidator or conservator of the Property to do all of the actions set forth in subparagraph (h) below and to, with the consent of Lender, dispose (by lease, sale or otherwise) of some or all of the Property in the course of the proceeding in which such receiver, trustee, liquidator or conservator is appointed; (h) the license granted to Borrower under Section 2.5 hereof shall automatically be revoked, and Lender may enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess and exclude Borrower and its agents and servants therefrom, without liability for trespass, damages or otherwise, and take possession of all books, records and accounts relating thereto and Borrower agrees to surrender possession of the Property and of such books, records and accounts to Lender upon demand, and thereupon Lender may (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat; (ii) complete any construction on the Property in such manner and form as Lender deems advisable; (iii) make alterations, additions, renewals, replacements and improvements to or on the Property; (iv) exercise all rights and powers of Borrower with respect to the Property, whether in the name of Borrower or otherwise, including the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Property and every part thereof; (v) require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Borrower; (vi) require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise; and (vii) apply the receipts from the Property to the payment of the Debt, in such order, priority and proportions as Lender shall deem appropriate in its discretion after deducting therefrom all expenses (including reasonable attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, Other Charges, insurance and other expenses in connection with the Property, as well as reasonable compensation for the services of Lender, its counsel, agents and employees;(i) exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including: (i) the right to take possession of the Fixtures, the Equipment, the Personal Property or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Fixtures, the Equipment, the Personal Property, and (ii) request Borrower at its expense to assemble the Fixtures, the Equipment, the Personal Property and make it available to Lender at a convenient place acceptable to Lender; (j) apply any sums then deposited or held in escrow or otherwise by or on behalf of Lender in accordance with the terms of this Security Instrument or any other Loan Document to the payment of the following items in any order in its discretion: (i) Taxes and Other Charges; (ii) Insurance Premiums; (iii) interest on the unpaid principal balance of the Note; (iv) amortization of the unpaid principal balance of the Note; and (v) all other sums payable pursuant to any Loan Document, including advances made by Lender pursuant to the terms of this Security Instrument; (k) surrender the Policies maintained pursuant to this Security

64198337

Instrument, collect the unearned Insurance Premiums and apply such sums as a credit on the Debt in such priority and proportion as Lender shall deem proper, and in connection therewith, Borrower hereby appoints Lender as agent and attorney-in-fact (which is coupled with an interest and is therefore irrevocable) for Borrower to collect such Insurance Premiums; (l) prohibit Borrower and anyone claiming for or through Borrower from making use of or withdrawing any sums from any lockbox, escrow or similar account; (m)     pursue such other remedies as Lender may have under applicable law; or (n) apply the undisbursed balance of any Net Proceeds Deficiency deposit, together with interest thereon, to the payment of the Debt in such order, priority and proportions as Lender shall deem to be appropriate in its discretion.

In the event of a sale, by foreclosure, power of sale or otherwise, of less than all of the Property, this Security Instrument shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority.

**Section 8.3     Other Rights.**  The purchase money, proceeds and avails of any disposition of the Property, and or any part thereof, or any other sums collected by Lender pursuant to any Loan Document, may be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper. During the continuance of any Event of Default, or if Borrower fails to make any payment or to do any act as herein provided, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, make any payment or do any act required of Borrower hereunder in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender is authorized to enter upon the Property for such purposes (subject to the rights of tenants), or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose this Security Instrument or collect the Debt. Lender has the right to appear in and defend any action or proceeding brought with respect to the Property and to bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its discretion, decides should be brought to protect its interest in the Property. Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for any Event of Default existing at the time such earlier action was commenced. The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument. Borrower shall not be relieved of Borrower's obligations hereunder by reason of (a) the failure of Lender to comply with any request of Borrower or any guarantor or any indemnitor with respect to the Loan to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions of any Loan Document, (b) the release, regardless of consideration, of the whole or any part of the Property, or of any person liable for the Debt or any portion thereof, or (c) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of any Loan Document. It is agreed that the risk of loss or damage to the Property is on Borrower, and Lender shall have no liability whatsoever for decline in value of the Property, for failure to maintain the Policies, or for failure to determine whether insurance in force is adequate as to the amount of risks insured. Possession by Lender shall not be deemed an election of judicial relief if any such possession is requested or obtained with respect to any Property or collateral not in Lender's possession. Lender may release any portion of the Property for such consideration as Lender may require without, as to the remainder of the Property, in any way impairing or affecting the lien or priority of this Security Instrument, or improving the position of any subordinate lienholder with respect thereto, and may accept any other property in place thereof as Lender may require without being accountable for so doing to any other lienholder. This Security Instrument shall continue as a lien and security interest in the remaining portion of the Property. If the Property is not in material compliance with Legal Requirements, Lender may impose additional requirements upon Borrower in connection herewith including monetary reserves or financial equivalents. Lender may resort for the payment of the

64198337

Debt to any other security held by Lender in such order and manner as Lender, in its discretion, may elect. Lender may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to foreclose this Security Instrument. Lender and other Indemnified Parties are entitled to enforce the obligations of Borrower without first resorting to or exhausting any security or collateral and without first having recourse to any of the Property, through foreclosure or acceptance of a deed in lieu of foreclosure or otherwise. The rights and remedies of Lender and other Indemnified Parties under the Loan Documents, at law or in equity, shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Subject to the rights of the Tenants under their Leases, upon reasonable notice to Borrower, Lender and its agents shall have the right to enter and inspect the Property at all reasonable times.

Section 8.4    **Rights Pertaining To Sales**.    The following provisions shall, to the extent permitted by law, apply to any sale or sales of all or any portion of the Property under or by virtue of this Security Instrument, whether under any power of sale herein granted or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale:

(a)    Trustee (for purposes of this Section 8.4 only, the term "Trustee" shall be interpreted to include any public officer or other person having the responsibility to conduct any sale of all or part of the Property pursuant to this Security Instrument) may conduct any number of sales from time to time. The power of sale shall not be exhausted by any one or more of such sales as to any part of the Property that has not been sold or by any sale that is not completed or is defective until the Debt has been paid in full.

(b)    Any sale may be postponed or adjourned by public announcement at the time and place appointed for such sale or for such postponed or adjourned sale, and such sale may be completed at the time and place so announced without further notice.

(c)    Lender is hereby appointed the true and lawful attorney-in-fact of Borrower, which appointment is irrevocable and shall be deemed to be coupled with an interest, in Borrower's name and stead, to make all necessary conveyances, assignments, transfers and deliveries of the Property and rights so sold, and for that purpose Lender may execute all necessary instruments to accomplish the same, and may substitute one or more persons with like power, and Borrower hereby ratifies and confirms all that said attorney or such substitute or substitutes shall lawfully do by virtue thereof. Nevertheless, Borrower, if requested by Lender, shall ratify and confirm any such sale or sales by executing and delivering to Lender or such purchaser or purchasers, as applicable, all such instruments as may be advisable, in Lender's judgment, for the purposes designated in such request.

(d)    Any and all statements of fact or other recitals made in any of the instruments referred to in Section 8.4(c) given by Lender concerning nonpayment of the Debt, occurrence of any Event of Default, any declaration by Lender that all or any of the Debt is due and payable, any request to sell, any representation that notice of time, place and terms of sale and property or rights to be sold was duly given, or that any other act or thing was duly done by Lender, shall be taken as prima facie evidence of the truth of the facts so stated and recited.

(e)    The receipt by Trustee of the purchase money paid at any such sale, or the receipt of any other person authorized to give the same, shall be sufficient discharge therefor to any purchaser of any property or rights sold as aforesaid, and no purchaser, or its representatives, grantees or assigns, after paying such purchase price and receiving such receipt, shall be bound to see to the application of such purchase price or any part thereof upon or for any trust or purpose of this Security Instrument or, in any manner whatsoever, be answerable for any loss, misapplication or non-application of any such purchase

64198337

money, or part thereof, or be bound to inquire as to the authorization, necessity, expediency or regularity of any such sale.

(f)     Any such sale or sales shall operate to divest all of the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of Borrower in and to the properties and rights so sold, and shall be a perpetual bar both at law and in equity against Borrower and any and all persons claiming or who may claim the same, or any part thereof, by, through or under Borrower to the fullest extent permitted by applicable law.

(g)     Upon any such sale or sales, Lender may bid for and acquire the Property and, in lieu of paying cash therefor, may make settlement for the purchase price by crediting against the Debt the amount of the bid made therefor, after deducting therefrom the expenses of the sale, the cost of any enforcement proceeding hereunder and any other sums that Lender is authorized to charge to Borrower under the terms of any Loan Document to the extent necessary to satisfy such bid.

(h)     If Borrower, or any person claiming by, through or under Borrower, shall transfer or refuse or fail to surrender possession of the Property after any sale thereof, then Borrower or such person shall be deemed a tenant at sufferance of the purchaser at such sale, subject to eviction by means of unlawful detainer proceedings or other appropriate proceedings, and to any other right or remedy available hereunder or under applicable law.

(i)     Upon any such sale, it shall not be necessary for Trustee, Lender or any public officer acting under execution or order of court to have present or constructively in its possession any or all of the Property.

(j)     In the event of any sale referred to in this Section 8.4, the entire Debt, if not previously due and payable, immediately thereupon shall, notwithstanding anything to the contrary in any Loan Document, become due and payable.

(k)     This instrument shall be effective as a mortgage. If a sale hereunder shall be commenced by Trustee, Lender may, at any time before the sale of the Property, direct the Trustee to abandon the sale, and may institute suit for the collection of the Debt or part thereof and for the foreclosure of this Security Instrument. If Lender shall institute suit for the collection of the Debt or part thereof, and for the foreclosure of this Security Instrument, Lender may at any time before the entry of final judgment in said suit dismiss the same (or part thereof) and direct the Trustee to sell the Property in accordance with the provisions of this Security Instrument. Lender may pursue its rights and remedies against any guarantor or other party liable for any of the obligations in such a suit for foreclosure or by separate suit, whether or not the Trustee is also pursuing a sale under the terms hereof.

**Section 8.5     Right to Sever Loan Documents**. Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents (the "**Severed Loan Documents**") in such denominations as Lender shall determine in its discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder. Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender. Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof; provided, however, Lender shall not make or execute any such documents under such power until three (3) days after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such

66

64198337

72

power.  Borrower shall be obligated to pay any costs or expenses incurred in connection with the preparation, execution, recording or filing of the Severed Loan Documents and the Severed Loan Documents shall not contain any representations, warranties or covenants not contained in the Loan Documents and any such representations and warranties contained in the Severed Loan Documents will be given by Borrower only as of the Closing Date.

**Section 8.6      Remedies Cumulative; Waivers**.  The rights, powers and remedies of Lender under this Security Instrument shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Security Instrument or the other Loan Documents, or existing at law or in equity or otherwise.  Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's discretion.  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

## ARTICLE IX - SPECIAL PROVISIONS

**Section 9.1      Securitization**.

**9.1.1      Sale of Notes and Securitization**.  (a) Borrower acknowledges and agrees that Lender may sell all or any portion of the Loan and the Loan Documents, or issue one or more participations therein, or consummate one or more private or public securitizations of rated single- or multi-class securities (the "**Securities**") secured by or evidencing ownership interests in all or any portion of the Loan and the Loan Documents or a pool of assets that include the Loan and the Loan Documents (such sales, participations or securitizations, collectively, a "**Securitization**").

(b)      Borrower shall use reasonable efforts to provide information not in the possession of Lender or which may be reasonably required by Lender or take other actions reasonably required by Lender, in each case in order to satisfy the market standards to which Lender customarily adheres or which may be reasonably required by prospective investors or the Rating Agencies in connection with any such Securitization.  Borrower acknowledges that certain information regarding the Loan, Borrower, Guarantor, the Property, and any Tenant may be included in a private placement memorandum, prospectus or other disclosure documents.  Borrower agrees that each of Borrower, Guarantor and their respective officers and representatives, shall, at Lender's request, cooperate with Lender's efforts to arrange for a Securitization. Borrower and Guarantor agree to review, at Lender's request in connection with the Securitization, the Disclosure Documents as such Disclosure Documents relate to Borrower, Guarantor, the Property and the Loan, and shall confirm that the factual statements and representations contained in such documents do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

(c)      Borrower agrees to make upon Lender's written request, without limitation, all structural or other changes to the Loan (including delivery of one or more new component notes to replace the original note or modify the original note to reflect multiple components of the Loan and such new notes or modified note may have different interest rates and amortization schedules), modifications to any documents evidencing or securing the Loan, creation of one or more mezzanine loans (including amending Borrower's organizational structure to provide for one or more mezzanine borrowers), delivery of opinions of counsel acceptable to the Rating Agencies or potential investors and addressing such

64198337

matters as the Rating Agencies or potential investors may require; provided, however, that in creating such new notes or modified notes or mezzanine notes Borrower shall not be required to modify any material economic term of the Loan or decrease the time periods during which Borrower is permitted to perform its obligations under the Loan Documents. In connection with the foregoing, Borrower covenants and agrees to modify any applicable Cash Management Agreement to reflect the newly created components or mezzanine loans.

(d)    If requested by Lender, Borrower shall provide Lender, promptly upon request, with any financial statements, or financial, statistical or operating information, as Lender shall determine to be required pursuant to Regulation AB under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), or any amendment, modification or replacement thereto or other legal requirements in connection with any private placement memorandum, prospectus or other disclosure documents or any filing pursuant to the Exchange Act in connection with the Securitization or as shall otherwise be reasonably requested by Lender.

(e)    Borrower hereby appoints Lender its attorney-in-fact with full power of substitution (which appointment shall be deemed to be coupled with an interest and to be irrevocable until the Loan is paid and this Security Instrument is discharged of record, with Borrower hereby ratifying all that its said attorney shall do by virtue thereof) to execute and deliver all documents and do all other acts and things necessary or desirable to effect any Securitization authorized hereunder; provided, however, that unless an Event of Default exists, Lender shall not execute or deliver any such documents or do any such acts or things under such power until five (5) days after written notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power. Borrower's failure to deliver any document or to take any other action Borrower is obligated to take hereunder with respect to any Securitization for a period of ten (10) Business Days after such notice by Lender shall, at Lender's option, constitute an Event of Default hereunder.

**9.1.2    Securitization Costs.** All reasonable third party costs and expenses incurred by Borrower and Guarantor in connection with Borrower's compliance with this Section 9.1 (including the fees and expenses of the Rating Agencies) shall be paid or reimbursed by Borrower.

**Section 9.2    Right To Release Information.** During the continuance of any Event of Default, Lender may forward to any broker, prospective purchaser of the Property or the Loan, or other person or entity all documents and information which Lender now has or may hereafter acquire relating to the Debt, Borrower, any Guarantor, any indemnitor, the Property and any other matter in connection with the Loan, whether furnished by Borrower, any Guarantor, any indemnitor or otherwise, as Lender determines necessary or desirable. Borrower irrevocably waives any and all rights it may have to limit or prevent such disclosure, including any right of privacy or any claims arising therefrom.

**Section 9.3    Exculpation.** The provisions of Section 18 of the Note are hereby incorporated by reference into this Security Instrument to the same extent and with the same force as if fully set forth herein.

## ARTICLE X - MISCELLANEOUS

**Section 10.1    Survival.** This Security Instrument and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents. Whenever in this Security Instrument any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives,

64198337

successors and assigns of such party. All covenants, promises and agreements in this Security Instrument, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

**Section 10.2    Lender's Discretion.** Whenever pursuant to this Security Instrument, Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole and absolute discretion of Lender and shall be final and conclusive.

**Section 10.3    Governing Law.** This Security Instrument shall be governed, construed, applied and enforced in accordance with the laws of the state where the Land is located without regard to the conflicts of law provisions thereof ("**Governing State**"). Borrower hereby consents to personal jurisdiction in the Governing State. JURISDICTION AND VENUE OF ANY ACTION BROUGHT TO ENFORCE THIS SECURITY INSTRUMENT OR ANY OTHER LOAN DOCUMENT OR ANY ACTION RELATING TO THE LOAN OR THE RELATIONSHIPS CREATED BY OR UNDER THE LOAN DOCUMENTS ("**ACTION**") SHALL, AT THE ELECTION OF THE LENDER, BE IN (AND IF ANY ACTION IS ORIGINALLY BROUGHT IN ANOTHER VENUE, THE ACTION SHALL AT THE ELECTION OF LENDER BE TRANSFERRED TO) A STATE OR FEDERAL COURT OF APPROPRIATE JURISDICTION LOCATED IN THE GOVERNING STATE. BORROWER HEREBY CONSENTS AND SUBMITS TO THE PERSONAL JURISDICTION OF THE STATE COURTS OF THE GOVERNING STATE AND OF FEDERAL COURTS LOCATED IN THE GOVERNING STATE IN CONNECTION WITH ANY ACTION, AND HEREBY WAIVES ANY AND ALL PERSONAL RIGHTS UNDER THE LAWS OF ANY OTHER STATE TO OBJECT TO JURISDICTION WITHIN SUCH GOVERNING STATE FOR PURPOSES OF ANY ACTION. Borrower hereby waives and agrees not to assert, as a defense to any Action or a motion to transfer venue of any Action, (i) any claim that it is not subject to such jurisdiction, (ii) any claim that any Action may not be brought against it or is not maintainable in those courts or that this Security Instrument may not be enforced in or by those courts, or that it is exempt or immune from execution, (iii) that the Action is brought in an inconvenient forum, or (iv) that the venue for the Action is in any way improper.

**Section 10.4    Modification, Waiver in Writing.** No modification, amendment, extension, discharge, termination or waiver of any provision of this Security Instrument, or of the Note, or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

**Section 10.5    Delay Not a Waiver.** Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Security Instrument, the Note or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Security Instrument, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

64198337

**Section 10.6     Notices.** All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, return receipt requested or (b) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, or (c) by telecopier (with answer back acknowledged) and with a second copy to be sent to the intended recipient by any other means permitted under this Section, addressed as follows (or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section):

<table>
<tr><td>If to Lender:</td><td>KeyBank National Association<br>11501 Outlook, Suite 300<br>Overland Park, Kansas 66211<br>Facsimile No.: 877-379-1625<br>Attention: Loan Servicing</td></tr>
<tr><td>with a copy to:</td><td>Dan Flanigan<br>POLSINELLI<br>900 West 48th Place, Suite 900<br>Kansas City, Missouri 64112<br>Facsimile No.: (816) 753-1536</td></tr>
<tr><td>If to Borrower:</td><td>Murchison Group, LLC<br>2868 Panorama Drive<br>Redding, California 96003<br>Attention: Chris Camann</td></tr>
</table>

A notice shall be deemed to have been given:  in the case of hand delivery, at the time of delivery; in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; or in the case of expedited prepaid delivery, upon the first attempted delivery on a Business Day; or in the case of telecopy, upon sender's receipt of a machine-generated confirmation of successful transmission after advice by telephone to recipient that a telecopy notice is forthcoming.

**Section 10.7     Trial by Jury.**  **TO THE FULLEST EXTENT NOW OR HEREAFTER PERMITTED BY APPLICABLE LAW, BORROWER AND LENDER HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND, TO THE FULLEST EXTENT NOW OR HEREAFTER PERMITTED BY APPLICABLE LAW, WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.   LENDER AND BORROWER ARE HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.**

**Section 10.8     Severability.** Wherever possible, each provision of this Security Instrument shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Security Instrument shall be prohibited by or invalid under applicable law, such provision shall be

64198337

ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Security Instrument.

**Section 10.9    Preferences**. Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower hereunder. To the extent Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

**Section 10.10    Remedies of Borrower**. If a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where by law or under this Security Instrument or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

**Section 10.11    Administration and Enforcement Expenses**. (a) Borrower shall pay Lender, on demand, all Administration and Enforcement Expenses (as hereinafter defined) now or hereafter incurred by Lender, together with interest thereon at the Default Rate, from the date paid or incurred by Lender until such fees and expenses are paid by Borrower, whether or not an Event of Default or Default then exists. Provided no Event of Default has occurred, fees and expenses related solely to origination and administration of the Loan shall be limited to reasonable fees and expenses, but charges of rating agencies, governmental entities or other third parties that are outside of the control of Lender shall not be subject to the reasonableness standard. All Administration and Enforcement Expenses shall be additional Debt hereunder secured by the Property, and may be funded, if Lender so elects, by Lender paying the same to the appropriate persons and thus making an advance on Borrower's behalf.

(b)        Borrower shall indemnify, defend and hold harmless the Indemnified Parties from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not an Indemnified Party shall be designated a party thereto), that may be imposed on, incurred by, or asserted against any Indemnified Party in any manner relating to or arising out of (i) any breach by Borrower of its obligations under, or any material misrepresentation by Borrower contained in, this Security Instrument or the other Loan Documents, or (ii) the use or intended use of the proceeds of the Loan (collectively, the "**Indemnified Liabilities**"); provided, however, that Borrower shall not have any obligation to any Indemnified Party hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of such Indemnified Party. To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnified Parties.

(c)        Borrower covenants and agrees to pay for or, if Borrower fails to pay, to reimburse Lender for, any fees and expenses incurred by any Rating Agency in connection with any Rating Agency review of the Loan, the Loan Documents or any transaction contemplated thereby or any consent,

64198337

approval, waiver or confirmation obtained from such Rating Agency pursuant to the terms and conditions of this Security Instrument or any other Loan Document and Lender shall be entitled to require payment of such fees and expenses as a condition precedent to the obtaining of any such consent, approval, waiver or confirmation.

**Section 10.12** **Exhibits Incorporated**. The Exhibits annexed hereto are hereby incorporated herein as a part of this Security Instrument with the same effect as if set forth in the body hereof.

**Section 10.13** **Offsets, Counterclaims and Defenses**. Any assignee of Lender's interest in and to this Security Instrument, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**Section 10.14** **No Joint Venture or Partnership; No Third Party Beneficiaries**. Borrower and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender. Borrower is not relying on Lender's expertise, business acumen or advice in connection with the Property. Nothing herein or therein is intended to create a joint venture, partnership, tenancy in common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender. This Security Instrument and the other Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in this Security Instrument or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein. All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's discretion, Lender deems it advisable or desirable to do so.

**Section 10.15** **Publicity**. All news releases, publicity or advertising by Borrower or its Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents, to Lender, KeyBank or any of their Affiliates shall be subject to the prior written approval of Lender and KeyBank in their discretion.

**Section 10.16** **Waiver of Marshalling of Assets**. To the fullest extent permitted by law, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's partners and others with interests in Borrower, and of the Property, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property for the collection of the Debt without any prior or different resort for collection or of the right of Lender to the payment of the Debt out of the net proceeds of the Property in preference to every other claimant whatsoever.

**Section 10.17** **Waiver of Counterclaim**. Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents.

64198337

**Section 10.18   Conflict; Construction of Documents; Reliance**. In the event of any conflict between the provisions of this Security Instrument and any of the other Loan Documents, the provisions of this Security Instrument shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender. Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies. Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

**Section 10.19   Brokers and Financial Advisors**. Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Security Instrument. Borrower hereby agrees to indemnify, defend and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower or Lender in connection with the transactions contemplated herein. The provisions of this Section 10.19 shall survive the expiration and termination of this Security Instrument and the payment of the Debt.

**Section 10.20   Prior Agreements**. This Security Instrument and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, between Borrower and Lender are superseded by the terms of this Security Instrument and the other Loan Documents.

**Section 10.21   Liability**. If Borrower consists of more than one (1) Person the obligations and liabilities of each Person shall be joint and several. Under no circumstances whatsoever shall Lender have any liability for punitive, special, consequential or incidental damages in connection with, arising out of, or in any way related to or under this Security Instrument or any other Loan Document or in any way related to the transactions contemplated or any relationship established by this Security Instrument or any other Loan Document or any act, omission or event occurring in connection herewith or therewith, and, to the extent not expressly prohibited by applicable laws, Borrower for itself and its Guarantor and indemnitors waives all claims for punitive, special, consequential or incidental damages. Lender shall have no duties or responsibilities except those expressly set forth in this Security Instrument and the other Loan Documents. Neither Lender nor any of its officers, directors, employees or agents shall be liable for any action taken or omitted by them as such hereunder or in connection herewith, unless caused by their gross negligence or willful misconduct. No provision of this Security Instrument shall operate to place any obligation or liability for the control, care, management or repair of the Property upon Lender, nor shall it operate to make Lender responsible or liable for any waste committed on the Property by the tenants or any other Person, or for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, employee or stranger. Nothing herein contained shall be construed as constituting Lender a "mortgagee in possession." This Security Instrument shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

64198337

**Section 10.22   Certain Additional Rights of Lender (VCOC).**  Notwithstanding anything to the contrary contained in this Security Instrument, Lender shall have:

(a)      the right to routinely consult with and advise Borrower's management regarding the significant business activities and business and financial developments of Borrower; provided, however, that such consultations shall not include discussions of environmental compliance programs or disposal of hazardous substances.  Consultation meetings should occur on a regular basis (no less frequently than quarterly) with Lender having the right to call special meetings at any reasonable times and upon reasonable advance notice;

(b)      the right, in accordance with the terms of this Security Instrument, to examine the books and records of Borrower at any reasonable times upon reasonable notice;

(c)      the right, in accordance with the terms of this Security Instrument, including Section 5.1.10 hereof, to receive monthly, quarterly and year-end financial reports, including balance sheets, statements of income, shareholder's equity and cash flow, a management report and schedules of outstanding indebtedness; and

(d)      the right, without restricting any other rights of Lender under this Security Instrument (including any similar right), to approve any acquisition by Borrower of any other significant property (other than personal property required for the day to day operation of the Property).

The rights described above in this Section 10.22 may be exercised by any entity which owns and controls, directly or indirectly, substantially all of the interests in Lender.

**Section 10.23   OFAC.**   Borrower hereby represents, warrants and covenants that neither Borrower nor any Guarantor is (or will be) a person with whom Lender is restricted from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury of the United States of America (including, those Persons named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including, the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and shall not engage in any dealings or transactions or otherwise be associated with such persons.  In addition, Borrower hereby covenants to provide Lender with any additional information that Lender deems necessary from time to time in order to ensure compliance with all applicable laws concerning money laundering and similar activities.

**Section 10.24   Lender's Right to Subordinate.**   Lender may, at its election, subordinate the Lien of this Security Instrument and any or all of Lender's rights, titles or interests hereunder to any lien, leasehold interest, easement, plat, covenant, restriction, dedication, encumbrance or other matter affecting the Property or any part thereof by recording a written declaration of such subordination in the office of the register or recorder of deeds or similar filing officer for the county in which the Land is located.  Without limitation of the foregoing, Lender shall have the right to unilaterally modify any Loan Document to release any lien on any portion of the Property.

**Section 10.25   Release of Property.**  Except as set forth in this Section 10.25, no repayment or prepayment of all or any portion of the Loan shall cause, give rise to a right to require, or otherwise result in, the release of the Lien of this Security Instrument on the Property.  If Borrower has the right to and has elected to prepay in full the Loan (or defease the Loan) in accordance with this Security Instrument and the Note, upon satisfaction of the applicable requirements in the Note and this Security Instrument, as applicable, and this Section 10.25, all of the Property shall be released from the Lien of this Security Instrument.  In addition, Borrower shall provide all other documentation Lender reasonably requires to be

64198337

delivered by Borrower in connection with such release. Borrower shall reimburse Lender for any costs and expenses Lender incurs arising from such release (including reasonable attorneys' fees and expenses) and Borrower shall pay, in connection with such release, to any Servicer, a processing fee in an amount determined by Lender or Servicer in its discretion. Upon full satisfaction of the Obligations (or upon defeasance in full in accordance with the Note), this Security Instrument shall automatically cease and terminate and Lender shall promptly deliver a release of this Security Instrument in accordance with the terms of this Section 10.25.

Section 10.26   **Duplicate Originals; Counterparts**. This Security Instrument may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Security Instrument may be executed in several counterparts, each of which counterpart shall be deemed an original instrument and all of which together shall constitute a single Agreement. The failure of any party hereto to execute this Security Instrument, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

Section 10.27   **Matters Concerning Manager**. If (a) an Event of Default hereunder has occurred and remains uncured, (b) Manager shall become subject to a Bankruptcy Action, (c) a default occurs under the Management Agreement, or (d) a DSCR Trigger Event occurs, Borrower shall, at the request of Lender, terminate the Management Agreement and replace the Manager with a Qualified Manager pursuant to a Replacement Management Agreement.

## ARTICLE XI – DEED OF TRUST PROVISIONS

Section 11.1   **Concerning the Trustee**. Trustee shall be under no duty to take any action hereunder except as expressly required hereunder or by law, or to perform any act which would involve Trustee in any expense or liability or to institute or defend any suit in respect hereof, unless properly indemnified to Trustee's reasonable satisfaction. Trustee, by acceptance of this Security Instrument, covenants to perform and fulfill the trusts herein created, being liable, however, only for gross negligence or willful misconduct, and hereby waives any statutory fee and agrees to accept reasonable compensation, in lieu thereof, for any services rendered by Trustee in accordance with the terms hereof. Trustee may resign at any time upon giving thirty (30) days' notice to Borrower and to Lender. Lender may remove Trustee at any time or from time to time and select a successor trustee. In the event of the death, removal, resignation, refusal to act, or inability to act of Trustee, or in its discretion for any reason whatsoever Lender may, without notice and without specifying any reason therefor and without applying to any court, select and appoint a successor trustee, by an instrument recorded wherever this Security Instrument is recorded and all powers, rights, duties and authority of Trustee, as aforesaid, shall thereupon become vested in such successor. Such substitute trustee shall not be required to give bond for the faithful performance of the duties of Trustee hereunder unless required by Lender. The procedure provided for in this paragraph for substitution of Trustee shall be in addition to and not in exclusion of any other provisions for substitution, by law or otherwise.

Section 11.2   **Trustee's Fees**. Borrower shall pay all reasonable costs, fees and expenses incurred by Trustee and Trustee's agents and counsel in connection with the performance by Trustee of Trustee's duties hereunder and all such costs, fees and expenses shall be secured by this Security Instrument.

Section 11.3   **Certain Rights**. With the approval of Lender, Trustee shall have the right to take any and all of the following actions: (a) to select, employ, and advise with counsel (who may be, but need not be, counsel for Lender) upon any matters arising hereunder, including the preparation, execution, and interpretation of the Note, this Security Instrument or the other Loan Documents, and shall be fully protected in relying as to legal matters on the advice of counsel, (b) to execute any of the trusts and

powers hereof and to perform any duty hereunder either directly or through his/her agents or attorneys, (c) to select and employ, in and about the execution of his/her duties hereunder, suitable accountants, engineers and other experts, agents and attorneys-in-fact, either corporate or individual, not regularly in the employ of Trustee, and Trustee shall not be answerable for any act, default, negligence, or misconduct of any such accountant, engineer or other expert, agent or attorney-in-fact, if selected with reasonable care, or for any error of judgment or act done by Trustee in good faith, or be otherwise responsible or accountable under any circumstances whatsoever, except for Trustee's gross negligence or bad faith and (d) any and all other lawful action as Lender may instruct Trustee to take to protect or enforce Lender's rights hereunder. Trustee shall not be personally liable in case of entry by Trustee, or anyone entering by virtue of the powers herein granted to Trustee, upon the Property for debts contracted for or liability or damages incurred in the management or operation of the Property. Trustee shall have the right to rely on any instrument, document, or signature authorizing or supporting an action taken or proposed to be taken by Trustee hereunder, believed by Trustee in good faith to be genuine. Trustee shall be entitled to reimbursement for actual expenses incurred by Trustee in the performance of Trustee's duties hereunder and to reasonable compensation for such of Trustee's services hereunder as shall be rendered.

**Section 11.4     Retention of Money**.  All moneys received by Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by applicable law) and Trustee shall be under no liability for interest on any moneys received by Trustee hereunder.

**Section 11.5     Perfection of Appointment**.  Should any deed, conveyance, or instrument of any nature be required from Borrower by any Trustee or substitute trustee to more fully and certainly vest in and confirm to the Trustee or substitute trustee such estates rights, powers, and duties, then, upon request by the Trustee or substitute trustee, any and all such deeds, conveyances and instruments shall be made, executed, acknowledged, and delivered and shall be caused to be recorded and/or filed by Borrower.

**Section 11.6     Succession Instruments**.  Any substitute trustee appointed pursuant to any of the provisions hereof shall, without any further act, deed, or conveyance, become vested with all the estates, properties, rights, powers, and trusts of its or his/her predecessor in the rights hereunder with like effect as if originally named as Trustee herein; but nevertheless, upon the written request of Lender or of the substitute trustee, the Trustee ceasing to act shall execute and deliver any instrument transferring to such substitute trustee, upon the trusts herein expressed, all the estates, properties, rights, powers, and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and moneys held by such Trustee to the substitute trustee so appointed in the Trustee's place.

## ARTICLE XII – LOCAL LAW PROVISIONS

**Section 12.1     Inconsistencies**.  In the event of any inconsistencies between the terms and conditions of this Article XII and the other provisions of this Security Instrument, the terms and conditions of this Article XII shall control and be binding.

**Section 12.2     Fixture Filing**. This Security Instrument constitutes a financing statement under N.C. Gen Stat. § 25-9-502, covers goods that are or are to become fixtures, and is to be filed for record in the real property records of the county in which the Land is located. This Security Instrument shall operate as a fixture filing. For the purposes of complying with N.C. Gen Stat. § 25-9-502: (i) the name of the debtor is set forth in the initial paragraph of this Security Instrument (Borrower under this Security Instrument); (ii) the mailing address of Borrower, as debtor, is set forth in the first paragraph of this Security Instrument; (iii) Borrower, as debtor, is a limited liability company, and Borrower's jurisdiction of organization is North Carolina; (iv) the name of the secured party is set forth in the initial paragraph of this Security Instrument (Lender under this Security Instrument); (v) the address of the secured party is

64198337

set forth in the initial paragraph of this Security Instrument; and (vi) the collateral covered hereby is described in the granting clauses of this Security Instrument and is or includes goods that are, or are to become, fixtures.

Section 12.3    **Maturity Date**. The maturity date of the Note is September 1, 2028.

Section 12.4    **Foreclosure**. Without limiting Lender's other rights as set forth in Article VI, upon the occurrence and during the continuance of any Event of Default, Lender may notify Trustee to exercise the power of sale granted hereunder and upon such notification it shall be lawful for and the duty of Trustee, and Trustee is hereby authorized and empowered to expose to sale and to sell the Property or any part thereof at public sale to the highest bidder for cash, in compliance with applicable requirements of North Carolina law governing the exercise of powers of sale contained in deeds of trust and upon such sale, Trustee shall collect the purchase proceeds and convey title to the portion of the Property so sold to the purchaser in fee simple.

Section 12.5    **Future Advances**. This Security Instrument is given wholly or partly to secure (i) all present and future advances and re-advances, if any, made or to be made to Borrower by Lender related to the Note, and (ii) all present or future obligations of Borrower to Lender. The amount of the present obligations secured by this Security Instrument is $4,150,000.00, and the maximum principal amount, including present and future obligations and advances, which may be secured by this Instrument at any one time is $8,300,000.00. Future obligations may be incurred and future advances may be made at any time within thirty (30) years of the date of this Security Instrument, and such advances shall be secured to the same extent as if made on the date of this Security Instrument. If Lender reserves the right to make future advances in excess of the face amount of the Note, it is not an indication that Lender intends to make such future advances. Any additional amounts advanced by Lender pursuant to the provisions of this Security Instrument shall be deemed necessary expenditures for the preservation and protection of the security. Each future advance made to or obligation incurred by Borrower need not be evidenced by a written instrument or notation signed by Lender or Borrower or any other party stipulating that such advance is secured by this Security Agreement. All future advances and obligations shall be considered to be made and secured pursuant to the requirements of North Carolina General Statutes Section 45-67, et seq..

Section 12.6    **Attorney's Fees**.    Borrower's obligation to pay attorneys' fees incurred by Lender hereunder shall not exceed the fees computed based upon normal hourly billing rates and without any statutory presumption.

Section 12.7    **Trustee's Commission**. For the avoidance of doubt, the costs and expenses to be paid by Borrower to Trustee pursuant to Section 11.2 shall include reasonable attorney fees incurred by Trustee and it's agents and counsel. In addition, Trustee shall be entitled to a Trustee's commission which shall be reasonable but shall not exceed five percent (5%) of the gross proceeds of the sale for a completed foreclosure. In the event foreclosure is commenced but not completed, Borrower shall pay all expense incurred by Trustee, including reasonable attorney's fees, and a reasonable partial commission not exceeding five percent (5%) of the outstanding indebtedness in accordance with the following schedule: one fourth (1/4th) thereof before Trustee issues a notice of hearing on the right to foreclose; one half (½) thereof after issuance of said notice; three fourths (3/4ths) thereof after such hearing; and the full commission after the initial sale.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

64198337

Filed 09/19/22     Case 22-22056     Doc 20

IN WITNESS WHEREOF, the undersigned has affixed its signature and seal as of the day and year first above written, by authority duly given, and delivers this Security Instrument, intending to be legally bound hereby.

**BORROWER**:

**MURCHISON GROUP, LLC,**
a North Carolina limited liability company (SEAL)

By: _____ (SEAL)
Name:   Christopher Michael Camann
Title:    Authorized Signatory

[ACKNOWLEDGEMENT ON FOLLOWING PAGE]

SIGNATURE PAGE TO DEED OF TRUST

64198337

84

**Attached and made part of:** <u>Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing</u>

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

STATE OF CALIFORNIA　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　) SS.
COUNTY OF _Shasta_　　　　　　　　　)

On ~~July~~ _August 1, 2018_, ~~, 2018~~, before me, _D. Quintana_____, a Notary Public, personally appeared <u>Christopher Michael Camann</u> who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature



Place Notary Seal Above　　　　　Signature of Notary Public　　　　　(SEAL)

D. QUINTANA
Commission # 2118748
Notary Public - California
Shasta County
My Comm. Expires Aug 5, 2019

ACKNOWLEDGEMENT PAGE TO DEED OF TRUST

64198337

85

IN WITNESS WHEREOF, the undersigned has affixed its signature and seal as of the day and year first above written, by authority duly given, and delivers this Security Instrument, intending to be legally bound hereby.

LENDER:

KEYBANK NATIONAL ASSOCIATION,
a national banking association (SEAL)

By: *Cynthia M Milioto* _____ (SEAL)
Cynthia M. Milioto, Assistant Vice President

STATE OF ~~KANSAS~~ Arizona    )
    ) ss.
COUNTY OF ~~JOHNSON~~ Maricopa    )

    On this _24th_ day of July, 2018, before me, the undersigned notary public, personally appeared Cynthia M. Milioto, the Assistant Vice President of **KEYBANK NATIONAL ASSOCIATION**, a national banking association, known to me to be the person who executed the document on behalf of **KEYBANK NATIONAL ASSOCIATION**, a national banking association, and acknowledged to me that s/he executed the same for the purposes therein stated.



_____
Notary Public in and for Said County and State

_____
(Type, print or stamp the Notary's name below his or her signature)

SARAH MCKAY
Notary Public - State of Arizona
MARICOPA COUNTY
My Commission Expires
April 14, 2022

My Commission Expires:

_4/14/22_ _____

SIGNATURE PAGE TO DEED OF TRUST

64198337

86

# EXHIBIT A

## (LEGAL DESCRIPTION)

Beginning at the intersection of the northern line of Chestnut Street with the western line of Front Street; running thence from said beginning point South 87 degrees 27 minutes West along the northern line of Chestnut Street 161.91 feet; running thence northwardly and parallel with Front Street North 2 degrees 33 minutes West 123.25 feet; running thence eastwardly and parallel with Chestnut Street North 87 degrees 27 minutes East 14.25 feet; running thence northwardly and parallel with Front Street North 2 degrees 33 minutes West 8.58 feet; running thence eastwardly and parallel with Chestnut Street North 87 degrees 27 minutes East 3.67 feet; running thence northwardly and parallel with Front Street North 2 degrees 33 minutes West 1.0 feet; running thence eastwardly and parallel with Chestnut Street North 87 degrees 27 minutes East 29.0 feet; running thence southwardly and parallel with Front Street South 2 degrees 33 minutes East 52.12 feet; running thence eastwardly and parallel with Chestnut Street North 87 degrees 27 minutes East 115.0 feet to a point in the western line of Front Street; running thence South 2 degrees 33 minutes East along the Western line of Front Street 80.8 feet to the point of beginning; same being part of Lot 4, 5 and 6, in Block 190, according to the official plan of the City of Wilmington, N.C.

ALSO DESCRIBED AS:

Beginning at the intersection of the northern right of way of Chestnut Street with the western right of way of Front Street: proceed from said point of beginning 87-27-00 W along the northern right of way of chestnut street 161.91 FT, thence northwardly and parallel with Front Street N 02-33-00 W 123.28 FT., thence eastwardly and parallel with Chestnut Street N 87-27-00 E 14.25 FT., thence northwardly and parallel with Front Street N 02-33-00 W. 8.58 FT., thence eastwardly and parallel with Chestnut Street N 87-27-00 E. 3.67 FT., thence northwardly and parallel with Front Street N 02-33-00 W 1.00 Ft., thence eastwardly and parallel with Chestnut Street N 87-27-00 E 29.00 Ft., thence southwardly and parallel Front Street S 02-33-00 E 52.12 FT., thence eastwardly and parallel with Chestnut Street N 87-27-00 E 115.00 FT., thence to a point on the western right of way of Front Street thence with the western right of way of Front Street S 02-33-00 E 80.80 FT. to the point of beginning.

Together with a right-of-way or easement in common with the owners of the lot next adjoining on the west, over and along a strip of land described as follows:

Beginning at a point in the northern line of Chestnut Street 161 feet 11 inches westwardly from the intersection of the northern line of Chestnut Street with the western line of Front Street, and running thence northwardly and parallel with Front Street 123 feet 3 inches; thence westwardly and parallel with Chestnut Street 7 feet; thence southwardly and parallel with Front Street 123 feet 3 inches to the northern line of Chestnut Street; thence eastwardly along the northern line of Chestnut Street 7 feet to the beginning.

64198337

87

EXHIBIT B

(RENT ROLL)

64198337

**MURCHISON BUILDING - RENT ROLL - JULY 1, 2018**

| Tenant | Suite | Occ SF | Vacant SF | Initial Occupancy Date | Lease Type | Lease Start | Lease Expire | Monthly Base Rent | Annual Base Rent | Annualized Rent/sf/yr | Option/Early Term Rights | Deposit | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| | |
|---|---|
| Total Vacant Space | 7,861 |
| Vacant (Feet) | 13,724 |
| G-104 | 1,324 |
| M-108 | 2,242 |
| Bldg | 202% |
| Floors 9, 10 | |

| | |
|---|---|
| Gross Leasable Area (SF) | 54,513 |
| Occupancy | 83.9% |
| Current Annualized Rental Income | $914,951.72 |
| Market Rent - Vacant Space | $270,060.00 |
| Gross Potential Rent | $1,185,069.72 |
| Occupied (%) | 85.9% |
| Available (%) | 9.4% |

**EXHIBIT C**

**(REQUIRED REPAIRS - DEADLINES FOR COMPLETION)**

| Item | Immediate Cost | Repair Deadline for Completion |
|---|---|---|
| Repair damaged interior walls | $5,000.00 | 6 months from the Closing Date. |
| Scrape and paint metal stairs | $15,000.00 | 6 months from the Closing Date. |
| Scrape and paint/repair metal guardrail | $1,500.00 | 6 months from the Closing Date. |
| Brick tuck pointing | $50,000.00 | 6 months from the Closing Date. |
| Repair damaged balcony | $2,500.00 | 6 months from the Closing Date. |
| Replaced rotted wood window framing | $3,500.00 | 6 months from the Closing Date. |
| Provide elevator certificate | n/a | 6 months from the Closing Date. |
| **Required Repairs Reserve Deposit = $77,500.00** | | |

64198337

Filed 09/19/22 Doc 20

## EXHIBIT D

### (ORGANIZATIONAL CHART OF BORROWER)



64198337

**EXHIBIT E**

**FORM OF DISBURSEMENT CERTIFICATION AND SCHEDULE**

Loan No. <u>10190286</u>

**Disbursement Certification and Schedule**

The undersigned ("**Affiant**") does hereby certify and affirm the following to _____ ("**Lender**") to induce Lender to disburse (the "**Disbursement**") the aggregate sum of $_____ from the [CHOOSE AS APPLICABLE: Required Repairs Account, Replacement Reserve Account, Monthly Rollover Reserve Account, Pour Taproom Rollover Reserve Account] pursuant to the terms of Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing ("**Security Instrument**") originally entered into between Murchison Group, LLC ("**Borrower**") and KeyBank National Association [(predecessor to Lender)] dated August 20, 2018. Any capitalized terms used herein and not otherwise defined herein shall have the meaning set forth in the Security Instrument.

1.  Affiant is the _____ of Borrower, has actual knowledge as to the matters herein set forth and makes this Certification pursuant to Section _____ of the Security Instrument.

2.  No Default or Event of Default exists under any of the Loan Documents.

3.  All of the statements, information, costs and amounts set forth herein or on <u>Exhibit A</u> attached hereto are true and correct in every material respect as of the date hereof. All of the Disbursement funds shall be used solely for the purposes of paying the costs of the [CHOOSE AS APPLICABLE: Required Repairs, Replacements, Rollover Obligations, Pour Taproom Rollover Obligations] specified herein, or for reimbursing Borrower for such costs previously paid by Borrower.

4.  All [CHOOSE AS APPLICABLE: Required Repairs, Replacements, Rollover Obligations, Pour Taproom Rollover Obligations] to be funded by the requested Disbursement have been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, have not been the subject of a previous Disbursement, and that all outstanding payables with respect thereto (other than those to be paid from the requested Disbursement) have been paid in full.

5.  Attached hereto as <u>Exhibit A</u> is a schedule of each contractor, subcontractor, materialman and/or person (each, a "**Payee**") to be paid (or for which Borrower is to be reimbursed for amounts previously paid by it to such Payee) from the proceeds of the Disbursement, the aggregate amount then payable to each such Payee, a description of the goods, work or services provided by each such Payee and related invoice numbers to be paid from the Disbursement.

6.  Each Payee has been paid, or will be paid with the proceeds of the Disbursement, the amounts then due and payable to such Payee in connection with the goods, work or services specified on <u>Exhibit A</u> provided by each such Payee, and Borrower has obtained lien waivers from each such Payee with respect to such specified goods, work or services.

7.  Each previous disbursement of [CHOOSE AS APPLICABLE: Required Repairs Funds, Replacement Reserve Funds, Monthly Rollover Reserve Funds, Pour Taproom Rollover Reserve Funds] was used to pay the costs of the [CHOOSE AS APPLICABLE: Required Repairs, Replacements, Rollover Obligations, Pour Taproom Rollover Obligations] identified in the Disbursement Certification and Schedule provided in connection with such previous disbursement.

64198337

Date: _____

[TO BE EXECUTED BY AN AUTHORIZED OFFICER, GENERAL PARTNER, MANAGING MEMBER OR SOLE MEMBER OF BORROWER, AS APPLICABLE]

# EXHIBIT 3



062S0009470862

$1.050
US POSTAGE
FIRST-CLASS
FROM 96001
SEP 06 2022
stamps
endicia

062S0009470862

$0.570
US POSTAGE
FIRST-CLASS
FROM 96001
SEP 06 2022
stamps
endicia

Mr. Charles L. Hastings
PMB 270
4719 Quail Lakes Drive, Suite G
Stockton, CA  95207

cia Wilson
gins & Wilson Bankruptcy Law
Redcliff Drive, Suite 100
ling, CA  96002

EXHIBIT 4

1  TIMOTHY T. HUBER (SBN 99800)
   LAW OFFICES OF TIMOTHY T. HUBER
2  1020 Suncast Lane, Suite 101
   El Dorado Hills, California 95762
3  Telephone: 916-358-8830
   Facsimile: 916-404-5705
4
   PETER P. VLAUTIN, III (SBN 54733)
5  LAW OFFICES OF PETER P. VLAUTIN
   1020 Suncast Lane, Suite 101
6  El Dorado Hills, California 95762
   Telephone: 916-365-9734
7  Facsimile: 888-755-1658
8
   Attorneys for Judgment Creditor
9  Integrated Consulting & Management, LLC

**F I L E D**

NOV 3 0 2017

CLERK OF THE SUPERIOR COURT
BY: G. HOYT, DEPUTY CLERK

10        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

11              IN AND FOR THE COUNTY OF SHASTA

12                   1500 COURT ST. RM. 319

13                     REDDING, CA 96001

14

15

16

17  MARSHAL MELTON, WEST BAY          Case No.    **1 8 8 8 0 9**
    PARTNERS, LLC, INVESTMENT
18  PARTNERS FUND I, LLC, and         **Unlimited Jurisdiction**
    INTEGRATED CONSULTING &
19  MANAGEMENT, LLC,                  JUDGMENT
                                      (SISTER-STATE JUDGMENT-CCP §
20        Plaintiffs,                 1710.25)

21            vs.

22  BHB OF GEORGIA, LLC, ASSET
    MANAGEMENT PLUS, LLC, BULK HOME
23  BUYERS, LLC, LEGACY PARTNERS 314,
    LLC, DRC PROPERTIES, LLC, and DAVID
24  R. MICHAL,

25        Defendants.

26
27  In this case, an application has been filed for entry of judgment based upon judgment entered in

28  the State of North Carolina.

BY FAX

Pursuant to section 1710.25, Code of Civil Procedure, Judgment is hereby entered in favor of plaintiff/judgment creditor Integrated Consulting & Management, LLC, against defendant/judgment debtor David R. Michal, for the amount shown in the application remaining unpaid under the Sister-State Judgment in the sum of $3,400,000.00 together with interest on this judgment is the sum of $0.00, filing fees in the sum of $435.00, for a total judgment of $3,400,435. Judgment filed and entered on ___NOV 3 0 2017___.

_____

Deputy Clerk

___NOV 3 0 2017___

Date

1   TIMOTHY T. HUBER (SBN 99800)
    LAW OFFICES OF TIMOTHY T. HUBER
2   1020 Suncast Lane, Suite 101
    El Dorado Hills, California 95762
3   Telephone: 916-358-8830
    Facsimile: 916-404-5705
4
    PETER P. VLAUTIN, III (SBN 54733)
5   LAW OFFICES OF PETER P. VLAUTIN
    1020 Suncast Lane, Suite 101
6   El Dorado Hills, California 95762
    Telephone: 916-365-9734
7   Facsimile: 888-755-1658
8
    Attorneys for Judgment Creditor
9   Integrated Consulting & Management, LLC

**FILED**

**NOV 3 0 2017**

CLERK OF THE SUPERIOR COURT
BY: G. HOYT, DEPUTY CLERK

10          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

11              IN AND FOR THE COUNTY OF SHASTA

12

13

14                                          Case No.   **1 8 8 8 0 9**

15   MARSHAL MELTON, WEST BAY            **Unlimited Jurisdiction**
     PARTNERS, LLC, INVESTMENT
16   PARTNERS FUND I, LLC, and          APPLICATION FOR ENTRY OF
     INTEGRATED CONSULTING &            JUDGMENT ON SISTER-STATE
17   MANAGEMENT, LLC,                   JUDGMENT

18          Plaintiffs,

19              vs.

20   BHB OF GEORGIA, LLC, ASSET
     MANAGEMENT PLUS, LLC, BULK HOME
21   BUYERS, LLC, LEGACY PARTNERS 314,
     LLC, DRC PROPERTIES, LLC, and DAVID
22   R. MICHAL,

23          Defendants.

24

25

26

27

28

---

MELTON et al v. BHB of Georgia, et. al          1
[Case No. _____]

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and Address)*: | TELEPHONE NO.: | FOR COURT USE ONLY |
|---|---|---|

ATTORNEY OR, PARTY WITHOUT ATTORNEY *(Name and Address)*:
Timothy T. Huber                    TELEPHONE NO.: (916) 358-8830
Law Offices of Timothy T. Huber
1020 SUNCAST LN., STE. 101
El Dorado Hills, CA 95762

ATTORNEY FOR *(Name)*:

NAME OF COURT: Shasta County Superior Court
STREET ADDRESS: 1500 Court St Room 319
MAILING ADDRESS:
CITY AND ZIP CODE: Redding CA 96001
BRANCH NAME:

PLAINTIFF: Marshal Melton, et. al.

DEFENDANT: BHB of Georgia, LLC, et. al.

CASE NUMBER:

**APPLICATION FOR ENTRY OF JUDGMENT ON SISTER-STATE JUDGMENT**
☐ **AND ISSUANCE OF WRIT OF EXECUTION OR OTHER ENFORCEMENT**
☐ **AND ORDER FOR ISSUANCE OF WRIT OR OTHER ENFORCEMENT**

Judgment creditor applies for entry of a judgment based upon a sister-state judgment as follows:

1. Judgment creditor *(name and address)*:
Integrated Consulting & Management, LLC
3300 Battleground Ave. Suite 430
Greensboro, NC 27410

2. a. Judgment debtor *(name)*:
David R. Michal
   b. ☒ An individual *(last known residence address)*:
      263 Ironwood Lane, Redding, CA 96003
   c. ☐ A corporation of *(specify place of incorporation)*:

     (1) ☐ Foreign corporation
              ☐ qualified to do business in California
              ☐ not qualified to do business in California

   d. ☐ A partnership *(specify principal place of business)*:

     (1) ☐ Foreign partnership which
              ☐ has filed a statement under Corp C 15700
              ☐ has not filed a statement under Corp C 15700

3. a. Sister state *(name)*: North Carolina

   b. Sister-state court *(name and location)*: General Court of Justice, Superior
                                  Court Division, Guilford County, N.C.
   c. Judgment entered in sister state on *(date)*: Feb. 10, 2017

4. **An authenticated copy of the sister-state judgment is attached to this application.** Include accrued interest on the sister-state judgment in the California judgment (item 5c).
   a. Annual interest rate allowed by sister state *(specify)*:  8%

   b. Law of sister state establishing interest rate *(specify)*:  North Carolina General Statutes sec. 24-1

5. a. Amount remaining unpaid on sister-state judgment: ........................ $  3,400,000
   b. Amount of filing fee for the application: ...................................... $  435
   c. Accrued interest on sister-state judgment: ................................ $  0
   d. Amount of judgment to be entered *(total of 5a, b, and c)*: ........... $  3,400,435

*(Continued on reverse)*

Form Approved by the
Judicial Council of California
EJ-105 [Rev. July 1, 1983]
Optional Form

CEB® Essential Forms
ceb.com

**APPLICATION FOR ENTRY OF JUDGMENT ON
SISTER-STATE JUDGMENT**

CCP 1710.15
1710.20

David Michal

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Melton v. Michal | |

6. ☐ Judgment creditor also applies for issuance of a writ of execution or enforcement by other means before service of notice of entry of judgment as follows:

  a. ☐ Under CCP 1710.45(b).

  b. ☐ A court order is requested under CCP 1710.45(c). Facts showing that great or irreparable injury will result to judgment creditor if issuance of the writ or enforcement by other means is delayed are set forth as follows:

☐ continued in attachment 6b.

7. An action in this state on the sister-state judgment is not barred by the statute of limitations.

8. I am informed and believe that no stay of enforcement of the sister-state judgment is now in effect in the sister state.

9. No action is pending and no judgment has previously been entered in any proceeding in California based upon the sister-state judgment.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct except as to those matters which are stated to be upon information and belief, and as to those matters I believe them to be true.

Date: November 10, 2017

Timothy T. Huber
    *(TYPE OR PRINT NAME)*

▶ _____
    *(SIGNATURE OF JUDGMENT CREDITOR OR ATTORNEY)*

EJ-105 [Rev. July 1, 1983]

CEB® **Essential** Forms®
ceb.com

**APPLICATION FOR ENTRY OF JUDGMENT ON SISTER-STATE JUDGMENT**
David Michal

Page two

**STATE OF NORTH CAROLINA**

In The General Court Of Justice

_____Guilford_____ County

**EXEMPLIFICATION**

U.S. Code Title 28-1738

As Clerk of the Superior Court of this County, State of North Carolina, I certify that the attached copies of the documents described below are true and accurate copies of the originals now on file in this office.

*Number And Description Of Attached Documents*

The following is an exemplified copy of the summary judgment for case number 16CVS7519. (Contains 1 page)

| | |
|---|---|
| Date | 10-03-2017 |
| Signature | |
| Name (Type Or Print) | Zachary Champion |
| ☒ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

As a Judge of the General Court of Justice, State of North Carolina, I certify that the signature appearing above is that of the Clerk, Assistant Clerk, or Deputy Clerk of Superior Court for this County, who is duly sworn. I further certify that the seal affixed to the certificate appearing above is the seal of this Court and that it has been used here in good form by the proper officer.

| | |
|---|---|
| Date | 10-4-17 |
| Signature Of Judge | |
| Name Of Judge (Type Or Print) | Cutchin |

As Clerk of the Superior Court of this County, State of North Carolina, I certify that the signature appearing above is that of a duly sworn Judge of the General Court of Justice, State of North Carolina.

| | |
|---|---|
| Date | 10-03-2017 / 10.4.17 |
| Signature | |
| Name Of Clerk (Type Or Print) | Teresa Blake |
| ☒ Assistant CSC ☐ Clerk Of Superior Court | |

AOC-G-102, Rev. 4/97
© 1997 Administrative Office of the Courts

NORTH CAROLINA

GUILFORD COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 7519

MARSHAL MELTON, WEST BAYRD
PARTNERS, LLC, INVESTMENT
PROPERTY PARTNERS FUND I, LLC,
and INTEGRATED CONSULTING &
MANAGEMENT, LLC,

        Plaintiffs,

v.

BHB OF GEORGIA, LLC, ASSET
MANAGEMENT PLUS, LLC, BULK
HOME BUYERS, LLC, LEGACY
PARTNERS 314, LLC, DRC
PROPERTIES, LLC, and DAVID R.
MICHAL,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER**

   . THIS MATTER COMING ON FOR HEARING before the undersigned Judge Presiding at the February 8, 2017 Civil Session of the General Court of Justice of Guilford County, Superior Court Division, upon Plaintiffs' motion for summary judgment duly made pursuant to Rule 56 of the North Carolina Rules of Civil Procedure; AND THE COURT HAVING CONSIDERED the motion, the pleadings on file, the Affidavit of Nicholas Bakatsias, and the arguments and submissions of counsel; AND THE COURT BEING OF THE OPINION that the motion should be allowed;

   NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED as follows:

   1.    Plaintiffs' motion for summary judgment made pursuant to Rule 56 of the North Carolina Rules of Civil Procedure should be, and the same is hereby allowed.

   2.    Plaintiffs shall have and recover of Defendants David R. Michal and BHB of Georgia, LLC the principal balance owed of $3,400,000.00, plus interest at the legal rate until paid, plus the costs of this action which shall be taxed against the Defendants David R. Michal and BHB of Georgia, LLC.

   This the 10th day of February, 2017.

                                _____
                                The Honorable R. Stuart Albright
                                Superior Court Judge Presiding